# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**INNOVATION VENTURES, LLC d/b/a**
**LIVING ESSENTIALS,**

*Plaintiff, Counter-Defendant,*

vs.

**N.V.E., INC.,**

*Defendant, Counter-Plaintiff.*

Case No. 2:08-cv-11867

HONORABLE LAWRENCE P. ZATKOFF
Magistrate Judge DONALD A. SCHEER

## DEFENDANT N.V.E.'S MOTION FOR SUMMARY JUDGMENT
## OF NO TRADEMARK INFRINGEMENT
## UNDER SECTION 43(a) OF THE LANHAM ACT

Pursuant to Fed. R. Civ. P. 56, Defendant/Counter-Plaintiff N.V.E., Inc. ("NVE") hereby moves for summary judgment on Count II of the Complaint --Plaintiff's only remaining claim in this action -- of Plaintiff/Counter-Defendant Innovation Ventures, LLC ("Living Essentials") under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  There is no genuine issue of material dispute that:

1)      Living Essentials has not established that it used its alleged common law trademark in the term "5-hour ENERGY" in any geographic location before NVE began using its "Stacker 2® 6 HOUR POWER" product name;

2)      Living Essentials did not own any trademark rights at the time that NVE began marketing its 2-ounce energy shots in March 2006;

3)      Living Essentials' alleged trademark rights are not valid or protectable where "5-hour ENERGY" is highly descriptive in nature and did not possess secondary meaning before March 2006 when NVE began marketing its product; and

4)      No likelihood of confusion exists as a matter of law between the mark "5-hour ENERGY" and NVE's product name of STACKER 2® 6 Hour POWER.

Pursuant to Local Rule 7.1, Counsel for NVE spoke with Counsel for Living Essentials on December 22, 2009, to seek concurrence for this Motion.  Such concurrence was not received which necessitated the bringing this Motion.

.

## **STATEMENT OF THE ISSUES**

1)      Should the Court enter summary judgment of no trademark infringement under the Lanham Act where Living Essentials has provided no evidence that it used the common law trademark in any geographic area before NVE began using the accused STACKER 2® 6 Hour POWER mark?

<u>Answer</u>:  Yes, the Court should enter summary judgment in favor of NVE of no trademark

infringement under the Lanham Act based on a lack of prior use.

2)      Should the Court enter summary judgment of no trademark infringement under the Lanham Act where the undisputed evidence demonstrates that Living Essentials never owned and still does not own any trademark rights in the term "5-hour ENERGY" because Living Essentials was and is only a non-exclusive licensee of those rights?

<u>Answer</u>:  Yes, the Court should enter summary judgment in favor of NVE of no trademark

infringement under the Lanham Act based on a lack of ownership.

3)      Should the Court enter summary judgment of no trademark infringement under the Lanham Act where the undisputed evidence demonstrates that the term "5-hour ENERGY" is highly descriptive in nature based upon Living Essentials' own admissions, and by findings of the Eastern District of Michigan and the Patent and Trademark Office, and where Living Essentials has offered no probative evidence that the term had any secondary meaning prior to March 2006 when NVE began marketing its product?

<u>Answer</u>:  Yes, the Court should enter summary judgment in favor of NVE of no trademark

infringement under the Lanham Act, based on a lack of a valid and protectable trademark.

4)     Should the Court enter summary judgment of no trademark infringement under the Lanham Act where the undisputed evidence demonstrates that no likelihood of confusion exists between the very weak mark "5-hour ENERGY" and the highly dissimilar NVE product name of STACKER 2® 6 Hour POWER as a matter of law, taking into account all of the relevant *Frisch* factors in a light most favorable to the non-movant?

<u>Answer</u>:  Yes, the Court should enter summary judgment in favor of NVE of no trademark infringement under the Lanham Act, based on a lack of likelihood of confusion.

**TABLE OF CONTENTS**

STATEMENT OF THE ISSUES ...................................................................... iii

TABLE OF CONTENTS ............................................................................... v

TABLE OF AUTHORITIES ......................................................................... vii

I.  INTRODUCTION ............................................................................ 1

II.  FACTS  ....................................................................................... 2

    A.  NVE Began Selling Dietary Supplements and Energy Products in 1980 ........... 2

    B.  Energy Shots are a Natural Extension of NVE's Energy Products Business .... 3

    C.  Living Essentials Has Not Established First Use In Any Geographic Area ...... 3

    D.  Living Essentials Does Not Own The Asserted 5 Hour Energy Mark .............. 4

    E.  Living Essentials Sued NVE As Part of its Trademark Litigation Campaign .... 6

    F.  Living Essentials Chose the Highly Descriptive Name "5-hour Energy" ........ 6

III.  ARGUMENT .................................................................................. 8

    A.  Summary Judgment Standard ........................................................... 8

    B.  Trademark Infringement Under the Lanham Act .............................. 8

    C.  Undisputed Evidence Supports Entry of Summary Judgment for NVE ............ 9

        1.  Living Essentials Cannot Prove Senior Use of the Alleged Trademark ........ 9

        2.  Living Essentials Does Not Own The 5-hour Energy Mark ...................... 10

            a.  Bio Clinical Is Clearly the Owner of the Intellectual Property ........ 10

            b.  The *Nunc Pro Tunc* Agreement Is a Sham ..................................... 11

        3.  5-hour ENERGY was Not a Valid, Protectable Trademark in March 2006 When NVE Began Selling STACKER 2® 6 Hour POWER ......................... 12

            a.  5-hour ENERGY is Highly Descriptive of its Energy Shots .......... 12

b. Living Essentials Has No Evidence Showing Any Secondary Meaning Prior to March 2006..........................................................14

4. No Likelihood of Confusion Exists as a Matter of Law between STACKER 2® 6 Hour POWER and 5-hour ENERGY ...........................18

a. The Mark is Descriptive and Weak.................................................18

b. "5-hour ENERGY" and "STACKER 2 6 Hour POWER" are Dissimilar .................................................................................20

c. NVE Selected its Mark Based its own Earlier Use of "Power".......24

d. No Factual Dispute Exists as to the Relatedness of Goods, Market Channels and Degree of Purchaser Care ...........................24

e. Evidence of Actual Confusion is *De Minimis* and Points to a Lack of Likelihood of Confusion...............................................25

f. Evaluation of the Frisch Factors Compels the Legal Conclusion that No Likelihood of Confusion Exists ......................28

IV   CONCLUSION.........................................................................................29

# TABLE OF AUTHORITIES

*All Video, Inc. v. Hollywood Entm't Corp.*
929 F. Supp. 262 (E.D. Mich. 1996)..........................................................................9, 10

*Amstar Corp. v. Domino's Pizza, Inc.*
615 F.2d 252 (5th Cir. 1980) ......................................................................................18

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)........................................................................................................8

*Ashland Oil, Inc. v. Olymco, Inc.*
905 F. Supp. 409 (W.D. Ky. 1994)..............................................................................15

*Ashland Oil, Inc. v. Olymco, Inc.*
1995 U.S. App. LEXIS 24652 (6th Cir. April 21, 1995)............................................19

*AutoZone, Inc. v. Tandy Corp.*
373 F.3d 786 (6th Cir. 2004) ...............................................................................16, 19

*Big Time Worldwide Concert & Sport Club at Town Ctr. v. Marriott Int'l*
236 F. Supp. 2d 791 (E.D. Mich. 2003)......................................................................25

*In re Boston Beer Co.*
198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir. 1999) ....................................................17

*Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*
871 F.2d 590 (6th Cir. 1989) ...............................................................12, 14, 16, 17

*Buscemi's Inc. v. Anthony Buscemi Delicatessen & Party Store*
96 Mich. App. 714 (1980) ..............................................................................................9

*Calvin Klein Co. v. Farah Manuf. Co.*
1985 U.S. Dist. LEXIS 13475 (S.D.N.Y. Nov 26, 1985)............................................16

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)........................................................................................................8

*Citizens Banking Corp. v. Citizens Financial Group, Inc.*
2009 U.S. App. LEXIS 8366 (6th Cir. April 2, 2009)...................................................9

*Cohn v. Petsmart*
281 F.3d 837 (9th Cir. 2002) .......................................................................................21

*Comerica, Inc. v. Fifth Third Bankcorp.*
282 F. Supp. 2d 557 (E.D. Mich. 2003)................................................................18, 22

*Commerce Bancorp, Inc. v. BankAtlantic*
   285 F. Supp. 2d 475 (D.N.J. 2003) ..........................................................9

*Cosmetic Dermatology and Vein Centers, P.C. v. New Faces Skin Care Centers, Ltd.*
   91 F. Supp.2d 1045 (E.D. Mich. 2000).............................................20, 27

*Degidio v. West Group Corp.*
   355 F.3d 506 (6th Cir. 2004) ........................................................13, 17

*ePrize L.L.C. v. Net Prize, Inc.*
   2006 U.S. Dist. LEXIS 89536 (E.D. MI Dec 12, 2006) ............................20

*Frisch's Restaurant v. Elby's Big Boy*
   670 F.2d 642 (6th Cir. 1982) .................................................passim

*Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*
   93 F.3d 774 (Fed. Cir. 1996)........................................................10

*General Motors Corp. v. Lanard Toys Limited*
   468 F.3d 405 (6th Cir. 2006) ........................................................15

*Holiday Inns, Inc. v. Holiday Out in Am.*
   481 F.2d 445 (5th Cir. 1973) ........................................................20

*Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*
   931 F.2d 1100 (6th Cir. 1991) ...........................................16, 18, 19

*Investacorp, Inc. v. Arabian Investment Banking Corp.*
   931 F.2d 1519 (11th Cir. 1991).  ....................................................14

*I.P. Lund Trading ApS v. Kohler Co.*
   118 F. Supp.2d 92 (D. Mass. 2000) ................................................16

*J&J Snack Foods Corp., v. Nestle USA, Inc.*
   149 F. Supp.2d 136 (D.N.J. 2001) ................................................14

*KP Permanent Make-Up, Inc. v. Lasting Impression, Inc.*
   543 U.S. 111 (2004).......................................................................26

*Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.*
   834 F.2d 568 (6th Cir. 1987) ..................................................20, 21

*Litton Systems, Inc. v. Whirlpool Corp.*
   728 F.2d at 1446 (Fed. Cir. 19984).................................................22

*Lucas v. Leaseway Multi Transp. Serv., Inc.*
      738 F. Supp. 214 (E.D. Mich. 1990)..........................................................................8

*Lucas v. Leaseway Multi Transp. Serv., Inc.*
      929 F.2d 701 (6th Cir. 1991) ...................................................................................8

*Marion Laboratories, Inc. v. Michigan Pharmacal Corp.*
      338 F. Supp. 762 (E.D. Mich. 1972)....................................................................2, 15

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
       475 U.S. 574, 587 (1986).......................................................................................8

*In re National Data Corp.*
      753 F.2d 1056 (Fed. Cir. 1985)............................................................................20

*In re Packaging Specialists, Inc.*
      221 USPQ 917 (TTAB 1984) ................................................................................17

*Quaker State Oil Refining Corp. v. Quaker Oil Corp.*
      453 F.2d 1296 (CCPA 1972) .................................................................................12

*Scott Paper Co. v. Scott's Liquid Gold, Inc.*
      589 F.2d 1225 (3rd Cir. 1978) ...............................................................................26

*Spraying Systems Co. v. Delavan, Inc.*
      975 F.2d 387 (7th Cir. 1992) .................................................................................19

*The Sports Authority, Inc. v. Abercrombie & Fitch, Inc.*
      965 F. Supp. 925 (E.D. Mich. 1997).....................................................................20

*Stouffer Corp. v. Winegardner & Hammons, Inc.*
502 F. Supp. 232 (S.D. Ohio 1980) ..........................................................................9

*Therma-Scan, Inc. v. Thermoscan, Inc.*
      295 F. 3d 623 (6th Cir. 2002) .............................................................18, 19, 26, 27

*Trenton Corp. v. Superior Corrosion Control, Inc.*
      2007 U.S. Dist. LEXIS 5800  (E.D. Mich., Jan. 25, 2007)...............................8, 9, 16

*Tri-State Rubber & Equipment, Inc. v. Central States Southeast & Southwest Pension Fund*
      677 F.Supp. 516 (E.D. Mich. 1987)........................................................................12

*Two Pesos, Inc. v. Taco Cabana, Inc.*
      505 U.S. 763 (1992)................................................................................................9

*Universal Money Centers, Inc. v. American Telephone & Telegraph Co.*
      22 F.3d 1527 (10th Cir) ........................................................................................27

*Upjohn Co. v. William S. Merrell Chemical Co.*
        269 F. 209 (6th Cir. 1920) ........................................................................... 14


**STATUTES**

15 U.S.C. § 1125(a)   ........................................................................... ii, 8


**TREATISE**

McCarthy, Trademarks § 15:33 ........................................................................... 14

McCarthy, Trademarks § 11:85 ........................................................................... 25

# I.    INTRODUCTION

Plaintiff/Counter-Defendant Innovation Ventures LLC d/b/a Living Essentials ("Living Essentials") and Defendant/Counter-Plaintiff NVE, Inc. ("NVE") compete in the market for 2-ounce energy shots, and are first and second in sales, respectively.  Living Essentials' claims must be dismissed for several reasons.  Living Essentials does not own the alleged trademark, and has no standing to bring an infringement case against NVE.  Living Essentials has produced no evidence proving use of its alleged trademark in any geographic area before NVE began selling STACKER 2® 6 Hour POWER energy shots.

Living Essentials sells 2-ounce energy shots labeled as "5-hour ENERGY," which term was already found to be merely descriptive and refused protection both by the U.S. Patent and Trademark Office ("USPTO") and the United States District Court for the Eastern District of Michigan. Nevertheless, Living Essentials asserts that its common law use of the descriptive phrase "5-hour Energy" precludes NVE from competing with its energy shots sold under NVE's federally-registered and famous "STACKER 2®" trademark in conjunction with its "6 HOUR POWER" trademark – *i.e.,* NVE's energy shot is always labeled as STACKER 2® 6 Hour POWER.

Numerous other competitors also tout the duration of the energy effect of their products using descriptive words concerning some number of hours of enhanced energy.  Living Essentials has no valid trademark interest that can remove words necessary to describe an energy shot from the lexicon that competitors can use.  Given the inherent weakness of its highly descriptive product name, Living Essentials has a "heavy burden" to show that the term 5-hour ENERGY has acquired secondary meaning, as Judge Borman recently concluded.  Meeting this burden is a threshold requirement to prove any trademark rights at all.

Living Essentials must also prove that its alleged mark acquired secondary meaning before March 2006 when NVE began selling its energy shot. *Marion Laboratories, Inc. v. Michigan Pharmacal Corp.*, 338 F. Supp. 762, 769 (E.D. Mich. 1972). That Living Essentials cannot do – it has offered no probative evidence of the existence of secondary meaning before March 2006. Its limited secondary meaning evidence is too little and too late – 2 and ½ years <u>after</u> NVE entered the market. Its trademark infringement case filed over two years after the products began competing in the market place must be dismissed for that reason alone.

Moreover, Living Essentials also cannot prove a likelihood of confusion between STACKER 2® 6 Hour POWER and its alleged 5-hour ENERGY trademark. The manifest weakness of the descriptive term strictly limits the range of protection. The two terms have highly dissimilar fonts, colors and orientation. The only commonality is the least prominent word "hour." This dissimilarity in product name and presentation occurs in the crowded field of other players also utilizing numerals in conjunction with hours of energy enhancement. The other *Frisch* factors, even taken in a light most favorable to Living Essentials, do not change the confusion equation. No genuine issue of material fact exists as to the ultimate legal conclusion of no likelihood of confusion. For these several reasons, NVE is entitled to summary judgment of no infringement.

## II.     FACTS

### A.     NVE Began Selling Dietary Supplements and Energy Products in 1980

NVE's predecessor company began selling diet and energy products from a single retail location in 1980. **Exhibit 9**, Occhifinto Dep. 9:8 -11:5.[1] NVE has since grown to become a nationally-known manufacturer of consumer diet and energy products. NVE manufactures markets and sells dietary supplements, energy pills, energy drinks, protein water and energy shots. *Id.* 29:21 – 31:17; 49:19 – 50:1; 55:11 – 60:19. NVE sells many of its products under the nationally prominent

---

[1] Exhibit numbers 1 to 44 are the same as those supporting NVE's Motion for Summary Judgment on its False Advertising claim. Exhibits 45 to 63 are new exhibits used in support of this motion. References to deposition testimony are in the form page:lines.

STACKER 2® trademark and has spent over $100 million advertising STACKER 2® diet and energy products. *Id.* 341:6-16.

**B.      Energy Shots are a Natural Extension of NVE's Energy Products Business**

Although they have recently become more popular, NVE began manufacturing energy shots for other companies in the 1980's. *Id.* 12:15 – 14:13; 142:20 – 143:17. NVE began formulating 2-ounce energy shots for BDI Marketing in the 2001 to 2002 period. When the FDA banned ephedra energy pills in April 2004, it created an opening for a non-pill energy product – energy shots. *Id.* 143:23 – 144:23; 145:21 – 147:17. NVE began selling 2-ounce energy shots using the "STACKER 2® YELLOW JACKET" and "STACKER 2® BLACK JAX" trade names no later than March 2006, with labels that also displayed the legend "6 Hour POWER!"

The first part of the trademark "6 Hour" was derived from the fact that one of the ingredients, caffeine, has effects in the human body lasting for about six hours. NVE had used the term "POWER" in connection with its sales of energy products for many years, using a multiple product display for energy pills that it called the TOWER OF POWER. *Id.* 88:13 – 89:25; **Exhibit 10**, Mclellan Dep. 177:15-178:14; **Exhibit 11**, Occhifinto Decl. ¶¶ 2-4 and Exhibits A-C thereto.

By early 2007, NVE began selling additional 2-ounce energy shots under the "STACKER 2® 6 Hour POWER" trade name. Since April 2007, NVE has introduced several flavors of its STACKER 2® 6 Hour POWER energy shots, obtaining broad distribution in the same trade channels as other STACKER 2® products. Convenience store sales account for over 80% of total STACKER 2® 6 Hour POWER product sales. **Exhibit 12**, Lee Dep. 110:19-24.

**C.      Living Essentials Has Not Established First Use in Any Geographic Area**

NVE took advantage of its long-established trade relationships to quickly build its energy shot sales. In March of 2006, NVE sold approximately 120,000 energy shots to nine distributors using the 6 Hour POWER trademark on the label with its famous STACKER 2® trademark. **Exhibit 45,** pp. 1-

2.  Those nine distributors were located in Wisconsin, Kentucky, New York, Ohio, North Carolina, Alabama and California.  **Exhibit 46**, NVE24019-24040, pp. 1-2.  In April and May 2006, NVE sold an additional 218,000 energy shots under the STACKER 2® 6 Hour POWER trademark, adding new distributors in Arizona, California, Texas, Indiana, Minnesota, Tennessee, South Carolina and Pennsylvania.  By the end of 2006, NVE had sold about 1.8 million energy shots (for $1.2 million) to distributors in a total of 22 states, adding Michigan, Colorado, Virginia, Washington, Utah, Oregon and West Virginia.  The majority were national or regional distributors to independent convenience and national or regional chains such as Speedway, Murphy Oil, Circle K, Pantry, and Pilot, Love's and Flying J Truck Stops.  **Exhibit 45**, pp. 1-24; **Exhibit 46**, pp. 1-6.

In contrast, Living Essentials' Rule 30(b)(6) witness was unable to identify the locations in which 5-hour ENERGY shots were sold during 2004 or 2005. **Exhibit 47A**, Henderson 30(b)(6) Dep. 82:8-84:25.  Living Essentials has not produced any detailed information about the geographic distribution of its sales, despite NVE's discovery requests.  **Exhibit 48**, Living Essential's 12/30/08 response to Request for Production No. 9.

   **D.      Living Essentials Does Not Own the Asserted 5 Hour Energy Mark.**

Manoj Bhargava is the founder, CEO and majority owner of Living Essentials, and the sole owner of a separate and distinct company called Bio Clinical Development Inc. ("Bio Clinical").  Bio-Clinical is not a party to this action. On September 15, 2004, Living Essentials, executed a licensing agreement acknowledging Bio Clinical's exclusive ownership of the trademark, product formula, and other intellectual property rights, under which Living Essentials would pay an annual licensing fee of $250,000.  **Exhibit 49**, ("Trademark License"), ¶ 2.  Mr. Bhargava signed for Bio Clinical, and Ed Snyder signed for Living Essentials as its Managing Member.  **Exhibit 50**, Snyder Dep. 102:25-116:12.[2]

---

[2] Living Essentials paid $250,000 to Bio Clinical in 2006 and 2007. The Trademark License was a legitimate agreement fully performed by the parties.   **Exhibit 47A**, Henderson Dep. 17:1-14; 24:7-25;13; 26:20-28:21; 47:9-48:13.

The Trademark License was renewed and amended in two respects on December 20, 2007, but was otherwise unchanged.  **Exhibit 51**, ("First Amendment").  Bio Clinical remained the exclusive owner of the 5-hour Energy trademark.  *Id.*; **Exhibit 47**, Henderson Dep. 50:25-53:18; 62:17-4.  The First Amendment was also signed by Mr. Bhargava and Mr. Snyder and was an arms-length, legitimate business transaction.  *Id.*, 55:7-58:3.  The Trademark License and by extension the First Amendment both contain a standard integration clause that precludes the use of oral agreements to modify the writing.  **Exhibit 49**, ¶ 18.  Mr. Henderson testified that there were no side agreements to the Trademark License.  **Exhibit 47A**, Henderson Dep. 31:10-20.

On February 1, 2008, Living Essentials and Bio Clinical executed a third agreement just before Living Essentials launched a trademark enforcement litigation campaign, including this case, purporting to "cancel" the fully performed 2004 Trademark License and the 2007 First Amendment *nunc pro tunc*.  *Id.*, 66:13-68:3; **Exhibit 52**.[3]  Ignoring the Trademark License integration clause, the *nunc pro tunc* agreement states that the parties "have always understood" "pursuant to prior oral agreements" that Living Essentials owns the trademarks and Bio Clinical owns only the product formulas.  These claims are contradicted by Mr. Bhargava's sworn declaration on December 18, 2007 that <u>Living Essentials</u>, not Bio Clinical, developed the product formula.  **Exhibit 53**, Bhargava Decl. dated 12/18/07, ¶¶ 5-13.[4]  Mr. Henderson signed the *nunc pro tunc* agreement for Living Essentials, but did not negotiate any terms.  **Exhibit 47A**, Henderson Dep. 76:10-77:17.

---

[3] Within four months, Living Essentials sued N2G, Inc. BDI Marketing, Inc. and NVE for trademark infringement.

[4] In reality the 5-hour ENERGY product formula was created by Custom Nutritional Laboratories (CNL) and its CEO, Alan Jones.  **Exhibit 54**, Alan Jones Decl. dated 4/10/09, ¶ 6; **Exhibit 55**, Jones Decl. dated 11/28/07, ¶¶ 1-8.

**E.      Living Essentials Sued NVE as Part of its Trademark Litigation Campaign**

In November 2007, Living Essentials sued a Texas supplier, Custom Nutrition Laboratories,

LLC, alleging Lanham Act trademark and unfair competition claims.  Within four months after

executing the "nunc pro tunc" agreement, Living Essentials sued NVE and two other competitors for

trademark infringement.  After NVE filed a summary judgment motion based upon fraud in procuring

the registered 5-hour ENERGY trademark, Living Essentials dropped its count asserting the registered

trademark from each suit.  Living Essentials' sole claim against NVE rests on infringement of

common law rights in the descriptive 5-hour Energy mark – rights it does not even own under the

Trademark License and First Amendment.  Living Essentials alleged that all of the NVE products

bearing 6 Hour POWER constitute trademark infringement, which are the following items:



**F.      Living Essentials Chose the Highly Descriptive Name "5-hour Energy"**

After test marketing in late 2004, Living Essentials began selling an energy shot in early 2005

under the name Chaser (also used on its hangover product) "5-hour Energy," shown below:



*See* **Exhibit 56**, pp. 14, 18, Trademark Reg. No. 3,003,077 file history.  Living Essentials filed an

intent-to-use application for 5-hour ENERGY with the U.S. Patent and Trademark Office ("USPTO")

on June 14, 2004.  In 2005, the USPTO refused to register Living Essentials' 5-hour Energy

trademark on the Principal Register because "applicant's proposed mark merely describes a product

that provides energy to the user for up to 5 hours and therefore the proposed mark describes a specific

characteristic of the goods."  **Exhibit 56**, p. 20.  Living Essentials did not dispute this finding, nor did

it dispute the USPTO finding that Living Essentials failed to establish that the mark had acquired

secondary meaning.[5]  Sometime in 2005 or 2006, Living Essentials changed the first descriptive bullet

from "Five Hours of energy now" to "Hours of energy now"  and  removed "Chaser" from its labels.



Judge Borman denied a preliminary injunction in a Living Essentials case against energy shot

competitor N2G's 6 Hour Energy product:

> Given the fact that "5 Hour Energy" is highly descriptive, the Court finds that Plaintiff has not
> carried its "heavy burden," . . . to demonstrate that the primary significance of "5 Hour
> Energy" is to "identify the source of the product rather than the product itself."

**Exhibit 2**, p. 8.  Magistrate Pepe and Judge Rosen later relied on this preliminary descriptiveness

ruling in determining that Living Essentials' Legal Notice, the same one at issue in NVE's

Counterclaim against Plaitniff in this case, drafted by Mr. Bhargava personally, was a literally false

advertisement.  **Exhibit 6**, pp. 6-7; **Exhibit 7**, pp. 2, 4.

---

[5] On July 29, 2005, Living Essentials sought registration on the Supplemental Register, an admission of mere descriptiveness. See p.13, infra.  Living Essentials' second application to place 5-hour ENERGY on the Principal Register was also refused on descriptiveness grounds.  Office Action dated November 11, 2008.

## III.   ARGUMENT

### A.   Summary Judgment Standard

If "there is no genuine issue as to any material fact and …the moving party is entitled to a judgment as a matter of law," then summary judgment must be granted.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  To defeat a motion for summary judgment, the non-moving party must "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party must do more than raise some doubt as to the fact — it must produce evidence that would be sufficient to require submission to the jury of the dispute.  *Lucas v. Leaseway Multi Transp. Serv., Inc.,* 738 F. Supp. 214, 217 (E.D. Mich. 1990), *aff'd*  929 F.2d 701 (6th Cir. 1991).  The disputed evidence must be outcome determinative and "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.   Trademark Infringement under the Lanham Act

The Lanham Act prohibits the use of any word, term, or name which "is likely to cause confusion … as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a).  To prevail on a trademark infringement claim, a plaintiff must show 1) ownership of a specific mark; 2) that is valid and legally protectable; and 3) that the defendant's use of the mark is likely to cause consumer confusion.  *Trenton Corp. v. Superior Corrosion Control, Inc.*, 2007 U.S. Dist. LEXIS 5800, *9 (E.D. Mich., Jan. 25, 2007).  Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects unregistered trademarks as long as the mark could qualify for registration under the Lanham Act, *i.e.*,

8

the mark is inherently indistinctive or has acquired distinctiveness. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Section 43(a) serves as the basis for trademark infringement claims for unregistered trademarks. The plaintiff's threshold burden is to prove ownership of a valid, protectable trademark interest. *Citizens Banking Corp. v. Citizens Financial Group, Inc.*, 2009 U.S. App. LEXIS 8366, *7-8 (6th Cir. April 2, 2009). The plaintiff then must prove a likelihood of causing confusion as to source or affiliation. *Id. at *8*; *Frisch's Restaurants Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 647 (6th Cir. 1982).

      **C.**     **Undisputed Evidence Supports Entry of Summary Judgment for NVE**

          **1.**     **Living Essentials Cannot Prove the Existence of Common Law Trademark Rights in any Geographical Area**

Without a registration on the Principal Register and relying solely upon common law rights, Living Essentials' alleged trademark rights extend only to those of areas in which it can prove secondary meaning. See *Commerce Bancorp, Inc. v. BankAtlantic*, 285 F. Supp. 2d 475, 483-85 (D.N.J. 2003). As the plaintiff asserting alleged common law trademark under Section 43(a) of the Lanham Act, Living Essentials must prove the existence of a common law trademark right for the geographic areas in which it claims superior rights. *Id.* at 485-486, 496-97; *Stouffer Corp. v. Winegardner & Hammons, Inc.*, 502 F. Supp. 232, 236 (S.D. Ohio 1980)(secondary meaning not shown to extend to Cincinnati area from Cleveland); *Buscemi's Inc. v. Anthony Buscemi Delicatessen & Party Store*, 96 Mich. App. 714 (1980) (finding that plaintiff lacked secondary meaning evidence in certain counties). Living Essentials, "bears the burden of proving the reputation of its trademark extend[ed] into a particular area" prior to NVE's March 2006 market entry. *Commerce Bancorp*, 285 F. Supp. 2d at 497. That is, Living Essentials must prove secondary meaning of its mark with competent evidence that is specific to geographic regions. *Id.* at 485-87; see also *All Video, Inc. v. Hollywood Entm't Corp.*, 929 F. Supp. 262, 266 (E.D. Mich. 1996) (finding of limited usefulness

sales data without geographic breakdown and advertising data without evidence of effects on particular market).

Living Essentials cannot make that showing, because its Rule 30(b)(6) deponent admits they did not know where their products marked with the alleged trademark were being sold in 2005. **Exhibit 47A**, Henderson 30(b)(6) Dep. 82:8-84:25.  Living Essentials also failed to answer discovery requests for this information.  **Exhibit 48**, pp. 9-10 12/30/08 Response to NVE Request for Production No. 11.  Thus, Living Essentials cannot prove that it had senior rights to use its alleged trademark in any geographic area, there is no jury issue, and summary judgment should be entered that Living Essentials has no valid trademark rights enforceable against NVE.

### 2. Living Essentials Does Not Own the 5-hour Energy Mark

Living Essentials does not own the "5-hour Energy" trademark and lacks standing to sue. See *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774 (Fed. Cir. 1996) (plaintiff did not own trademark when it filed, therefore it could not prove infringement).

### a. Bio Clinical Is Clearly the Owner of the Intellectual Property

The 2004 Trademark License and 2007 First Amendment clearly show that Bio Clinical, and not Living Essentials, owns the alleged trademark rights.  Again, Bio-Clinical is not a party to this case.  The Trademark License provides that: the "5 Hour Energy" trademarks and product formulas are owned exclusively by Bio Clinical; that Bio Clinical owns the "name 5 Hour Energy"; that the associated goodwill belongs exclusively to Bio Clinical; and that Living Essentials was granted only a non-exclusive license to use the rights.  **Exhibit 49**, Trademark License.  The paragraph entitled "IP Ownership" states that the intellectual property is Bio Clinical's "sole property" and that Living Essentials "has no interest whatsoever" in the intellectual property, including the marks.  *Id.*, ¶ 12.  In the 2007 First Amendment, Bio Clinical retained all ownership rights. **Exhibit 47A**, Henderson Dep. 50:25-53:18; 62:17-4; **Exhibit 50**, First Amendment.  The parties specifically affirmed in the First

Amendment that other than the changes to the duration and termination provisions, "the provisions of [the Trademark License] Agreement are unchanged and remain in full force and effect." *Id;* **Exhibit 47A**, Henderson Dep. 55:7-16; 57:13-22.

### b.       The *Nunc Pro Tunc* Agreement Is a Sham

Although the 2004 Trademark License had been fully performed as of December 2007, and although Bio Clinical remained the owner of the 5-hour Energy trademark under the December 2007 First Amendment, Living Essentials realized that it would be unable to conduct its litigation campaign because it did not own the trademark.  Living Essentials sought to fix this problem with a legal artifice – the *nunc pro tunc* agreement.  The agreement does not assign any rights to Living Essentials. Instead, it purports to "cancel" the prior agreements and seeks to wipe the slate clean, as if the Trademark License and First Amendment  never existed.  **Exhibit 52**.  The *nunc pro tunc* agreement disregards Bio Clinical's ownership of the 5-hour Energy mark and instead asserts that "the parties have always understood" pursuant to "prior oral agreements" that Living Essentials owned the marks and trade dress, while Bio Clinical owned the product formulas.  *Id*.  It purports to "confirm" that the Trademark License related only to formulas, and that the license is exclusive – directly contrary to the explicit terms of the earlier **non-exclusive** license to **all** the intellectual property.

Living Essentials' President Scott Henderson confirmed that the Trademark License and First Amendment were legitimate agreements, binding upon and performed by the parties; **Exhibit 47A**, Henderson Dep., 24:13-20; 58:3-8.  Living Essentials has not identified the "prior oral agreements" mentioned in the *nunc pro tunc* agreement, and the existence of such agreements would conflict both with paragraph 18 of the Trademark License, and with Mr. Henderson's Rule 30(b)(6) testimony.  *Id.*, p. 31:10-20.  In its scramble to fix the ownership problem, Living Essentials also overlooked the December 18, 2007 contrary declaration of Mr. Bhargava swearing that <u>Living Essentials</u> (not Bio Clinical) had developed the product formula.  **Exhibit 53**, Bhargava Decl. ¶¶ 5-13.

11

The purpose of a *nunc pro tunc* (now for then) agreement is to correct clerical errors or to memorialize a previous event or agreement that was not memorialized at the time.  A *nunc pro tunc* pronouncement cannot simply erase the fully-performed Trademark License and the First Amendment, which show that Bio Clinical owns the trademark and Innovation Ventures owns nothing.  "It is elemental that a party to an executed contract cannot rescind it *nunc pro tunc.*"  *Tri-State Rubber & Equipment, Inc. v. Central States Southeast & Southwest Pension Fund*, 677 F.Supp. 516, 519 (E.D. Mich. 1987) (citations omitted).  Thus the 2008 *nunc pro tunc* agreement cannot simply "cancel" the prior agreements and does not even claim to transfer ownership of the trademark to Living Essentials.  Bio Clinical is still the trademark owner.  Living Essentials had no rights when it filed suit or today and its action must be dismissed.  No jury question exists.

> **3.    5-hour ENERGY was Not a Valid, Protectable Trademark in March 2006 When NVE Began Selling STACKER 2® 6 Hour POWER**

Living Essentials must prove that its mark is valid and protectable.  Because the term "5-hour ENERGY" is highly descriptive and not inherently distinctive, Living Essentials must prove that the term acquired distinctiveness before NVE's market entry in March 2006.  *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 595-96 (6th Cir. 1989).

> **a.  5-hour ENERGY is Highly Descriptive of its Energy Shots**

The descriptive nature of the 5-hour ENERGY has been repeatedly decided and is beyond legitimate dispute.  Living Essential's registration of that term on the Supplemental Register serves as an admission that its mark is descriptive.  *Quaker State Oil Refining Corp. v. Quaker Oil Corp.*, 453 F.2d 1296, 1299 (CCPA 1972) ("when appellant sought registration of SUPER BLEND on the Supplemental Register, it admitted that the term was merely descriptive of its goods . . .and

acknowledged that it did not have an exclusive right therein at that time.").[6]  Marks are classified in the following categories of increasing distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.  *Degidio v. West Group Corp.*, 355 F.3d 506, 510 (6th Cir. 2004).  A mark is descriptive if it describes one or more of the following: intended purpose, function, use, class of users, a desirable characteristic, or the end effect upon the user.  *Id.* at 510-11.

Living Essential's "5-hour ENERGY" mark describes the purpose, function, use, a desirable characteristic and the end effect upon the user.  As shown on its 2005 website and in its 2005 trademark filing in the USPTO, the first statement below the name on Living Essentials' 5-hour Energy bottle label was "*5 hours of energy now*."  **Exhibit 14**.  Living Essentials' 2005 website states: "*we named it 5-hour Energy for a reason.  People typically feel an elevated sense of energy, focus and alertness for about five hours*."  **Exhibit 13**.  Former Living Essentials President Thomas Morse affirmed that "5 hours of energy now" describes a feature or characteristic of the product.  **Exhibit 57,** Morse Dep., p. 50-60, 87:14-16.[7]

The Eastern District of Michigan also found the mark to be "highly descriptive" in 2008.  Denying a preliminary injunction request, Judge Borman found that Living Essentials was unlikely to prove competitor N2G's "6 Hour Energy Shot" would be trademark infringement:

> Given the fact that "5 Hour Energy" is **highly descriptive**, the Court finds that Plaintiff has not carried its "heavy burden," at this point in the case, to demonstrate that the primary significance of "5 Hour Energy" is to "identify the source of the product rather than the product itself."  Furthermore, Defendants have produced a variety of competing two-ounce energy drink products from different manufacturers that use phrases such as "7 Hour Energy Boost," "6 Hour Energy!," "Extreme Energy Six Hour Shot," and "6 Hour Power" - thus diluting Plaintiff's potential claim that "5 Hour Energy" has a strong secondary meaning that particularly identifies its source.  *Id.* at p.8 (emphasis added).

---

[6]  Living Essentials withdrew its registered trademark from this suit after NVE challenged its procurement by fraud but its common law claim involves precisely the same term, and Living Essentials is bound to the admission as well as acknowledgement of lack of rights in July 2005.

[7]  In another lawsuit, Mr. Henderson provided a declaration introducing a clinical study claiming that "the number of hours" for which 5-hour ENERGY users showed an energy increase was 4.92 hours.  **Exhibit 58,** Henderson Decl ¶ 21; **Exhibit 59,** Blum Study, p. 21.  Vice President of Sales Rise Meguiar testified "when people buy the product it gives them exactly what it says on the bottle, the energy boost that they need for five hours."  **Exhibit 15**, 33:11-21.

**Exhibit 2**, p. 8; see **Exhibit 2A** depicting competing products.  Magistrate Pepe and Judge Rosen later relied on this preliminary descriptiveness ruling in determining that Living Essentials' Legal Notice drafted by Mr. Bhargava was a literally false advertisement.  **Exhibit 6**, pp. 6-7; **Exhibit 7**, pp. 2, 4.

> **b.  Living Essentials Has No Evidence Showing Any Secondary Meaning Prior to March 2006**

Because 5-hour ENERGY is highly descriptive, Living Essentials must demonstrate that its product had obtained secondary meaning **before** NVE entered the energy shot market in March 2006.  *Burke-Parsons-Bowlby*, 871 F.2d at 595-96; *Upjohn Co. v. William S. Merrell Chemical Co.*, 269 F. 209, 212 (6th Cir. 1920).  Secondary meaning is "the connection in the consumer's mind between the mark and the provider of the service."  *Investacorp, Inc. v. Arabian Investment Banking Corp.*, 931 F.2d 1519, 1525 (11th Cir. 1991).  The plaintiff has "the burden of sustaining a high degree of proof in establishing a secondary meaning for a descriptive term."  *Id.* (granting summary judgment as mark not shown to acquire secondary meaning prior to defendant's market entry)*.*   "The greater the degree of descriptiveness of the mark, the heavier the evidentiary burden on the plaintiff to establish secondary meaning."  *J&J Snack Foods Corp., v. Nestle USA, Inc.*, 149 F. Supp.2d 136, 152 (D.N.J. 2001) (citing 2 McCarthy, Trademarks § 15:33 at 15-51).

Living Essentials cannot meet this very heavy evidentiary burden – indeed, it has essentially no probative evidence as to secondary meaning prior to March 2006.  Living Essentials is expected to argue three sources of evidence to prove secondary meaning prior to March 2006:  sales, advertising expenditures and a survey from Dr. Michael Rappeport purporting to find a minor amount of acquired distinctiveness in September-October 2008, 2½ years after NVE's market entry.

The survey matter raises no genuine issue of fact due to its timing and due to the vast differences in advertising after NVE's market entry but before the survey.  Although the court may consider survey evidence created after the relevant timeframe, the court must consider the nature of the particular survey and the time and events between the market entry date of the defendant (i.e.,

March 2006) and the survey date (i.e., September/October 2008).  See *General Motors Corp. v. Lanard Toys Limited*, 468 F.3d 405, 419 (6th Cir. 2006).  The survey was taken in September 2008 – 2½ years too late to establish secondary meaning prior to March 2006.  See *Ashland Oil, Inc. v. Olymco, Inc.*, 905 F. Supp. 409, 413 (W.D. Ky. 1994) (plaintiff failed to establish secondary meaning of "Instant Oil Change" prior to defendant's market entry; Rappeport survey conducted <u>two years after market entry</u> was insufficient); *Marion Laboratories, Inc. v. Michigan Pharmacal Corp.*, 338 F. Supp. 762, 769 (E.D. Mich. 1972) (survey conducted <u>three years after market entry</u> and general advertising figures insufficient to establish secondary meaning).   Living Essentials spent less than $1 million on advertising before NVE entered the market, but had spent about $60 million after NVE's March 2006 market entry and before the late 2008 survey:



*2009 Projected
Source: LENVE0093 and Henderson September 28, 2009 30(b)(6) Dep. Exhibit 6

Living Essentials' advertising expenditures for 2005 amounted to less than $400,000 and was "primarily radio."  **Exhibit 47A,** 109:4-14; 152:2-8; 158:8-20.  For the first quarter of 2006, the advertising expenditures were not more than that figure; Living Essentials did not even begin television advertising until later in 2006.  *Id*.  The Sixth Circuit has observed that "extensive

advertising which results in consumer association with a single source" is needed to establish secondary meaning. *Burke-Parsons-Bowlby.*, 871 F.2d at 596; *Trenton*, 2007 U.S. Dist. LEXIS 5800 at * 12-13. Living Essentials has no evidence that its advertising promoted a conscious connection in the public's mind between the name and the plaintiff's business. Advertising budget only "has an attenuated link to actual market recognition." *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991).

In addition, Dr. Rappeport's survey is too fundamentally flawed to have any evidentiary value whatsoever, as respondents were asked leading questions and responses were miscoded to credit secondary meaning when unwarranted. According to Dr. Jacoby, "not a single respondent's answer could unambiguously be accepted as indicating the respondent associated the term 5-hour Energy with drinks or shots that come from a single source." [8]

Nor does Living Essentials have probative evidence on any other factors generally considered in determining whether a particular mark has acquired a secondary meaning. Even assuming Living Essentials first sold 5-hour ENERGY in September 2004 (data shows sales actually began in 2005), this was only eighteen months before NVE's market entry. See *Burke-Parsons-Bowlby.*, 871 F.2d at 595-96 (twenty months considered a short period insufficient to establish secondary meaning). Living Essentials sold only about $3 million total through the end of 2005 and another $970,000 by the end of February 2006. Living Essentials has no evidence that even these modest sales had anything to do with customer recognition of the 5-hour ENERGY mark on the bottle. Indeed, throughout 2005 and into 2006, Living Essentials was selling its product prominently displaying its Chaser brand.

---

[8]  **Exhibit 60**, Jacoby Report, pp. 17-29. Dr. Rappeport has been repeatedly criticized by judges for flawed surveys and "loaded" questions, including by the Sixth Circuit. *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 799, n.2 (6th Cir. 2004). At least one of his surveys was excluded as "untrustworthy" in 2002, including for use of a flawed definition for descriptiveness. *J&J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 371-72 (D.N.J 2002); see also *I.P. Lund Trading ApS v. Kohler Co.*, 118 F. Supp.2d 92, 108 (D. Mass. 2000) ("Rappeport's survey provides minute evidence of secondary meaning, if any at all."). Here Dr. Rappeport continues to eschew the survey methodology widely approved by the courts; his unique method lacks scientific reliability. Since the survey "does not even purport to reproduce the market conditions" prior to the time of NVE's market entry, the "survey is fatally defective as a meaningful indication of secondary meaning for the relevant time period." See *Calvin Klein Co. v. Farah Manuf. Co.*, 1985 U.S. Dist. LEXIS 13475, * 24 (S.D.N.Y. November 26, 1985).

According to Mr. Henderson, "people knew Chaser.  So Chaser was on the bottle above 5-hour Energy."  **Exhibit 47**, Henderson Dep. p. 85.  Sales can increase for many reasons that have little to do with the recognition by consumers of the mark as a particular source – the modest sales through early 2006 may simply be a result of product placement at the cash register,[9] recognition of the Chaser brand, market timing,[10] or any number of other reasons.  *See Burke-Parsons-Bowlby*, 871 F.2d at 595-96 ($2 million in sales insufficient to establish secondary meaning as sales volume is "not necessarily sufficient to indicate recognition of the mark by purchasers as an indication of source").

In July 2005, just eight months before NVE's market entry, Living Essentials accepted the USPTO's decision that sales and advertising to that date had not established secondary meaning, and sought trademark registration on the Supplemental Register.  That Living Essentials still has not offered such evidence substantiates the lack of secondary meaning.[11]  As Judge Borman noted in assessing secondary meaning in 2008, "highly descriptive" terms "may need a massive quantity and quality of secondary meaning evidence to become a trademark."  Living Essentials has not offered even close to enough secondary meaning evidence sufficient to create a jury issue.

Before NVE's market entry in March 2006, 5-hour Energy was a new product lacking in any widespread consumer recognition, and with a highly descriptive name with limited source distinguishing power.  See *Degidio*, 355 F.3d at 511.  Any recognition as a branded product, if at all, was likely due to the Chaser trademark.  The lack of pre-March 2006 secondary meaning evidence defeats Living Essentials' trademark infringement claim and summary judgment is warranted because there is no issue of material fact for a jury to decide.

---

[9] Placement at the checkout counter results in "impulse" purchases – an important source of sales.  **Exhibit 15**, Meguiar Dep. 24:11-24:19; 118:5-18.

[10] Numerous witnesses have testified that the success of energy shots had much to do with their introduction just after the FDA ban on ephedra pills went into effect. See e.g.  **Exhibit 9**, Occhifinto Dep. 143:23 – 144:23; 145:21 – 147:17.

## 4. No Likelihood of Confusion Exists as a Matter of Law between STACKER 2® 6 Hour POWER and 5-hour ENERGY

Living Essentials case fails on the threshold issue of ownership as it is not the owner of the alleged "5-hour Energy" mark. Likewise, its case fails because it cannot demonstrate that it has protectable rights in the designation before NVE's market entry. Living Essentials' case also fails on the likelihood of confusion analysis essential to its common law trademark claim. There are simply no issues for a jury to decide.

The level of trademark protection corresponds to the distinctiveness of the mark. *Comerica, Inc. v. Fifth Third Bankcorp.*, 282 F. Supp. 2d 557, 567-68 (E.D. Mich. 2003). The Sixth Circuit considers eight interrelated factors as a non-exhaustive guide in assessing likelihood of confusion: strength of plaintiff's mark; relatedness of the goods/services; similarity of the marks; evidence of actual confusion; marketing channels used; degree of purchaser care; defendant's intent in selecting the mark; and likelihood of expansion in selecting the mark. *Frisch*, 670 F.2d at 647. The factors do not imply "mathematical precision" as the ultimate question remains centered on whether there is a likelihood of confusion. *Homeowners Group*, 931 F.2d at 1106-7. "The ultimate question remains whether relevant consumers are likely to believe that the products and services offered by the parties are affiliated in some way." *Id.* at 1107. Furthermore, confusion "is a mixed question of fact and law." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F. 3d 623, 630 (6th Cir. 2002). The ultimate determination of whether a given set of foundational facts establishes a likelihood of confusion is a legal conclusion. *Id.* at 631.

### a. The Mark is Descriptive and Weak

"The strength and distinctiveness of plaintiff's mark is a vital consideration in determining the scope of protection it should be accorded" – strong marks are widely protected; weak marks are not. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir. 1980). "The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore the more protection it is

due." *Frisch's Restaurant*, 759 F.2d at 1264.   The strength of the mark is its power to act as an indicator of origin to identify and distinguish the source of goods, which is determined by the mark's distinctiveness and the degree of recognition in the marketplace.  *Homeowners*, 931 F.2d at 1107.  A mark's strength generally results from its unique nature within the distinctiveness scale (inherent distinctiveness) and/or its owner's intensive advertising efforts (acquired distinctiveness). *Therma-Scan*, 295 F.3d at 631.

The 5-hour ENERGY mark is inherently weak and highly descriptive.  Living Essentials advances little probative evidence of secondary meaning and primarily relies upon Dr. Rappeport's flawed survey.[12]  Living Essentials has offered no evidence that its advertising was directed to or effective in building a source-identifying trademark.  Living Essentials offered no evidence that its sales growth is attributable to consumer association of the 5-hour ENERGY phrase with a single source of the product.  The evidence instead shows that the product name merely describes the length of the effects of the energy shot – with many other shots in the marketplace with similar descriptors. Living Essentials VP of Sales Rise Meguiar testified that it is most important that "when people buy the product it gives them exactly what is says on the bottle, the energy boost that they need for five hours."  **Exhibit 15**, Meguiar Dep. 33:11-21.  On April 14 2008, in refusing to enjoin a competitor from using the name "6 Hour Energy," Judge Borman determined that 5-hour ENERGY was highly descriptive.  *Supra* at pp. 13-14.

This factor strongly supports a lack of confusion given the highly descriptive nature of the term and the very limited evidence of secondary meaning.  The 5-hour ENERGY trademark is further weakened by extensive third-party use of similar marks.  *AutoZone,* 373 F.3d at 794-95.  A weak

---

[12]   While Dr. Rappeport's survey is insufficient to raise a genuine issue of material fact on secondary meaning prior to NVE's market entry in March 2006, the fundamental flaws render the survey scientifically unreliable and meaningless. Even with these serious flaws, the survey still only found a modest 39% of recognition in the fall of 2008.  Surveys with 38% recognition have been considered marginal.  See *Ashland Oil, Inc. v. Olymco, Inc.*, 1995 U.S. App. LEXIS 24652, *12-13 (6th Cir. April 21, 1995)(rejecting 42% recognition as not sufficiently probative of secondary meaning two years prior to survey and citing *Spraying Systems Co. v. Delavan, Inc*., 975 F.2d 387, 394 (7th Cir. 1992) for the proposition that a "figure of thirty-eight percent [is] 'marginal' evidence of secondary meaning, even in a 'properly designed survey'").

trademark is one that is often used by other parties.  *Holiday Inns, Inc. v. Holiday Out in Am.*, 481

F.2d 445, 448 (5th Cir. 1973); see also *ePrize L.L.C. v. Net Prize, Inc.*, 2006 U.S. Dist. LEXIS 89536,

* 7 (E.D. Mich. December 12, 2006)(use of common word "prize" suggests weaker mark).  The

evidence is undisputable that the mark is on an array of other products, including "7 Hour Energy

Boost," "6 Hour Energy!," "Extreme Energy Six Hour Shot," and "6 Hour Power."[13]

Even when viewing the evidence in the light most favorable to Living Essentials, its mark is

very weak, *i.e.*, highly descriptive, lacks secondary meaning, is widely used by others and creates no

jury issue.

   **b.**  **"5-hour ENERGY" and "STACKER 2 6 Hour POWER" are Dissimilar**

Where the marks are sufficiently dissimilar, the factor can be "pivotal," even where most of

the other factors favor the trademark owner.  *Little Caesar*, 834 F.2d at 572 (no likelihood of

confusion due to substantial dissimilarity between "Little Caesar" and "Pizza Caesar" despite direct

competition in the same market where asserted mark was strong and the consumer care low).

"Similarity of marks is a factor of considerable weight."  *The Sports Authority, Inc. v. Abercrombie &*

*Fitch, Inc.*, 965 F. Supp. 925, 937 (E.D. Mich. 1997).  A "court must determine, in light of what

occurs in the marketplace, whether the mark will be confusing to the public when singly presented."

*Cosmetic Dermatology and Vein Centers, P.C. v. New Faces Skin Care Centers, Ltd.*, 91 F. Supp. 2d

1045, 1053 (E.D. Mich. 2000).  The court must analyze the overall similarity of the marks, including

pronunciation, appearance and verbal translations," but the court can also "consider individual

differences between the original mark and the alleged infringing mark."  *Id.*; see also *In re National*

*Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985).

The marks at issue here are not similar in overall appearance.  The only common word is the

word "hour" which is the least prominent portion of both marks.  See *Little Caesar Enterprises, Inc. v.*

---

[13] N2G has added other energy shots with "hour" in their name. **Exhibit 61.** *See* **Exhibit 2A.**

*Pizza Caesar, Inc.*, 834 F.2d 568, 572 (6th Cir. 1987) (finding "Little Caesar" and "Pizza Caesar" to be obviously dissimilar in sound and appearance).  In both 5-hour ENERGY and STACKER 2® 6 Hour POWER the word "hour" is the only word to appear in lower case.  The word "hour" in 5-hour ENERGY is also in a smaller font.  The fonts are different, with 5-hour ENERGY italicized.  The font color is also different, as 5-hour ENERGY is black with a yellow outline and "6 Hour Power" appears either as solid black or other colors but never black with a yellow shadow line.  *Supra*, p. 6.  The marks are formatted differently, with the numeral 6 is in a larger font that spans the word "Hour" appearing above and aligned with the word "POWER."  In contrast, "5-hour" appears as a single hyphenated word centered over the word "ENERGY."  NVE's housemark STACKER 2®  appears in prominent position at the top (above the term 6 Hour POWER).  The word POWER is the most dominant aspect of the accused mark.

When viewed as presented in the market, the marks are highly distinct.  Any potential for confusion lessens considerably when viewed in their entirety as the marks appear in the marketplace.  *See e.g. Cohn v. Petsmart*, 281 F.3d 837, 842 (9th Cir. 2002).  5-hour ENERGY is packaged in a standard 2 oz plastic shot bottle that is shrink wrapped in a multi-color plastic.

  

A silhouetted runner appears in black on the black mountain.  In prominent position at the top of the bottle, the flavor appears with a cartoon depiction of the corresponding fruit.

In contrast, the STACKER 2® 6 Hour POWER in the Yellow Jacket and Black Jax with the words "6 Hour POWER!" at the top is markedly different in packaging.[14]  The other variety of STACKER 2® 6 Hour POWER is also nothing like the packaging of 5-hour ENERGY.  STACKER 2® 6 Hour POWER is in a standard 2 oz plastic shot bottle shrink wrapped in a generally solid color wrapper corresponding to the drink flavor: red-berry, purple-grape, green-lemon/lime, orange-orange, purple/pink-punch, red/orange (with seeds)-watermelon, black-extra strength.[15]  The flavor and term "Sugar Free" appears right next to the term "Hour."  A slogan, "Feel it Fast, Energy that Lasts," appears in white letters in the middle of the bottle and then some key benefits in a standard black font.  At the bottom, an image of fruit corresponding to the flavor appears.

When considering likelihood of confusion, "the most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name." *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 (Fed. Cir. 1984).  Living Essentials only places its company name in very small letters on the side panel of the product, thus de-emphasizing this source information.  Importantly, the famous STACKER 2® trademark is given the most prominent space on NVE's bottles– at the very top of the bottle on the lid.  See *Comerica, Inc. v. Fifth Third Bankcorp*, 282 F. Supp. 2d 557, 565-66 (E.D. Mich. 2003) (use of housemark sufficient to distinguish otherwise similar mark).  NVE has spent over $100 million advertising the Stacker 2® trademark in connection with diet

---

[14]  The bottle is thin and tall and shrink wrapped in a solid red or solid yellow plastic.  The STACKER 2 emblem is displayed over the words Yellow Jacket or BLACK JAX.  While the term 6 Hour POWER! is prominently displayed on the cap of the bottle (the Hour term being the least prominent), the overall feel of the packaging is nothing like 5-hour ENERGY.  See the middle picture above and s*upra*, p.6.

[15]  See product lineup at p. 7.

and energy products, which are sold nationally in the same convenience store and other trade channels in which energy shots are sold.  **Exhibit 9**, Occhifinto Dep. 341:6-16.

Third parties who distribute both products uniformly testified to a lack of similarity between 5-hour ENERGY and 6 Hour POWER.  Mr. J.R. Merlau is the Vice President of Licensing and Business Development for Novelty, Inc., which is a large direct-store- distributor to convenience stores. **Exhibit 23**, Merlau Dep. 4:11-7:16.   While uncomfortable with "being in the middle" of a supplier dispute, *Id.,* 6:7-12, Mr. Merlau testified to substantial confusion due to the press release but was clear that the products themselves were not confusing.

> Q:   Do you think it is difficult to tell 6 Hour Power apart from 5-hour Energy?
> A:   If you are looking at the product, I don't believe so.  If you reading it in a
>       written recall notice, I believe it can be confusing. [referring to the misleading
>       Living Essentials' recall notice referencing a "6 Hour" energy shot].
> Q:   So you believe in the written form 5-hour Energy can be confusing with 6 Hour
>       Power??
> A:   I believe the references to 5-hour and 6 Hour were the confusion.
> Q:   Do you believe that 6 Hour Power can be confusing to 5-hour Energy?
> A:   No.

*Id.,* 53:8-21.  Similarly, Category Buyer Karen Mclellan of Core Mark, distributor to approximately 30,000 convenience stores, does not believe that 6 Hour POWER closely resembles 5-hour ENERGY. **Exhibit 10**, Mclellan Dep. 172:8-19.  Carlos Bengoa, owner of CB Distributors also does not think that the two marks are confusingly similar.  **Exhibit 29**, Bengoa Dep. 226:9-13 ("Not at all.  I think they're very different.")

Considering the dominance of the famous STACKER 2® trademark as the first text and the numerous differing characteristics showing lack of overall similarity between the marks, this factor weights heavily against a finding of likelihood of confusion and creates no jury issue.

**c.      NVE Selected its Mark Based its own Earlier Use of "Power"**

There is no genuine issue of material fact that NVE did not copy the alleged mark of Living Essentials.  Living Essentials has no evidence of copying while substantial evidence exists that NVE had independent reasons for choosing the particular mark.

The first part of the trademark "6 HOUR" was derived from the fact that one of the ingredients, caffeine, has effects in the human body lasting for about 6 hours.  NVE had used the term "POWER" in connection with its sales of energy products for many years, using a multiple product display that it called the "TOWER OF POWER."  **Exhibit 9**, Occhifinto Dep. 88:13 – 89:25; **Exhibit 10**, Mclellan Dep. 177:15-178:14; **Exhibit  11** Occhifinto Decl. ¶¶ 2-4 and Exhibits A-C thereto.

NVE had every right to use common words to appropriately designate its product, particularly given that the only word in common with Living Essentials' alleged trademark is "hour."  NVE chose its own previously-used term "POWER" from its rhyming display "TOWER OF POWER" for energy pills and used that term in another rhyming name, "6 Hour POWER."  NVE simply went back to its own well to repeat the concept (tower, POWER) for energy shots (Hour, POWER).  NVE also placed the famous STACKER 2® trademark that it had used and advertised for years in the same trade channels above and adjacent to the 6 Hour POWER term.  Prominent use its own house mark on the product is the opposite of intentionally causing confusion.

Thus, the only competent evidence regarding intent strongly supports a conclusion that there is no likelihood of confusion, and that no reasonable jury could conclude otherwise.

**d.      No Factual Dispute Exists as to the Relatedness of Goods, Market
             Channels and Degree of Purchaser Care**

There is no factual dispute that Living Essentials and NVE are direct competitors in the market for 2-ounce energy shot products.  Though there are some differences in the market channel mix, the majority of both parties' sales are through convenience stores.

Likewise, the facts are not in dispute concerning the factor of likely degree of purchaser care. Energy shots are often regarded as impulse purchases, with preferred product placement in gas stations and convenience stores on or near the check-out counter. It is also undisputed that the price of energy shots varies from $2.50 to over $4 for two ounces of liquid. This is a fairly high cost to volume ratio and the price of energy shots is also high in comparison to the cost of a single energy pill or a larger-volume caffeinated beverage such as a cup of coffee, energy drink like Red Bull, or a bottle of Coke or Mountain Dew. More importantly, the energy shot market is now crowded with over 150 products, and many of them tout the hours or increase in energy associated with their products. *Big Time Worldwide Concert & Sport Club at Town Ctr. v. Marriott Int'l*, 236 F. Supp. 2d 791, 800 (E.D. Mich. 2003) (where merely one of a crowd of marks, "customers will not likely be confused between any two of the crowd and may have learned to carefully pick out one from the other." 2 McCarthy, Trademarks § 11:85). The effect of a large array of similar products is to encourage a consumer looking for a product from a particular source to more carefully examine and select between products.

The undisputed evidence shows the customer care factor to be neutral. Even assuming the factor marginally favors Living Essentials when viewed in a light most favorable to the non-movant, the factor is insufficient to change the legal conclusion that there is no likelihood of infringement, because very little care is necessary to distinguish between the products in the market place.

> **e.     Evidence of Actual Confusion is *De Minimis* and Points to a Lack of Likelihood of Confusion**

This factor favors NVE: the parties co-existed for many years with little to no actual confusion as to the source of the STACKER 2® energy shots at issue despite NVE's sales of several million energy shots. In its confusion log Living Essentials offers no evidence of actual confusion evidence between 2006 and 2008 during the first two years that NVE sold millions of energy shots. The alleged confusion evidence after 2008 primarily does not even involve a "6 Hour Power" product (often just "6 hour" and sometimes explicitly other energy shots). Living Essentials has listed

numerous incidents of alleged "actual confusion" that either cannot constitute actual confusion as a matter of law or is hearsay by its employees, without evidentiary foundation or admissibility.[16]

Living Essentials' attempt to muddy up this issue fails due to its own overreaching in categorizing actual confusion to create false evidence where no confusion exists.  For example, Living Essentials' inclusion of other products that were placed in a 5-hour ENERGY display includes non-NVE products Ephrine, Socko energy drink, NOS, Ephrine Plus, BDI Mini Thin Rush, Top Flight Energy, Xantrex 3, Red line and Amp.  Living Essentials frequently refers to other "6 hour" and even "7 hour" energy drinks in its confusion log that state "6 hour energy" or just "6 hour" without any reference to 6 Hour POWER. **Exhibit 62**. Thus, taking the facts as Living Essentials alleged, what Living Essentials managed to prove was that confusion and/or mistakes in the market occurred no more often regarding "STACKER 2® 6 Hour POWER" than what was generally occurring in the energy shot market.

Where the evidence is brief, uncertain or stems from unprotected aspects other than the alleged trademark, the evidence is not entitled to much, if any, weight.  *Therma-scan*, 295 F.3d at 634-36 (twelve of eighteen emails discounted as evidence of actual confusion).  Living Essential's actual confusion "evidence" is really just evidence of descriptiveness in reverse.  Selection of a highly descriptive mark naturally entails a risk of some uncertainty and the law will not assure absolute protection. *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3rd Cir. 1978); see also *KP Permanent Make-Up, Inc. v. Lasting Impression, Inc.*, 543 U.S. 111, 122 (2004) ("The common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact

---

[16]  **Exhibit 62**, Confusion Log.  Living Essentials apparently created this log in 2008 in anticipation of trademark litigation.  Its employees were encouraged and perhaps pressured to provide evidence of alleged confusion for litigation.  Former President Tom Morse testified that "Frequently in the office [CEO] Manoj would instruct myself and other employees to – that it was okay to lie as long as you don't get caught," and Mr. Morse mentioned receptionist Keven Anne Mancherian in particular.  **Exhibit 57**, Morse Dep. p. 75:20-77:16.  Nearly half of the entries on the alleged "log" were from Ms. Mancherian.  Living Essentials cannot rely on those entries because Ms. Mancherian became so distressed at the thought of answering questions under oath about her log entries that she became physically ill and had to halt the deposition due to unmanageable stress.

that in cases like this one an originally descriptive term was selected to be used as a mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first.").   Living Essentials itself caused and should have expected confusion in the market when it chose a highly descriptive mark and then compounded the issue by removing the only possible distinctive element, its house mark "Chaser."

There appears to be only one example of actual confusion, where a college student who consumed a STACKER 2® 6 Hour POWER, shot then felt nauseous while lifting weights, contacted info@fivehour.com.  First, one or even a few incidents such as this report is *de minimis*, and supports a lack of likelihood of confusion, particularly after a three-year period of parallel sales of millions of consumable products.  *Cosmetic*, 91 F. Supp. 2d at 1055; *Therma-scan*, 295 F.3d at 634-36; *Universal Money Centers, Inc. v. American Telephone & Telegraph Co.*, 22 F.3d 1527, 1534-36 (10th Cir).  Second, Mr. Henderson confirmed that Living Essentials has received similar complaints from customers who consumed the 5-hour ENERGY product.  **Exhibit 47B**, Henderson Vol. II 244:5-250:12.  Mr. Henderson dismissed these incidents:  "I believe the FDA closed the file without any incident.  We sell 20 million bottles a month, and to have one complaint is statistically insignificant." *Id.*

Nevertheless, taking the admissible evidence of one incident of confusion in the light most favorable to Living Essentials, this factor continues to favor NVE.  Three years of direct competition, millions of units sold, and the fact that the amount of alleged actual confusion did not exceed the alleged confusion that existed with a number of other competitive energy shot products strongly favors NVE, but one incident of actual confusion somewhat mitigates the strength of this factor for NVE.[17]

---

[17]  Living Essentials has also commissioned a confusion survey, which was conducted in July 2009.  This survey adds nothing of probative value, as it is flawed on nearly every level from the survey universe to the alleged screening questions to lack of a proper control and down to the highly leading questions used. Despite the use of leading questions, the evidence shows that most of the survey participants were not confused and believed that neither product presented was one

**f.      Evaluation of the Frisch Factors Compels the Legal Conclusion that No Likelihood of Confusion Exists**

Living Essentials "evidence," even taking all justifiable inferences in its favor, does not raise a genuine issue of material fact.   The mark 5-hour ENERGY is very weak, highly descriptive, and bordering on generic as shown by widespread use in the energy shot market.  Even if the mark was valid and had obtained some secondary meaning, only very narrow protection could possibly be warranted even in cases where there are nearly identical marks.  Yet, the marks here are far from identical.  NVE's trademark "STACKER 2® 6 Hour POWER" is markedly different in overall impression, with only the least significant word in common and is presented to the consumer in a different font, color, and orientation from the alleged "5-hour Energy" trademark.  The energy shot field is full of other product names using the same pattern: a number representative of the hours of energy enhancement followed by the word "hour," frequently followed by the word "Energy," which does not appear in the "STACKER 2® 6 Hour POWER" name.  As noted above, Living Essentials coexists with a large number of marks that are much more similar to "5-hour Energy" than NVE's mark, including "6 Hour Energy, "7 Hour Energy" and "8 Hour Energy."  Furthermore, the accused 6 Hour POWER product prominently displays the famous STACKER 2® mark above the product name.  There can be no genuine issue of material fact that the factors of strength of mark and similarity of marks heavily favor NVE.

The remaining factors do not alter the conclusion compelled by these factors.  NVE did not copy the alleged mark, and so that factor also favors NVE.  NVE had a longstanding history of selling energy based capsule and drink products through convenience stores under its famous Stacker 2 registered trademark.  The introduction of its 2-ounce energy shots using the 6 Hour Power trademark over two years before Plaintiff started this action was a natural extension of its product line.  While

---

that appeared in an advertisement.  Dr. Jacoby's report explains the many flaws in the confusion survey and the unreliability of its methodology and results.  **Exhibit 60**, Jacoby Report, pp. 29-42.

the parties are direct competitors selling goods to overlapping customers, these factors have less bearing where the marks are not similar. Even assuming that energy shot consumers are less discerning than the ordinary consumer, dissimilarity between marks minimizes the importance of that factor. Little attention is necessary to notice the difference between the products.

Finally, the last factor is actual confusion. Living Essentials overreaches to attempt to create evidence on this factor. However, as discussed above, this factor also supports NVE, given the minimal showing despite Living Essential's substantial efforts to develop that evidence since 2008 and the several million shots sold by NVE. Living Essentials showed through its entries on the confusion log that the level of alleged "confusion" is no greater for STACKER 2® 6 Hour POWER than for the energy shot market generally. The confusion survey is fatally flawed and so not probative of confusion. The scanty confusion evidence simply does not support an inference that this factor supports Living Essentials. Even if it did, this factor would not outweigh the other Frisch factors that support only one conclusion – that no likelihood of confusion exists, as a matter of law.

## IV.    CONCLUSION

Indisputable record evidence demonstrates that Living Essentials' common law trademark infringement claim is not viable. Since there is no genuine issue of material fact to be decided by a jury, NVE respectfully requests that this Court GRANT summary judgment in its favor dismissing Plaintiff's action in its entirety with prejudice and finding that: 1) Living Essentials does not own the mark; 2) Living Essentials failed to prove secondary meaning prior to the market entry by NVE and the mark is therefore not valid or protectable; and 3) the use of the designations "STACKER 2® 6 Hour POWER" or simply 6 Hour POWER, do not create a likelihood of confusion as a matter of law based on the undisputed facts.

Respectfully submitted,

Date: December 22, 2009          By: /s Leigh C. Taggart
                                     R. Terrance Rader (P28747)
                                     Leigh C. Taggart (P63765)
                                     Douglas P. LaLone (P45751)
                                     RADER, FISHMAN & GRAUER PLLC
                                     39533 Woodward Avenue, Suite 140
                                     Bloomfield Hills, Michigan 48304
                                     Tel: (248) 594-0600
                                     Fax: (248) 594-0610
                                     Email: lct@raderfishman.com

                                     Anthony Davis, Of Counsel
                                     Charles P. Guarino, Of Counsel
                                     NICOLL, DAVIS & SPINELLA LLP
                                     95 Route 17 South, Suite 203
                                     Paramus, New Jersey 07652
                                     (201) 712-1616
                                     cguarino@ndslaw.com

                                     *Attorneys for Defendant/Counterclaim Plaintiff*

R0704563