# UNITED STATED DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

INNOVATION VENTURES, LLC d/b/a
LIVING ESSENTIALS,

                Plaintiff/Counter-Defendant,

                                    Case No. 08-11867

      v.                               Hon. Terrence G. Berg

NVE, INC.,

                Defendant/Counter-Plaintiff.

_____/

## ORDER RESOLVING MOTIONS IN LIMINE

      This is a trademark infringement case, brought by Plaintiff Innovations

Ventures, LLC d/b/a Living Essentials ("Plaintiff") against Defendant NVE, Inc.

("Defendant").  Plaintiff makes and distributes a 2-ounce energy shot called "5-Hour

ENERGY," and asserts that Defendant's competing energy shot – called "Stacker

2® 6-Hour POWER" – infringes its common law trademark rights.  In a

counterclaim, Defendant asserts that Plaintiff violated the Lanham Act by issuing

false advertising against Plaintiff.  Defendant's counterclaim is that, after Plaintiff

obtained a preliminary injunction in a previous case[1] against the manufacturer of a

different "6-Hour" energy shot, Plaintiff issued a "Legal Notice" to retailers that

appeared to claim that Defendant's "6 Hour POWER" energy shot had been recalled

when, in fact, it had not been.

---

[1] *See, e.g., Innovation Ventures, LLC v. N2G Distrib., Inc.,* 763 F.3d 524 (6th Cir. 2014).

This case is set for a jury trial on March 16, 2015.  There are numerous motions in limine pending.  The Court heard oral argument on several of these motions on December 10, 2014.  The Court's rulings are set forth below.

## A.  Objections to Magistrate Judge Whalen's Order Concerning Plaintiff's "Supplemental" Expert Reports (Dkts. 304, 324)

Both parties object to an order entered by Magistrate Judge Whalen on October 5, 2014 (Dkt. 302).  In the order, Magistrate Judge Whalen denied Defendant's motion to strike (Dkt. 284) a second expert report submitted by Plaintiff's expert witness Dr. Dan Sarel (the "New Sarel Report"), but granted Defendant's motion to strike a report submitted by Plaintiff's expert witness Dr. E. Deborah Jay.  Defendant objects (Dkt. 304) to allowing the New Sarel Report; Plaintiff objects (Dkt. 324) to the striking of Dr. Jay's report.  To bring this dispute into focus, the Court provides the following procedural history.

 Plaintiff filed this case seven years ago, on May 1, 2008 (Dkt. 1).  Pursuant to a stipulated scheduling order (Dkt. 57), burden of proof expert reports were due on or before August 1, 2009. Plaintiff timely served five expert reports, including one prepared by Dr. Sarel (the "Original Sarel Report") and another prepared by Dr. Howard Marylander.  Plaintiff did not, at that time, produce a report by Dr. Jay. On September 15, 2010, Judge Lawrence P. Zatkoff[2] granted cross motions for summary judgment, and dismissed this case in its entirety.

On September 13, 2012, the Sixth Circuit reversed, in part, and remanded the case for further proceedings only on Plaintiff's trademark infringement claim

---

[2] This case was reassigned to the undersigned on October 2, 2014 (Dkt. 300).  The Honorable Lawrence P. Zatkoff passed away on January 22, 2015.

and on Defendant's false advertising counterclaim. *See Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723 (6th Cir. 2012). After remand, on January 9, 2014, Judge Zatkoff entered another stipulated scheduling order (Dkt. 281), setting a "supplemental expert report" deadline of April 30, 2014, a deadline for "rebuttal expert reports" of May 28, 2013, and a date to complete expert depositions by June 30, 2014. Prior to the deadline for submission of "supplemental expert reports," Plaintiff served a follow-up report from Dr. Sarel (again, his second, the first being timely submitted during the initial discovery period) and a report from Dr. Jay (her first in this case). Defendant contends that these two reports do not qualify as "supplemental reports" under Fed. R. Civ. P. 26(e), and therefore should be stricken as untimely. Plaintiff argues that these two reports are in fact "supplemental reports" that were timely filed under the terms of the January 9, 2014 scheduling order.

The standard of review set forth in Rule 72(a) governs this non-dispositive matter. *See* Fed. R. Civ. P. 72(a). Pursuant to that rule, "[t]he district judge in the case must consider timely objections and modify or set aside any part of the [Magistrate Judge's] order that is clearly erroneous or is contrary to law." *Id*. Similarly, under 28 U.S.C. § 636(b)(1)(A), a Magistrate Judge's orders shall not be disturbed unless "found to be clearly erroneous or contrary to law." *See United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001). The "clearly erroneous" standard requires the Court to affirm the Magistrate Judge's decision unless, after reviewing the entirety of the evidence, it "is left with the definite and firm conviction that a

mistake has been committed." *See Sandles v. U.S. Marshal's Serv.*, 2007 WL
4374077 *1 (E.D. Mich. 2007) (citing *United States v. United States Gypsum Co.*,
333 U.S. 364, 395 (1948)).

Having carefully reviewed the parties' briefs in support of their objections
and the relevant authorities, the Court finds that Magistrate Judge Whalen's order
is not "clearly erroneous or contrary to law," therefore, both parties' objections are
**OVERRULED**.  As to the New Sarel Report, Magistrate Judge Whalen correctly
found that this report was "substantially responsive" to the criticisms leveled
against the Original Sarel Report by Defendant's expert witness, Dr. Jacoby.  As
such, the New Sarel Report "serves as a response to an opposing expert's pointing
out gaps in [Sarel's] chain of reasoning." *Eiben v. Gorilla Ladder Co.*, 2013 WL
1721677 *6 (E.D. Mich. Apr. 22, 2013); citing *Miller v. Pfizer, Inc.,* 356 F.3d 1326,
1332 (10th Cir. 2004).  If Defendant wished to have Dr. Jacoby respond to the New
Sarel Report, it could have done so during the time set aside for "rebuttal expert
reports" in the stipulated scheduling order (Dkt. 281).

Regarding the Jay report, Magistrate Judge Whalen correctly ruled that this
report did not qualify as a "supplemental" expert report.  Unlike Dr. Sarel, Dr. Jay
did not previously file an expert report.  Plaintiff argued that Jay's report is
supplemental to that of one of its other experts, Howard Marylander, whom
Defendant's expert – Dr. Jacoby – roundly criticized.  Magistrate Judge Whalen
found it significant that with Dr. Jay, Plaintiff seeks to supplement the report of his
previously disclosed expert, Mr. Marylander, with that of an entirely different

expert.  Citing *Gilbane Bldg. Co. v. Downers Grove Community High School District No. 99*, 2005 WL 838679 (N.D. Ill. 2005), Magistrate Judge Whalen correctly struck the Jay report, since it was "grossly untimely," not substantially justified and prejudicial to Defendant.  *See Noffsinger v. The Valspar Corp.*, 2011 WL 9795, *3 (N.D. Ill. 2011)(citing *Gilbane*, and stating, "A new expert, especially one who conducts new tests and writes a new report, is not 'supplementation'*"); In re Enron Corporation Securities, Derivative & "Erisa" Litigation*, 2007 WL 5023541, 8-11 (S.D. Tex. 2007) (finding subsequent report prepared by a different expert was not a proper supplemental report).  These conclusions are fully supported by the applicable law concerning supplemental expert reports, and the parties' objections simply do not demonstrate that Magistrate Judge Whalen's order is clearly erroneous and contrary to law.  Thus, Plaintiff will be permitted to use the New Sarel Report at trial, but the Jay report is excluded.

## B. *Plaintiff's Motion in Limine to Exclude Evidence of USPTO Proceedings (Dkt. 307)*

Plaintiff moves to exclude evidence of its prior proceedings in the United States Patent and Trademark Office (USPTO), in which Plaintiff's asserted trademark was refused registration.  Plaintiff's proceedings before the USPTO began when Plaintiff filed a federal "intent-to-use" trademark application for the trademark "5-Hour ENERGY" on June 14, 2004 (U.S. Reg. No. 3003077).  On January 20, 2005, the USPTO refused registration of the "5-Hour ENERGY" trademark on the Principal Register on the grounds that the mark was merely descriptive.

On July 19, 2005, Plaintiff amended its trademark application and requested registration on the Supplemental Register.  On September 27, 2005, the "5-Hour ENERGY" trademark was registered on the Supplemental Register.  On July 15, 2008, Plaintiff filed another trademark application for "5-Hour ENERGY" with the USPTO (U.S. Reg. No. 4004225).  The USPTO also refused registration of the second trademark application on the grounds that the mark was merely descriptive, in an office action dated October 29, 2008.

In briefing and argument on appeal to the Sixth Circuit, the parties again raised the issue of whether the "5-Hour ENERGY" mark was a protectable trademark.  The Sixth Circuit sided with Plaintiff, holding:

> The line between merely descriptive and suggestive marks is admittedly hazy and can be difficult to discern. However, we disagree with [Defendant's] contention that the mark is not distinctive and thus not protectable. **The "5-Hour ENERGY" mark is "suggestive."**  We decline [Defendant's] request to affirm on an alternate ground.  Because the "5-Hour ENERGY" mark is suggestive and thus protectable, we next consider whether a triable issue of likelihood of confusion exists.

*Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 730 (6th Cir. 2012) (emphasis added, internal citations omitted).  In its motion seeking to exclude the introduction of evidence concerning the prior USPTO proceedings, Plaintiff argues that such "evidence is contrary to the law of the case as clearly stated in the mandate from the Sixth Circuit and would only confuse the jury about an issue that has already been decided" (Dkt. 307 at 2-3).  Defendant responds that evidence concerning the USPTO proceedings is probative of the relative strength or weakness of Plaintiff's mark, as part of the likelihood of confusion analysis.

6

While the Court appreciates Defendant's argument that the USPTO's orders have some probative value on the strength of Plaintiff's mark, it is clear that on balance the evidence relating to the prior USPTO proceedings is more prejudicial than probative. *See* Fed. R. Evid. 403. The Sixth Circuit made an explicit finding that the "5-Hour ENERGY" trademark is suggestive, and thus protectable. *See Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 730 (6th Cir. 2012). Introducing prior USPTO findings which conclude that the mark is merely descriptive, and therefore *not* protectable, would contradict the Sixth Circuit's legal conclusion and serve only to confuse the jury. *See, e.g., Minemyer v. B-Roc Representatives, Inc.*, 2012 WL 346621 *4 (N.D. Ill. Feb. 2, 2012) (collecting cases) (In excluding certain PTO office actions as "gravid with unfair prejudice" and "potential for jury confusion," a court surveyed the law and determined that the cases are virtually uniform in recognizing "that interim acceptances, rejections and adjustments are the norm at the PTO" and should be excluded as not relevant or prejudicial). Even with a limiting instruction, proof that the USPTO had repeatedly denied Plaintiff a trademark could carry definitive weight with the jury, and suggest that they were allowed to reach a conclusion inconsistent with the Sixth Circuit's ruling. Defendant has not cited any cases where prior USPTO rulings were presented as evidence to a jury, as probative of the strength of the mark, relative to the likelihood of confusion analysis. While arguably relevant to the issue of the "strength" of the mark, the prior USPTO are most directly probative of the "protectability" of Plaintiff's mark, and the Sixth Circuit has removed any need to

offer proof on this question by ruling that the "5-Hour ENERGY" mark is protectable, thus obviating the need to present this evidence.  The USPTO proceedings are more prejudicial than probative on the question of the strength of the mark.  Plaintiff's motion to exclude evidence of the prior USPTO proceedings is therefore **GRANTED**.

### C. Plaintiff's Motion in Limine to Preclude Defendant from Asserting an Unclean Hands Defense (Dkt. 308)

Plaintiff seeks to preclude Defendant for asserting an unclean hands defense, on the ground that Defendant allegedly failed to produce discovery in support of its unclean hands defense.  In its Answer and Counterclaim, Defendant asserted the following affirmative defense:

EIGHTH AFFIRMATIVE DEFENSE

8. Plaintiff's alleged claims may be barred, in whole or in part, by the defenses of estoppel, unclean hands, waiver, or acquiescence.

On October 8, 2008, Plaintiff served its First Set of Interrogatories on Defendant. This set of interrogatories included Interrogatory No. 11:

Interrogatory No. 11: State the legal and factual bases for each affirmative defense pled in [Defendant's] Answer and Affirmative Defenses.

On November 25, 2008, Defendant responded to Interrogatory No. 11:

[Defendant] incorporates the general objections set forth above and specifically objects to this interrogatory to the extent it seeks information that is protected from disclosure by privileges. Moreover, this request constitutes a premature contention interrogatory because discovery has just been initiated and [Defendant] has not yet gathered all of the facts and information that will be used to support these claims and defenses, and has not yet received information from [Plaintiff] that may also be used to support these claims and defenses. Without waiving said objections, [Defendant]

states that it will supplement this response at an appropriate time as discovery continues.

Plaintiff claims that Defendant never supplemented this response, including during the supplemental discovery period after this case was remanded from the Sixth Circuit.

Defendant responds that it did, in fact, supplement its interrogatory response. On July 3, 2009, Defendant served the following supplemental response:

> [Boilerplate objections]… Defendant refers Plaintiff to Paragraph 116-140 of the Third Amended Answer and Counterclaims, which detail the factual bases of Plaintiff's fraudulent procurement of the registration forming the basis of its assertions against Defendant, notably concerning fraudulent material representations to the [USPTO] in which Plaintiff falsely claimed that the good of the alleged registration were in use to fraudulently secure registration of the mark. The [USPTO] relied on Plaintiff's false and material representation to the [USPTO] in granting U.S. Registration No. 3,003,077 on the Supplemental Register. Plaintiff has subsequently asserted the invalid U.S. Registration No. 3,003,077 against numerous defendants knowing that the registration was invalid. Defendant further states that Plaintiff in November of 2007 usurped Defendant's own 6 HOUR POWER mark by registered (sic) the domain names "sixhourpower.com" and "6hourpower.com" in bad faith. Plaintiff continues to hold such domain names hostage, refusing to transfer them to the rightful owner, Defendant, even though Plaintiff has no legitimate purpose for retaining the domain names.

This response contains sufficiently specific factual allegations to put Plaintiff on notice of the nature of Defendant's unclean hands defense.

Furthermore, in Plaintiff's Rule 30(b)(6) deposition notice to Defendant dated October 16, 2009, Plaintiff identified several corporate deposition topics relevant to Defendant's unclean hands defense:

> 29. The circumstances including the date that [Defendant] learned that 6hourpower.com and sixhourpower.com were registered to another entity.

9

31. The basis for asserting [Plaintiff] committed fraud before the Patent and Trademark Office and any alleged damage associated therewith.

32. The basis for asserting [Plaintiff] engaged in anticompetitive conduct and any alleged damage associated therewith.

33. The basis for asserting that [Defendant] was damaged by another entity registering 6hourpower.com and sixhourpower.com.

Defendant identified corporate witnesses for each of these topics, Karen Finocchio for topics 29 and 33, and Erling Jensen for topics 31 and 32. In addition to the corporate deposition testimony given in response to these topics, Defendant provided a 107-page report of antitrust expert Dr. Frank Gollop dated August 3, 2009, and Plaintiff deposed Dr. Gollop at length on November 11, 2009. In his report, Dr. Gollop identified and discussed alleged anti-competitive behavior such as Plaintiff's "STS rack program" that paid retailers to keep Defendant's products off the front counters at convenience stores.

In short, during fact and expert discovery, Plaintiff received ample information from Defendant concerning its allegations of anti-competitive and unfair conduct so that it was sufficiently aware of the nature and scope of Defendant's unclean hands defense. Plaintiff has not demonstrated that it would be unfairly prejudiced by permitting Defendant to assert an unclean hands defense.

Furthermore, unclean hands is recognized as a defense against trademark infringement actions:

The doctrine of unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Auto.*

10

*Maint. Mach. Co.*, 324 U.S. 806, 814 (1945). "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation" of the unclean hands doctrine. *Id*. at 815. If a plaintiff is suing for trademark infringement, fraud in the procurement of the mark may constitute unclean hands. *Cf. Urecal Corp. v. Masters*, 413 F.Supp. 873, 875–76 (N.D. Ill. 1976) (noting that when unclean hands is raised as an affirmative defense in an unfair competition case, the court's role is "to protect the consuming public from commercial dishonesty"). As the Sixth Circuit has stated, "(f)raud or unclean hands are not to be lightly inferred. They must be established by 'clear, unequivocal and convincing' evidence." *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.*, 562 F.2d 365, 371 (6th Cir. 1977) (quoting *Schnadig Corp. v. Gaines Mfg. Co.*, 494 F.2d 383, 392 (6th Cir. 1974)).

*Scooter Store, Inc. v. SpinLife.com*, LLC, 777 F. Supp. 2d 1102, 1113 (S.D. Ohio 2011).

This motion in limine also seeks to exclude any presentation of evidence or argument contrary to the Sixth Circuit opinion; Plaintiff argues that the Court should preclude Defendant from presenting certain evidence in support of its unclean hands defense because such evidence is "no longer relevant given that [Defendant's] claims of cybersquatting and antitrust violations have been dismissed" (Dkt. 309 at 8). However, Defendant did not appeal the dismissal of its cybersquatting claim to the Sixth Circuit, and the Sixth Circuit did not squarely address that claim. Moreover, the fact that certain evidence was found to be insufficient to sustain Defendant's counterclaim for antitrust violations does not mean that such evidence is not relevant to Defendant's equitable unclean hands defense. Indeed, the facts underlying an unclean hands defense need not be of "such a nature as to be punishable as a crime or as to justify legal proceedings of any character." *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 342

11

U.S. 806, 997 (1945). *See also* 2 John Norton Pomeroy, A Treatise on Equity, § 404 ("Misconduct which will bar relief in a court of equity need not necessarily be of such a nature as to be punishable as a crime or constitute the basis of a legal action").

For these reasons, this motion is **DENIED**. Defendant shall be permitted to assert an unclean hands defense at trial. Having said that, Defendant shall not be permitted to assert an unclean hands defense premised upon a "fraudulent procurement" of the "5-Hour ENERGY" mark on the USPTO's Supplemental Register. First, Plaintiff is only asserts a common law trademark infringement claim, thus it does not appear that a fraudulent procurement defense is even relevant. Second, "fraud in the procurement [of trademarks] must be alleged with specificity as required by Rule 9(b)." *Holley Performance Products, Inc. v. Quick Fuel Tech., Inc.*, 2011 WL 3159177 *3 (W.D. Ky. July 26, 2011) quoting *San Juan Prods. Inc. v. San Juan Pools of Kansas, Inc.,* 849 F.2d 468, 472 (10th Cir. 1988). Defendant has not pled its unclean hands defense with sufficient particularity, so as to maintain a fraudulent procurement of trademark defense. In any event, Defendant's response to this motion in limine disclaims this portion of its unclean hands defense (Dkt. 348, FN 2 – "[Plaintiff's] fraudulent misrepresentation to the [USPTO] is no longer relevant in this case because [Plaintiff] withdrew its claim of infringement based on its registered trademark, leaving only [Plaintiff's] common-law trademark infringement claim").

Considering the allegations made by Defendant of misconduct by Plaintiff, the Court finds that Defendant may mount an unclean hands defense.

### D. Plaintiff's Motion in Limine to Exclude Evidence or Argument Contrary to the Sixth Circuit's Mandate (Dkt. 309)

In this motion, Plaintiff seeks to preclude Defendant from presenting evidence or argument that is "contrary to the Sixth Circuit's mandate."  More specifically, Plaintiff wishes to prevent Defendant from introducing evidence: (i) that Plaintiff was not the first to use the mark in specific geographic areas, when the Sixth Circuit stated that Plaintiff used its mark "nationwide" since June 2005; (ii) that the "5-hour ENERGY" mark was weak when Defendant entered the market; and (iii) that Defendant's conduct supports Plaintiff's unclean hands defense where Defendant's cybersquatting and antitrust counterclaims are no longer in the case.

Because this case was remanded from the Sixth Circuit, this Court must "proceed in accordance with the mandate and law of the case as established by the appellate court."  *Hanover Ins. Co. v. American Engineering Co.*, 105 F.3d 306, 312 (6th Cir. 1997).  The Supreme Court's interpretation of the doctrine is that "when a court decides upon a rule of law, that decision should continue to govern the same issue in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983).  The doctrine protects parties from having to re-litigate issues decided in prior stages and assures that inferior courts obey the law established by superior courts.  *See NAACP v. Detroit Police Officers Ass'n.*, 676 F.Supp. 790, 791 (E.D. Mich. 1988).  This doctrine, however, is not an "inexorable command." *Hanover*, 105

13

F.3d at 312.  Courts may reconsider a ruling where there is substantially different evidence, new law is decided by a superior court, or where the decision is clearly erroneous and following it would result in manifest injustice.  *Id*.  Further, the law of the case doctrine only binds a lower court on "those questions necessarily decided in the earlier appeal."  *Id*.  If a question was not necessarily decided on appeal, then any statement regarding it is dicta, and does not bind the lower court.  *Id*. at 312–13 (Sixth Circuit's comment in previous appeal on question that was not before the court did not bind lower court).

Having carefully reviewed the Sixth Circuit's opinion, the Court does not agree with Plaintiff's broad reading of its scope.  Because the holding of the Court of Appeals did not decide the questions on which Plaintiff seeks to foreclose the evidence, this motion is **DENIED**.  The Sixth Circuit's decision did not excuse Plaintiff from carrying its burden of proof of establishing its trademark infringement claim at trial, through the introduction of admissible evidence and testimony.  In a common law trademark action, the plaintiff has the burden of proof to establish first use of its trademark in every specific geographic area in which it claims superior rights.  *See, e.g., Commerce Bancorp, Inc. v. BankAtlantic*, 285 F. Supp. 2d 475, 497 (D.N.J. 2003) (stating that the senior user "bears the burden of proving [that] the reputation of its trademark extends into a particular area").  As the Sixth Circuit has explained, "[a]t common law, ownership of a trademark or service mark rights is obtained by actual use.  The first to use a mark in the sale of goods or services is the "senior user" of the mark and *gains common law rights to*

14

*the mark in the geographic area in which the mark is used." Allard Enters. v.*
*Advanced Programming Res., Inc.*, 249 F.3d 564, 571-572 (6th Cir. 2001) (citing J.
Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 16:1 (4th
ed. 2000)) (emphasis added).

Plaintiff premises its argument that the Sixth Circuit definitively ruled that
it used the 5-Hour ENERGY mark "nationwide" upon a single sentence from an
introductory paragraph in the opinion, in which the Court recites background
information to frame the appeal.  From this sentence – "Starting in June 2005,
[Plaintiff] marketed '5-Hour ENERGY' in national drugstore chains, convenience
stores, and retailers nationwide" *Innovation Ventures,*  694 F.3d  at 727 – Plaintiff
concludes that the Court of Appeals established as the law of the case that Plaintiff
had geographical superiority *nationwide* going back to June 2005.  Viewed in
context, however, this sentence appears to be part of the Court's recitation of
background facts, not a definitive ruling or finding of fact intended to establish the
date upon which Plaintiff's use of its mark occurred in particular geographic areas.
Thus, whether Plaintiff used the "5-Hour ENERGY" mark in any particular
geographic area before Defendant used the "6-Hour POWER" mark in that area was
not decided by the Sixth Circuit, and it remains a factual issue that Plaintiff bears
the burden of proving through the admission of evidence at trial.

Next, Plaintiff argues that Defendant should be precluded from arguing that
the "5-Hour ENERGY" mark was a "weak" mark when Defendant's "6-Hour
POWER" product entered the market in March 2006.  Plaintiff avers that the Sixth

Circuit's finding that the "5-Hour ENERGY" mark was "suggestive," and thus protectable, precludes Defendant from presenting evidence about the relative strength of weakness of Plaintiff's mark when Defendant entered the market. Defendant responds that Plaintiff is improperly conflating two legal inquiries – protectability, and the likelihood of confusion.[3]  Defendant is correct.  The Sixth Circuit found that there was a genuine issue of material fact on the likelihood of confusion question, characterizing it as a "factually intensive issue" and a "close call" that could be "decided either way." *Innovation Ventures*, 694 F.3d at 733. Indeed, the Court found that "[s]ummary judgment was improperly granted on this claim," and remanded for a jury trial.  *Id.*  As such, Defendant should not be precluded from introducing evidence that Plaintiff's mark was "weak" when Defendant entered the market, to counter Plaintiff's evidence that its mark was "strong."  Plaintiff still has the burden of proving a likelihood of confusion, which may be proven in part with evidence showing the strength of the mark under the *Frisch* factors.  In mounting its defense, Defendant may adduce whatever evidence it may have in an attempt to show that the "5-Hour ENERGY" mark was not strong in the marketplace before Defendant entered the market in March 2006.  Plaintiff may not exclude such evidence.

---

[3] Likelihood of confusion is determined by examining the eight *Frisch* factors: (1) "**strength of the plaintiff's mark**," (2) "relatedness of the goods or services," (3) "similarity of the marks," (4) "evidence of actual confusion," (5) "marketing channels used," (6) "likely degree of purchaser care," (7) "the defendant's intent in selecting its mark," and (8) "likelihood of expansion of the product lines." *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 548 (6th Cir. 2005) (emphasis added) citing *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir.), *cert. denied,* 459 U.S. 916 (1982).

Finally, Plaintiff argues that Defendant should be precluded from introducing evidence of alleged cybersquatting and antitrust/anti-competitive behavior as part of its unclean hands defense, because those counterclaims have been dismissed from the case.  First, while it is true that these claims are no longer being made, the evidence pertaining to them may nevertheless be offered as relevant to support an unclean hands defense.  It is not necessary that the facts underlying an unclean hands defense be sufficient to support a separate legal claim. *See Precision Instrument Mfg. Co. v. Automotive Maint. Machinery Co.*, 342 U.S. 806, 997 (1945) ("[O]ne's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character").  Second, the Sixth Circuit did not address the merits of Defendant's unclean hands defense, thus there is no clear mandate negating that defense.  *See Shakespeare Co. v. Silstar Corp. of Am.*, 906 F. Supp. 997, 1005 (D.S.C. 1995) (finding that the appellate court did not address "in a substantive fashion the merits of defendant's unclean hands defense" and thus the mandate rule did not preclude the district court's consideration of it).  Defendant is therefore entitled to rely on some or all of the same factual evidence that may have been relevant to proving its cybersquatting and antitrust claims, even though those counterclaims are no longer at issue in this case.

### E. Defendant's Motion to Exclude the Original Report and Testimony of Dr. Dan Sarel (Dkt. 313)

Defendant has raised a *Daubert* challenge to the admissibility of the "Original Report" of Dr. Dan Sarel.  Dr. Sarel is a marketing consultant, whom

17

Plaintiff hired to "[p]rovide an expert opinion as to the likelihood of confusion" between Plaintiff's 5-Hour ENERGY mark and Defendant's 6-Hour POWER mark. (Dkt. 313, Ex. A, Dr. Sarel's 5-Hour ENERGY v. 6-Hour POWER Likelihood of Confusion Study, dated July 29, 2009, at 5, hereinafter, the "Original Sarel Report").

The Original Sarel Report describes a "mall intercept" survey conducted at various locations in the United States between May 29, 2009 and June 22, 2009. *Id.* at 16-17. The survey respondents were limited to "buyers and potential buyers of 2-ounce energy drinks who are 18-35 years old, ¾ males, ¼ females, residing all over the country." *Id.* at 16. This group was selected based on Dr. Sarel's belief that the "demographic characteristics of the primary customers seem to be young adults (18-25 years old), mostly males . . ." *Id.* at 15.

Federal Rule of Evidence 702 provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This Rule allows the trial court to act as a gatekeeper in barring unsupported, unreliable and speculative expert opinion from trial. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). However, determining that an expert's assertions are reliable is not the same as deeming them correct, which is for the trier of fact to

18

decide. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529–30 (6th Cir. 2008). Indeed, "rejection of expert testimony is the exception, rather than the rule, and we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record." *Id*. at 530 (citations omitted). Still, the Court has an obligation to scrutinize the principles and methodology used by an expert, to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.

Defendant argues that the Original Sarel Report should be excluded under Federal Rule of Evidence 702 due to multiple flaws in his survey methodology. In particular, Defendant challenges the methodology for including an improper survey population, employing an improper control, utilizing leading and suggestive questions, and failing to replicate market conditions. These problems, Defendant maintains, rendered the scientific foundation for Dr. Sarel's opinions unreliable. Perhaps most saliently, Defendant notes that, in late 2011, a very similar survey and report from Dr. Sarel was excluded in another case brought by Plaintiff in this District, with the Court finding that Dr. Sarel's survey methodology had "multiple flaws" resulting in an "unreliable scientific foundation for its conclusions." *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, 08-10983, 2011 WL 6010206 (E.D. Mich. Nov. 30, 2011) (Borman, J.).

19

The Court has reviewed Judge Borman's analysis and finds that Dr. Sarel's report in this case suffers from many of the same kinds of problems that led to exclusion in that case. Plaintiff attempts to distinguish Judge Borman's opinion by pointing out that, in the *N2G* case, Judge Borman relied in part on the fact that Dr. Sarel did not allow the survey participants to handle the actual sample bottles, but rather used pictures of the various products. In the Original Sarel Report before this Court, survey participants were given the actual bottles. While this major flaw from the *N2G* case is not present here, other significant flaws remain. Judge Borman also ruled that the Sarel report at issue in *N2G*: (i) relied upon leading questions; (ii) improperly failed to inform survey participants that "don't know" was an acceptable answer to questions; and (iii) used an inadequate control product, the energy shot "ROCK ON." These same flaws are present in the Original Sarel Report at issue in this motion, and the Court finds no basis to depart from Judge Borman's reasoning that these flaws rendered the report at issue unreliable, and excludable under the *Daubert* analysis.

As in *N2G*, using "ROCK ON" as the control is improper because, as Judge Borman found, it has "blatantly obvious differences" from the 5-Hour ENERGY product in color, lettering, theme, imagery, and name. The 5-Hour ENERGY product label consists of a red color changing to orange and yellow like a sunrise or sunset, and depicts terrain with blue-colored mountains in the background. It has large black lettering and smaller yellow lettering placed horizontally on the label. The name of the product, "5-Hour ENERGY," emphasizes an effect that will last for

a particular time period.  The ROCK ON product, by contrast, shares none of those characteristics. The ROCK ON product is a predominantly black bottle with vertical silver lettering – it has no significant red, orange, yellow, or blue coloring.  The ROCK ON product does not emphasize time or duration.  Likewise, the ROCK ON product is markedly different from the 6-Hour POWER Very Berry product – which is in a bright red bottle to coordinate with its flavor, depicts an image of fruit, and features durational language in a bold font in horizontal writing.

The Original Sarel Report contains nearly identical flaws as those that led to exclusion in the *N2G* case.  Apparently recognizing this fact, Plaintiff directed Dr. Sarel to conduct a new survey using different methodology (which gave rise to the New Sarel Report, discussed in section A, above).  Defendant has not raised a *Daubert* challenge to the New Sarel Report.  Plaintiff may rely upon the New Sarel Report at trial, but not the Original Sarel Report.  For these reasons, this motion is **GRANTED**.

### F.  Defendant's Motion to Exclude Plaintiff's Expert Witness Howard Marylander (Dkt. 315)

Defendant also raises a *Daubert* challenge to exclude Plaintiff's expert witness, Howard Marylander.  Plaintiff hired Mr. Marylander to conduct a so-called Teflon survey[4] to measure "whether consumers understand 5-Hour ENERGY to be a common name or a brand name in the context of food and food supplements" (Dkt. 315, Ex. A, Marylander Report at 4).  Based on his survey results, Marylander

---

[4] A "Teflon survey" is a well-known survey protocol designed to test consumers' understanding of whether a trade mark is understood to be a generic term or a brand name.  The protocol was first used by the DuPont company in 1975 to prove that TEFLON was not generic.  *See E. I. DuPont de Nemours & Co. v. Yoshida Int'l, Inc.*, 393 F. Supp. 502 (E.D.N.Y. 1975).

offers two conclusions: (1) 5-Hour ENERGY "is recognized as a brand name in the context of foods and food supplements . . . [and] that brand recognition is a strong one[]" and (2) "[b]ecause of its clear recognition as a brand, . . . 5-HOUR ENERGY has strong secondary meaning." Ex. A at 13.

Defendant argues that Marylander should be prohibited from testifying at trial, because his opinions that 5-Hour ENERGY is a brand name and not a common or generic name are irrelevant, because the issue of genericness was mooted by the Sixth Circuit's finding that the term "5-Hour ENERGY" is suggestive, and thus protectable. Defendant further argues that Marylander should be excluded, because his survey contains numerous methodological flaws, including improper definitions for brand names and common names, an improper "category context," and an improper universe.

As to Defendant's first argument, Plaintiff responds that the Marylander survey attempts to test brand strength, and that the study conducted by Marylander is widely accepted as evidence for "strength of the mark" – one of the *Frisch* factors in dispute in this case for a likelihood of confusion.

As noted above, under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), the Court must ensure that expert testimony "is not only relevant, but reliable." *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). *Daubert* and *Kumho* are codified in Federal Rule of Evidence 702. "[T]he trial judge must have considerable leeway in determining whether particular expert testimony is reliable." *Kumho Tire Co.*, 526 U.S. at 152. In evaluating a proffered expert's

22

qualifications, "[t]he trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire Co.*, 526 U.S. at 156. *Daubert* requires that the expert possess expertise assessed in the context of the "nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony." *Id.* at 150. The *Daubert* standard applies to survey evidence. *See, e.g., The Sports Authority, Inc. v. Abercrombie & Fitch, Inc.*, 965 F.Supp. 925, 933 (E.D. Mich. 1997) (holding that "[t]he proponent of a consumer survey has the burden of establishing that it was conducted in accordance with accepted principles of survey research") (citation omitted).

Having reviewed the Marylander survey and report, the Court finds that its results and Marylander's opinion are relevant to the issue of the strength of the "5-Hour ENERGY" mark, one of the key factors that the jury will have to consider in its likelihood of confusion analysis. *See Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). In another lawsuit involving infringement of the 5-Hour ENERGY trademark, the Sixth Circuit stated that a similar Marylander study "showed that people generally perceived [5-Hour ENERGY] as a brand name, not a generic name" and that "the jury was entitled to credit Marylander's conclusion that [the 5-Hour ENERGY] was a robust mark." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 535 (6th Cir. 2014).

The Court notes that the procedural posture of this case is somewhat unique. The Sixth Circuit has ruled that the 5-Hour ENERGY mark is "suggestive," and

thus protectable.  Normally, a Teflon survey is used in a trademark case to determine "genericness," in other words, whether a mark is protectable.  Broadly speaking a mark must be distinctive in order to be protectable.  A mark is distinctive if it either: 1) is inherently distinctive or 2) has acquired distinctiveness through secondary meaning.  Marks are classified in order of increasing distinctiveness as: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; or 5) fanciful.  A mark is "inherently distinctive" if it is suggestive, arbitrary, or fanciful. A mark that is not inherently distinctive can be rendered distinctive if it acquires a secondary meaning.  Generic terms are not protectable.  *See, e.g., Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 762 (6th Cir. 2005).  In this case, the Sixth Circuit decided the question and found that 5-Hour ENERGY was a protectable mark.  Thus, the question becomes, is a "Teflon survey" still relevant and probative of the strength of Plaintiff's mark.  Given the unique procedural posture of this case, the Court finds that Marylander's Teflon survey remains relevant to determine the relative strength of Plaintiff's mark.  "The strength of a mark is a factual determination of the mark's distinctiveness.  The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr*., 109 F.3d 275, 280 (6th Cir. 1997) (citation omitted).

Turning to the survey itself, the relevant case law counsels that – subject to the Court's overriding gatekeeping function under *Daubert* – errors in survey methodology are more properly directed against the weight a jury should give the

survey, rather than overall admissibility. *See, e.g.*, *Whirlpool Props., Inc. v. LG Elecs. USA, Inc.*, 2006 WL 62846 *3 (W.D. Mich. Jan. 10, 2006) ("the majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence"); *Jack Daniel Distillery, Inc. v. Hoffman Distilling Co.*, 190 F.Supp. 841, 845 (W.D. Ky. 1960), aff'd 298 F.2d 606 (6th Cir. 1962) (market survey admitted, even though held inadequate to prove secondary meaning for Jack Daniel's whiskey bottle label); *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 228 (2d Cir. 1999) ("[E]rrors in methodology thus properly go only to the weight of the evidence," not its admissibility).

The general reliability of Teflon surveys cannot be questioned, given their wide acceptance in trademark litigation. The Marylander survey methodology is patterned after other surveys that have been judicially scrutinized and approved by other courts. *See In re DaimlerChrysler AG, Serial No. 74/734,869*, 2001 WL 862242, at * 6 (T.T.A.B. July 26, 2001) ("The so-called 'Teflon survey' is widely accepted in determining whether a term is generic."); *Anheuser–Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 639 (8th Cir. 1984) (characterizing a Teflon survey as "properly conducted"); *Invisible Fence, Inc. v. Fido 's Fence, Inc.*, No. 3:09–CV–25, 2013 WL 6191634 (E.D. Tenn. Nov.26, 2013) (accepting a survey that "generally" complies with Teflon ).

The Court finds that any purported errors in Marylander's methodology are more akin to technical deficiencies than to major flaws capable of skewing the reliability of the results. Consequently, such errors may be considered by the jury

25

in evaluating what weight to give this evidence, but they do not support a finding that Marylander's survey unreliable as a matter of law.  As such, this motion is **DENIED.**

### G. Defendant's Motion to Exclude Plaintiff's Expert Witness Dr. Gregory Carpenter (Dkt. 316)

Defendant also moves under *Daubert* to exclude Plaintiff's expert witness Dr. Gregory Carpenter on three grounds:  (1) Dr. Carpenter improperly speculates about Defendant's intent in copying Plaintiff's mark; (2) Dr. Carpenter's opinion concerning the likelihood of confusion issue is an improper legal conclusion; and (3) Dr. Carpenter's opinion on brand strength is cumulative.

In reviewing Plaintiff's response, it appears to the Court that certain aspects of this dispute are no longer at issue.  Plaintiff states that it agrees not to elicit testimony concerning Defendant's intent in selecting the name 6-Hour POWER (Dkt, 340 a 7-8).  This alleviates Defendant's first concern, as Plaintiff will not be permitted to present Dr. Carpenter's opinion regarding Defendant's intent. Likewise, Plaintiff's response brief states that it will not seek to elicit testimony from Dr. Carpenter concerning the ultimate issue of likelihood of confusion, or infringement (Dkt. 340 at 8).  This appears to adequately address Defendant's second concern with Dr. Carpenter's testimony.  The Court will therefore limit the scope of Dr. Carpenter's testimony to exclude any comments or opinion regarding likelihood of confusion and infringement.

Thus, the only matter still in dispute is whether Dr. Carpenter's opinion concerning the strength of Plaintiff's brand is cumulative of the testimony offered

by Plaintiff's other experts. Dr. Carpenter is a professor of marketing strategy at Northwestern University who was hired by Plaintiff to "assess the strength of the 5-Hour ENERGY brand in the marketplace, the sources of success of the 5-Hour ENERGY brand, and to analyze the implications of the infringements of the value of the brand to [Plaintiff]" (Dkt. 316, Ex. A at ¶ 2). Dr. Carpenter is a well-credentialed professor specializing in marketing. In particular, Dr. Carpenter appears to specialize in market research concerning "pioneering brands," or brands that have a "first mover" advantage. Dr. Carpenter has authored numerous articles and regularly conducts presentations on the concept of pioneering brands.

Defendant argues that Dr. Carpenter "merely parrots the findings of other expert reports without conducting any independent investigation, study, or survey to assess brand strength…" (Dkt. 316 at 9). As such, Defendant contends that Dr. Carpenter's testimony should be excluded because whatever probative value that it arguably has, such value is substantially outweighed by a danger of needlessly presenting cumulative evidence.

According to Plaintiff, Dr. Carpenter will provide testimony as to how a pioneering brand draws competitors and why others would want to trade on the power of the brand. Dr. Carpenter will also explain how Defendant's actions are indicative of these types of competitors (Dkt. 316, Ex. A, Carpenter Report at ¶¶24-28). The Court agrees with Plaintiff. Dr. Carpenter's testimony concerning "pioneering brands" is not cumulative of the testimony of Plaintiff's experts. This testimony may be helpful to the jury in understanding how the various expert

27

surveys support the marketing theory that pioneering brands have high brand strength.

Accordingly, this motion is **GRANTED IN PART** and **DENIED IN PART**. Dr. Carpenter shall not be permitted to opine on Defendant's intent in selecting the name 6-Hour POWER, nor will Dr. Carpenter be permitted to opine on the ultimate issue in this case, *i.e.*, that a likelihood of confusion exists between the two competing products. Thus, Defendant's motion is granted on these points. The Court does not find that Dr. Carpenter's testimony regarding pioneering brands and brand strength in general is cumulative of Plaintiff's other expert witnesses, and will not prohibit him completely from testifying. Thus, this portion of Defendant's motion is denied.

### H. Defendant's Motion to Exclude Plaintiff's Expert Witness Tom Pirko (Dkt. 317)

Regarding Plaintiff's food and beverage industry expert, Tom Pirko, Defendant raises a three-point *Daubert* challenge. Defendant argues that Mr. Pirko should be prohibited from testifying because: (1) several of his opinions appear directed against Defendant's antitrust counterclaim, which the Sixth Circuit dismissed; (2) Mr. Pirko's testimony relates only to factual disputes, and as such will not be helpful to the jury; and (3) Mr. Pirko's testimony is not based upon any reliable scientific method or supported by reference to any recognized peer-reviewed authority.

Mr. Pirko was retained by Plaintiff to offer a rebuttal opinion on Defendant's counterclaims of false advertising and antitrust violations. Defendant alleged in its

28

antitrust counterclaim that Plaintiff violated Section 2 of the Sherman Act by, among other things, "offering incentives to retailers for superior product placement" and "requesting that its retailers sell its product at the exclusion of other energy-shot products." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 694, 739 (6th Cir. 2012). Defendant offered the expert opinions of Frank Gollop and Carl Degen to support the claim. Mr. Pirko reviewed and rebutted the opinions of Defendant's experts stating, based on over 35 years of experience in marketing and sales in the food and beverage industry, that Plaintiff's merchandising, display and incentive programs are consistent with the industry standard and Defendant's own practices (Dkt. 317, Ex. A at ¶¶10, 25-31).

Defendant's antitrust claim was subsequently dismissed on summary judgment and that dismissal was affirmed on appeal. *See Innovation Ventures*, 694 F.3d at 740-741. However, Defendant is still vigorously asserting an unclean hands defense in response to Plaintiff's trademark infringement claim, and that defense relies on factual grounds quite similar to Defendant's previously dismissed antitrust claim. Indeed, the proposed joint final pretrial order, states that Defendant "shall assert a complete defense of unclean hands based on, among other proofs: . . . . [Plaintiff's] concerted efforts to keep [Defendant's] products off the shelves or off the preferred point-of-sale product placement locations in retail stores" (Dkt. 398, Ex. D at 8-9). In light of Defendant's unclean hands allegations, Mr. Pirko's testimony remains relevant, notwithstanding the fact that Defendant's antitrust counterclaim

has been dismissed.  Therefore, Defendant's first argument to exclude Mr. Pirko is not well-taken.

Turning to Defendant's second challenge to Mr. Pirko – that he improperly opines and speculates on factual disputes – the Court agrees with Defendant that certain portions of Mr. Pirko's report should not be presented to the jury.  While it is impossible to foretell exactly how Plaintiff will present Mr. Pirko's testimony at trial, the Court can give the parties some guidance as to the nature of testimony that it will not allow.  For example, the following are excerpts from Mr. Pirko's report containing statements about the "Legal Notice" which Plaintiff sent out advising customers that a court had enjoined the sale of a "6 Hour" energy shot. (Dkt. 317, Ex. A):

35) The "Legal Notice" clearly states: "Court orders immediate stop to manufacturing, distributing and sale of 6 Hour Energy shot." (NVE25038.) **It distinctly and explicitly avoids listing or naming the 6 Hour Power brand, a product that too competed against the 6 Hour Energy product, the product infringing [Plaintiff's] trademark.**

36) The "Legal Notice" continued to explain that [Plaintiff] "won a decision against a '6 Hour' energy shot that closely mimicked 5-Hour Energy." **Several [of Defendant's] employees in this matter have testified that this language does not and cannot refer to 6 Hour Power**.

37) The "Legal Notice" also explained that "It can be difficult to tell 5 Hour-Energy apart from the '6 Hour' knockoff product." **Again, several [of Defendant's] employees in this matter have testified that this language does not and cannot refer to 6 Hour Power.**

**\*\*\***

41) The "Legal Notice" then advocates not a demand for action (removal of "the" offending product, 6 Hour Energy, from the shelves) but rather recommends making a call if there was any doubt on the part of the retailer: "If you have any questions, please call us at 248-960- 1700 ext 217." **This**

**was further insurance against any misreading of the notice**. Of course, any retailer could Google "6 Hour Energy recall" or the case number (08-CV-10983) listed in the "Legal Notice" and obtain more information immediately.

\*\*\*

43) **Based on the above, there could be no damage to [Defendant] in the form of lost sales as a result of the "Legal Notice." In fact, if there was anyone that misread the "Legal Notice" it is because [Defendant] selected a name of its shot 6 Hour POWER that is confusingly similar to 5-hour ENERGY.**

The statements highlighted above in bold are examples of the kind of testimony that crosses the line from proper opinion evidence to improper factual and legal conclusions. These are not the only inadmissible statements found in Mr. Pirko's report, but they are offered here to be illustrative of the problem. In light of his experience and expertise, Mr. Pirko may properly testify concerning how recall notices are normally handled in the beverage industry, and what kinds of actions a typical merchant would ordinarily take in response to a Legal Notice of the type sent out by Plaintiff. He may not offer his opinion concerning the intended scope of the Legal Notice or speculate about its "meaning," or how others would understand or interpret that meaning. He may not summarize what he believes to be the testimony or statements of other people who have read the Legal Notice and may not offer any opinion on the ultimate issue as to whether the Legal Notice was misleading or whether Defendant's 6-Hour POWER brand is or is not confusingly similar to Plaintiff's 5-Hour ENERGY brand.

Defendant's third challenge attacks Mr. Pirko's qualifications because he is not recently published on the subject matters in this suit and he lists no-peer

31

reviewed or non-peer-reviewed articles citing him as an expert.  As the Court indicated during oral argument, Mr. Pirko's expertise is in the general practices of the beverage industry.  Mr. Pirko has over 35 years of experience in advising food and beverage managers, manufacturers and sellers on, among other things, competition, marketing, advertising, sales, distribution and convenience store retailing (Dkt. 317, Ex. A at ¶¶2, 5).  He has nearly 25 years of experience with recalls, including advising as to the effect of them on sales and distribution.  *Id.* at ¶¶3, 7.  He has offered consultation services regarding energy shot products. *Id.* at ¶5. He has testified before government and regulatory bodies on food and beverage industry standards, and has advised industry clients on ligation in the nutritional supplement industry and served as an expert witness in cases involving intellectual property claims.  *Id.* at ¶7.

Expert opinion may be based entirely on experience.  As the Sixth Circuit has explained, if the *Daubert* "framework were to be extended to outside the scientific realm, many types of relevant and reliable expert testimony—that derived substantially from practical experience—would be excluded. Such a result truly would turn *Daubert*, a case intended to relax the admissibility requirements for expert scientific evidence, on its head."  *United States v. Jones*, 107 F.3d 1147, 1158 (6th Cir. 1997) (citation omitted).  The Sixth Circuit's insight was later vindicated by the Supreme Court's observations in *Kumho Tire* that "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case"; in some cases "the relevant reliability concerns may focus upon personal knowledge or

32

experience." *Kumho Tire Co.*, 526 U.S. at 141, 150. Therefore, whether "*Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153; *see also, Walker v. Jax Mold & Mach.,* 1995 WL 723216 *5 (6th Cir. Dec. 6, 1995) ("Due to their extensive practical experience in the relevant industry, the district court did not err in finding that [the experts] were qualified to provide information on industry standards, nor did the court abuse its discretion in determining that their expert opinions would assist the jury"). Mr. Pirko may not be an academic expert or a scientist, but he may offer opinion testimony based on his significant experience and training in the food and beverage industry on the defined subject matters permitted by this order.

This motion is **GRANTED IN PART** and **DENIED IN PART**. Mr. Pirko may be called as an expert witness. However, as discussed above, the Court will limit Mr. Pirko's trial testimony to the subject matters described herein, will address any objections thereto as they arise and will instruct the jury to disregard any testimony that exceeds these parameters.

## I. *Defendant's Motion to Preclude Plaintiff from Introducing Certain Instances of Alleged "Actual Confusion" (Dkt. 319)*

As stated on the record on December 10, 2014, this motion is **GRANTED IN PART** and **DENIED, WITHOUT PREJUDICE, IN PART**. This motion attempts to exclude numerous kinds of evidence. Specifically, Defendant seeks to exclude Plaintiff's 47 claimed instances of "actual confusion" between the two products, broadly grouped into the following categories: (1) misstatements or "slips of tongue"

33

made by Defendant's counsel or expert witnesses; (2) instances of alleged actual confusion that do not specifically relate to 6-Hour POWER's product or name, (3) other instances where there is no showing of any actual confusion; (4) instances of alleged actual confusion that constitute hearsay not within any exception; and (5) inquiries about the source of the parties' products that are not probative of any actual confusion on the part of the person making the inquiry. In light of the variety of kinds of statements at issue and the significance of the individual circumstances when they were made, the admissibility of the evidence pertaining many of these incidents of "actual confusion" will turn in large part on the context in which the evidence is proffered at trial. There is, however, one category of evidence that is clearly excludable – the misstatements or "slips of the tongue" made by Defendant's counsel or expert witnesses during the litigation of this case.

Plaintiff points out that during the six-plus years that this case has been pending, Defendant's counsel and experts have occasionally misstated the name of Plaintiff's and Defendant's products during discovery. These slips of tongue or inadvertent oral or written misstatements made by Defendant's counsel or its expert witnesses included, for example, mistakenly referring to "5-Hour ENERGY" as "5-Hour POWER." The Court does not believe that this sort of inadvertent misspeaking by lawyers or retained experts tends to prove the existence of any "actual confusion" between Defendant's "6-Hour POWER" mark and Plaintiff's "5-Hour ENERGY" mark in the marketplace of consumers. The relevant inquiry must focus on confusion in the minds of purchasers or potential purchasers of the

trademarked products, or in other words, consumers in the marketplace for those goods. *See, e.g., Marshall Field & Co. v. Mrs. Field's Cookies*, 25 U.S.P.Q. 2d 1321, 1992 WL 421449, at *16 (T.T.A.B. 1992) ("It is obvious that respondent's attorney was quite aware of the differences between the two [trademarks] and that what occurred was nothing more than a slip of the tongue under the pressure of conducting the interrogation"); *VMC Corp. v. Distrib. Marketing Serv.*, 192 U.S.P.Q 227, 1976 WL 21124, *3 n.4 (T.T.A.B. 1976) ("This slip of the tongue under the tension of being subjected to interrogation by opposing counsel is not indicative of a marketing environment"). This evidence is not probative of trademark confusion. Moreover, the spectacle of Plaintiff's presenting misstatements by Defendant's counsel or witnesses to prove actual confusion would be fraught with unfair prejudice that would greatly outweigh whatever miniscule probative value such evidence may have. Therefore, all of this evidence shall be excluded. *See* Fed. R. Evid. 403. This motion is granted as to this evidence.

As to the second category – instances of alleged actual confusion that Defendant claims do not specifically relate to 6-Hour POWER's product or name – the Court agrees with Defendant, as a general proposition, that Plaintiff must lay a foundation that the confusion asserted arguably relates to *Defendant's* 6-Hour POWER product, and not to some other "6-Hour" product. *See, e.g.*, *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006) ("In order to prove actual confusion, the confusion must stem from the mark in question…"); *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004)

35

(District Court did not err in holding that, to be admissible, an instance of purported actual confusion must: (1) "specifically mention [the alleged infringer] . . . and (2) describe the specific evidence of the direct link to [the alleged infringer] in either the form of (a) documentary evidence, . . . or (b) a clear and specific statement by the customer").

As to the commingling of Plaintiff's and Defendant's products on a common display shelf, the Court will permit the introduction of this evidence. At a bare minimum, this evidence is relevant to show that the parties' products are sold through the same marketing channels – the fifth *Frisch* factor.

With respect to those instances of actual confusion that Defendant believes should be excluded under the hearsay rule, Defendant above all should recall the Sixth Circuit's admonition in the appeal of this case that "the strict application of the rules of evidence to a claim that depends on customer confusion places too heavy a burden on" the offering party (in that instance, Defendant NVE) and that customer calls "were not relied on to show the content of the conversations, but rather were introduced merely to show that the conversations occurred and the state of mind of the declarants" and were admissible under Fed. R. Evid. 803(3). *Innovation Ventures*, 694 F.3d at 738.

Given that this motion seeks exclusion of some 47 separate statements, some of which may not even be offered by Plaintiff, the Court will reserve ruling on the remaining instances of confusion but will require Plaintiff to make a proffer of the challenged evidence and the basis of its admissibility before the testimony or other

36

evidence is offered.    Accordingly, this motion is **GRANTED IN PART** and

**DENIED, WITHOUT PREJUDICE, IN PART**.

## J. *Defendant's Motion in Limine to Exclude Plaintiff's Invoice Summary (Dkt. 320)*

In this motion, Defendant argues that Plaintiff should be prohibited from

offering as evidence at trial both its "invoice summary" and the underlying invoices

supporting that summary, because Plaintiff allegedly failed to produce these

documents during discovery.  More particularly, Defendant argues that it requested

through interrogatories and document requests information concerning the

geographic extent of Plaintiff's sales of 5-Hour ENERGY, but that Plaintiff failed to

produce such information.[5]

Plaintiff responds that Defendant did not specifically request this document

during discovery and, in any event, that Plaintiff has maintained since the outset of

this litigation that it marketed its 5-Hour ENERGY product nationwide since 2005.

The parties have very different views of what was, and what was not

requested and produced during the original discovery period in this case.  It is clear,

however, that the invoice summary at issue was produced by Plaintiff to Defendant

on January 20, 2010 as an exhibit to Plaintiff's response to Defendant's motion for

summary judgment (Dkt. 158, Ex. 21).  Defendant's summary judgment motion

argued that Plaintiff had not established first use in any geographic area (Dkt. 137,

p. 13).  In response to this allegation, Plaintiff produced the invoice summary at

---

[5] This information is relevant because, as the common law trademark plaintiff, Plaintiff has the burden of proving first use in each geographic area where it claims priority.  *See Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 571-72 (6th Cir. 2001) (citing 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 16:1 (4th ed. 2000)).

issue.  The Court is not persuaded that Defendant would suffer any undue surprise from the admission of a document that it has had in its possession for over five years.  This motion is **DENIED.**

### K. *Defendant's Motion in Limine to Preclude Plaintiff from Presenting Evidence Regarding the Ephedra Lawsuits (Dkt. 321)*

At the close of the hearing on these motions on December 10, 2014, the Court stated on the record its ruling indicating that this motion is **GRANTED**. Defendant moves to preclude Plaintiff from referencing specific lawsuits filed by consumers against Defendant and others for personal injuries and wrongful death allegedly caused by the ingestion of Defendant's discontinued products which contained ephedra.  As indicated on the record, this evidence will be excluded because its probative value is substantially outweighed by the danger of unfair prejudice.

The ephedra lawsuits naming Defendant were product liability cases. Plaintiff's claims in this case involve trademark infringement.  Evidence specifically referencing the ephedra lawsuits, and Defendant's involvement in those lawsuits, offers no support for the claims that Defendant infringed Plaintiff's trademark; it simply suggests that Defendant is a bad actor.  Under the probative/prejudice balancing test of Fed. R. Evid. 403, the prejudice resulting from this kind of evidence clearly outweighs its probative value.

Defendant's motion also seeks to exclude certain prior sworn statements made by Defendant's President, Robert Occhifinto, in testimony before a Congressional Committee investigating the ephedra lawsuits.  As the Court stated

38

in the hearing, if Mr. Occhifinto should make any statements at trial that are
inconsistent with his sworn testimony before Congress, then that testimony may be
used to impeach him.  Beyond its use for such impeachment, however, reference to
the ephedra lawsuits is excluded.

### L. Defendant's Motion in Limine to Exclude the Testimony of Jesus "Joe" Palmeroni (Dkt. 322)

This motion, to exclude the testimony of Defendant's former vice president as
"inherently unreliable," was also **DENIED** at the close of oral argument for the
reasons stated on the record.  The former vice president, Mr. Palmeroni, was
terminated by Defendant in 2006 due to purported theft and fraudulent conduct in
his role as a sales representative for Defendant.  In 2006, Defendant sued Mr.
Palmeroni in New Jersey to recover the allegedly stolen monies.

Defendant has presented evidence that an attorney purportedly acting on Mr.
Palmeroni's behalf contacted Defendant's counsel and allegedly offered to arrange
for Mr. Palmeroni to provide favorable deposition testimony in the instant
litigation, in exchange for Defendant agreeing to a favorable settlement with Mr.
Palmeroni in the New Jersey litigation.[6]  Based on the evidence offered in support
of the motion, it appears that Defendant did not accept what appeared to be a
solicitation to offer Mr. Palmeroni the inducement of a favorable settlement in the
New Jersey case in exchange for his being "forgetful" in his testimony – in

---

[6] In support of this motion, Defendant attached a transcript of a tape-recording of a purported phone
call between the attorneys (Dkt. 322, Ex. B).  In this transcript, the attorney calling on Mr.
Palmeroni's behalf allegedly stated that "Joe" (presumably Mr. Palmeroni) "could either be forgetful
of not so forgetful" during his deposition testimony, and that the attorney wished to "have a dialogue
about how we can help each other bring finality to both things" (presumably, the two lawsuits).  *Id.*

Defendant's favor – in this case.  This scheme was never carried off, however, and Mr. Palmeroni ultimately provided deposition testimony that was unfavorable to Defendant in this case:

> Q: Mr. Palmeroni, do you believe the name 6-Hour POWER was selected by [Defendant] to trade off of the success and reputation of 5-Hour ENERGY?
>
> A: Yes (Dkt. 322, Ex. D at 146:6).

During the deposition, Defendant cross examined Mr. Palmeroni at length about the scheme laid out in the tape-recorded conversation and Mr. Palmeroni stated that he was *not* aware of any communications between the two attorneys (Dkt. 384, Ex. 1, at 140:24-141:14).  When Mr. Palmeroni was specifically asked whether he had any knowledge of a conversation on November 16, 2009, where the attorney claimed that Mr. Palmeroni would threaten to lie under oath during his deposition, Mr. Palmeroni answered: "Absolutely not." (*Id.*, at 144:24-145:3).  Defendant can point to no corroborating evidence that Mr. Palmeroni knew of or participated in any kind of a deal to provide favorable testimony in exchange for a favorable outcome in the New Jersey litigation brought by Defendant against him.  While a witness's prior conduct in offering to alter his testimony – or even to lie – in exchange for a benefit of some kind would clearly be relevant to credibility, it would not necessarily preclude him from testifying outright.  His prior conduct would subject him to quite effective cross-examination, and a jury would have a strong reason to disregard his testimony, but a party would not be prohibited from calling

40

him as a witness *if* the party believed in good faith that the testimony then to be given was true.

In this case, there is no proof that this witness, Mr. Palmeroni, ever offered to change his testimony – in fact, he denies doing so or being aware of anyone else's offer on his behalf to do so.  There is proof, however, that a contact did occur by an attorney purporting to act on Mr. Palmeroni.  Thus, Defendant may question Mr. Palmeroni at trial as to whether or not he was aware of this alleged offer to modify his testimony in exchange for a favorable settlement of the New Jersey litigation.

## M. Defendant's Motion in Limine to Preclude Plaintiff from Arguing that the Legal Notice is "Literally True" (Dkt. 323)

Defendant's motion to preclude Plaintiff from arguing that the "Legal Notice" supporting Defendant's Lanham Act counterclaim is "literally true" was denied for the reasons stated on the record after the hearing on December 10, 2014.  Defendant maintains that the Sixth Circuit held that the Legal Notice is "ambiguous," and that therefore any argument by Plaintiff that the Legal Notice, or portions thereof, is "true" is outside of the scope of what the jury must decide.

False advertising is prohibited under Section 43(a) of the Lanham Act, which bars "[a]ny person [from] . . . using in commerce any word, term, name, symbol, or device . . . which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." 15 U.S.C. § 1125(a)(1)(B).  As the Sixth Circuit explained, "[l]iability arises [for false advertising] if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous,

41

but has the tendency to deceive consumers." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 734 (6th Cir. 2012).[7]   The Court went on to state that "[t]he language of the recall notice teeters on the cusp between ambiguity and literal falsity." *Id*. at 737.   The Sixth Circuit then held that "[w]hile it is a close question whether the notice is literally false, we cannot say that it is unambiguously so. However, we hold that a genuine dispute exists as to whether the notice was misleading and tended to deceive its intended audience." *Id*.   In other words, the Sixth Circuit held that Defendant could not premise its Lanham Act counterclaim on the theory that the Legal Notice was "literally false," but that there was a triable issue of fact as to whether the Legal Notice was "misleading and intended to deceive its intended audience."

Whether or not parts of the Legal Notice were "literally true" is, thus, somewhat beside the point, because even if certain parts of it were literally true, as a whole, it could still be possibly construed as misleading.[8]   The Court will not

---

[7] "Where statements are literally true yet deceptive or too ambiguous to support a finding of literal falsity, a violation can only be established by proof of actual deception. A plaintiff relying on statements that are literally true yet misleading cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react. On the other hand, where statements are literally false, a violation may be established without evidence that the statements actually misled consumers. Actual deception is presumed in such cases.  A 'literally false' message may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 735-36 (6th Cir.  2012) (internal quotations and citation omitted).

[8]   Arguing that the Legal Notice is "literally true" is no kind of a defense, as the statute nevertheless prohibits advertising which is literally true or ambiguous but has the tendency to deceive consumers. Where the Sixth Circuit itself found that the Legal Notice "teeters on the cusp between ambiguity and literal *falsity*," *Innovation Ventures*, 694 F.3d  at 736, it would seem unwise to try to argue that the Legal Notice was in fact literally *true*, but the jury must consider all the evidence to answer this question, and the Court will not restrict Plaintiff from characterizing the language in the Legal Notice in the matter it believes the evidence supports.

prohibit Plaintiff from arguing that the Legal Notice contains some true statements. The question for the jury to decide is whether the Legal Notice was misleading, deceptive to its intended audience, and actually deceived recipients. Defendant's motion to preclude Plaintiff from arguing that portions of the Legal Notice are literally true is therefore **DENIED**.

### N. Defendant's Motion to Preclude Plaintiff from Introducing Evidence Concerning the Prior Criminal Convictions of Robert Occhifinto (Dkt. 354)

For the reasons stated on the record on December 10, 2014, this motion is **GRANTED**. This motion concerns whether Plaintiff is able to impeach Robert Occhifinto, the President and owner of Defendant, with evidence of his prior criminal convictions. In 1991, Mr. Occhifinto was convicted of conspiracy to import hashish, conspiracy to possess hashish, importation of hashish, and possession of hashish with intent to distribute in the state of Florida. Mr. Occhifinto was fined $200 and received probation. Also in 1991, Mr. Occhifinto pled guilty to one count of money laundering under 21 U.S.C. § 1956, and on June 4, 1996, he was sentenced to 18 months incarceration and fined $50,000. Mr. Occhifinto was released from prison on December 30, 1997.

First, neither of these offenses involved an act of dishonesty or false statement, which would allow them to be admitted regardless of their punishment under Rule 609(a)(2). Neither smuggling hashish into the United States in violation of 18 U.S.C. § 545, *see United States v. Mehrmanesh*, 689 F. 2d 822 (9th Cir. 1982), nor conspiracy to commit money laundering, s*ee United States v.*

43

*Watkins*, 2009 WL 927494 (C.D. Ill. Apr. 2, 2009), falls within the scope of Rule 609(a)(2).

Second, even if these convictions did involve dishonesty, Rule 609(b) creates a presumption against the use of conviction evidence if more than ten years have passed since the later of the witness's conviction or release from confinement. Convictions more than 10 years old are admissible "only if the probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b). "When stale convictions are offered for the purpose of impeaching a witness, they often shed little light on the present tendency of the witness toward truthfulness and veracity." *United States v. Sims*, 588 F.2d 1145, 1148 (6th Cir. 1978). Evidence of convictions more than ten years old will "very rarely and only in exceptional circumstances" be admitted. *Id.* In this case, Mr. Occhifinto's prior criminal convictions do not satisfy this rule; both are significantly more than 10 years old, and neither has specific facts and circumstances which outweigh their prejudicial effect.

Plaintiff has not established that the probative value of Mr. Occhifinto's prior criminal convictions "substantially outweighs" the danger of unfair prejudice posed by their admission. Plaintiff's proffered reason for admitting Mr. Occhifinto's prior criminal conviction is tenuous. Essentially, Plaintiff claims that testimony from Mr. Occhifinto in 2003 before a Congressional committee investigating ephedra (regarding his alleged knowledge of the street names of drugs) directly contradicts his 2009 deposition testimony. Mr. Occhifinto's 2003 Congressional testimony was

44

that he only learned after naming certain ephedra-containing products "Yellow Jacket" and "Black Beauty" that those names were also street names for illicit drugs (Dkt. 371, Ex. A). during his deposition in this case, in 2009, Mr. Occhifinto testified:

> Q: Okay. Now it says in this article that Yellow Jackets and Black Beauties are the street names for barbiturates and amphetamines.  Is that your understanding?

> A: No, it's not (Dkt. 371, Ex. B, pp. 34-35).

Plaintiff maintains that Mr. Occhifinto's testimony regarding the Black Beauty and Yellow Jacket product names is "inconsistent with a person that was convicted twice for drug activities" (Dkt. 371 at 6-7).  Plaintiff apparently wants the jury to infer that a person who has two drug-related convictions necessarily knows street names for drugs and, thus, that Mr. Occhifinto must have been lying when he testified to Congress that he did not know that "Yellow Jackets" and "Black Beauties" were veiled references to illegal narcotics.  Plaintiff also appears to be arguing that Mr. Occhifinto has a propensity to copy from other product names, whether from the drug-world, or from other energy drink competitors such as 5-Hour ENERGY, and then lie about how he has chosen the names for his products.

This tortured logic simply does not give rise to adequate probative value, sufficient to overcome the highly prejudicial nature of presenting Mr. Occhifinto's prior criminal convictions to the jury.  While Plaintiff may certainly cross-examine Mr. Occhifinto concerning any prior inconsistent statements he may have made about his reasons for naming his products, Plaintiff may not introduce evidence or

argument concerning Mr. Occhifinto's prior criminal convictions.  Defendant's

motion to exclude such evidence is **GRANTED**.

### O.  *Plaintiff's Motion to Exclude Certain Damages Theories of Defendant (Dkt. 398 Ex. 1)*

On February 2, 2015, several months after the cut-off for motions in limine,

Plaintiff filed a motion for leave to file an additional motion (Dkt. 398).  The Court

directed Plaintiff to file a copy of the proposed additional motion in limine as an

exhibit to the motion for leave, which Plaintiff did (Dkt. 398, Ex. 1).  Plaintiff's

motion for leave (Dkt. 398) is **GRANTED**, and the Court will decide this matter on

the merits.

This final motion concerns whether Defendant should be precluded from

pursuing two allegedly "new" damage theories in relation to its Lanham Act

counterclaim at trial – Defendant's lost market share, and disgorgement of

Plaintiff's profits.  In its response brief, Defendant clarified that it is not seeking

disgorgement of Plaintiff's profits (Dkt. 400 at 3-4), thus the only remaining dispute

is whether Defendant can seek recovery of its own lost profits as part of its Lanham

Act damage claim.

Plaintiff claims in its motion that it first learned of Defendant's "new

damages theories" in a December 17, 2014 email from Defendant's counsel Anthony

Davis, in which Mr. Davis stated that Defendant "will claim and pursue its full

damages for the loss of its market share from the time of the Legal Notice through

the present at trial" (Dkt. 398, at p. 1).  This email was apparently sent by Mr.

Davis to Plaintiff's counsel Mark Cantor to inquire about the status of settlement

46

negotiations.  Plaintiff claims that this email was the first time that Defendant stated it was seeking to recover lost profits.  Thus, the question before the Court is whether Defendant previously informed Plaintiff of its intent to seek recovery of its own lost profits as damages under its Lanham Act counterclaim.

In the proposed joint final pretrial order, Defendant itemized its Lanham Act damages as follows:

> On its False Advertising counterclaim, [Defendant] expects to request **a minimum of $3.4 million in damages, or more according to the proofs at trial**. Due to the willful nature of the false advertising, [Defendant] also expects to request that the Court treble any monetary damages determined by the jury, award reasonable attorneys' fees as provided in the Lanham Act, and award pre-judgment and post-judgment interest on the monetary damages (Dkt. 398, Ex. D at 25) (emphasis added).

During the initial discovery period, Defendant served the damages report of its economics expert Carl Degen on or about August 5, 2009 (Dkt. 398, Ex. C).  Plaintiff claims that Mr. Degen opined that Defendant "was entitled to $3.4 million for lost sales and market share of 6 HOUR POWER as a result of [Plaintiff's] alleged illegal activity" (Dkt. 398 at 4).  Mr. Degen stated his opinions in his report as follows:

> "It is my opinion that a **lower bound** on [Defendant's] damages in this case is $3.4 million" (Dkt. 398, Ex. C, ¶ 4) (emphasis added).

> "It is my opinion that Living Essentials' revenues from June 15, 2008 through February 2009 equal $145.6 million, which I understand to be an element of damage under [Defendant's] Lanham Act claims" *Id.* ¶ 5; *see also* ¶¶ 69-70.

The damages to which a plaintiff may be entitled under the Lanham Act are specified in 15 U.S.C. § 1117:

> When ... a violation under § 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled ...

47

subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

*Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 688 (6th Cir. 2000). A party is "only entitled to disgorgement if it could show that defendant gained additional sales due to the [false] advertisement, or that plaintiff lost sales, or was forced to see its product at a lower price." *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 695 (6th Cir. 2000). Again, Defendant stated in its response brief that it is not seeking disgorgement of Plaintiff's profits. Thus, the only remaining dispute is whether Defendant can seek its own lost profits.

As to its own lost profits, Defendant argues that its expert economist, Mr. Degen, calculated damages conservatively, for a limited time-period immediately following Plaintiff's dissemination of the legal notice – June 2008 to April 2009. Shortly after service of Mr. Degen's report, Defendant's president (Bob Occhifinto) and CFO (Erling Jensen) testified in their depositions that Mr. Degen's expert was conservative, and that the allegedly misleading legal notice knocked Defendant's product "off its growth curve," resulting in "lost sales north of $10 million and still counting" (Dkt. 400, Ex. 4, Occhifinto Tr. 200:11-201:23).

First, the Court finds that Plaintiff is reading Mr. Degen's expert report, and Defendant's statement regarding its Lanham Act damage claim in the proposed joint final pretrial order, too narrowly. Mr. Degen never opined that $3.4 million was the upper bound of Defendant's damages. In fact, he explicitly stated that $3.4 million was a "lower bound." Furthermore, the proposed joint final pretrial order

48

states that Defendant is seeking "*a minimum* of $3.4 million in damages, *or more* according to the proofs at trial" (emphasis added).  In other words, Defendant explicitly stated that $3.4 million was the floor, not the ceiling, of its Lanham Act damage claim.

Second, Plaintiff has been aware that Defendant was seeking recovery of its own lost profits throughout this litigation.  On December 15, 2009, Defendant's CFO testified:

> Q. We've talked about those things that you spent quite a bit of time talking about, like the legal notice letter and things along those lines?
>
> A. Yes. I believe that that severely stunted our growth curve, severely.
>
> Q. Here's the question for you. Do you believe that [Defendant] in growing the whole pie and doing its activities that grew the whole pie -- bad question. Do you believe that [Plaintiff], in conducting its activities that you described of in growing the entire pie, [Defendant] would have maintained its market share in that larger pie?
>
> A. Had it not been for the legal notice that you sent out, yes, I believe that we would have continued the same growth curve, on the same growth curve, if not higher (Dkt. 400, Ex. 7, Jensen Tr. 44:12-45:4).

This damage theory is also enunciated in Mr. Degen's report.  Defendant alleges that, before the Legal Notice, it was growing much faster than Plaintiff, and was rapidly increasing its market share.  According to Mr. Degen's report, Defendant was strongly out-performing market growth before the Legal Notice, but its growth rate fell over 90% after Plaintiff disseminated the Legal Notice (Dkt. 398, Ex. C ¶ 52).  Defendant's theory of damages put Plaintiff on notice throughout this litigation that Defendant was seeking to recover its own lost profits.

In its reply brief (Dkt. 401), Plaintiff also argues that the testimony of Messrs. Occhifinto and Jensen on the impact of the Legal Notice on Defendant's "growth curve" constitutes expert opinion testimony, and should be excluded because these witnesses were never disclosed as experts during discovery. This argument is not well-taken. Federal Rule of Evidence 701 provides that:

> [i]f a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Subsection (c) was added to this rule in 2000 in order to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701, Advisory Committee Notes for the 2000 Amendments. The Advisory Committee Notes for the 2000 Amendments further explain that:

> [M]ost courts have permitted the *owner or officer* of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis. *JGR, Inc. v. Thomasville Furniture Indust., Inc.*, 370 F.3d 519, 525 (6th Cir. 2004), citing Advisory Committee Notes (emphasis in the original).

Similarly, the Sixth Circuit has permitted an investor and member of the board of directors of a company to testify about the company's value and projected value without first qualifying as an expert. *See Lativafter Liquidating Trust v. Clear Channel Communications, Inc.*, 345 Fed. App'x. 46, 51 (6th Cir. 2009). Quoting the

above language from the Advisory Committee's notes regarding a business owner or officer, the Sixth Circuit reasoned that "[a]s an investor who researched [the plaintiff company's] financial condition, and later as a member of [the company's] board, [the witness] had personal, particularized knowledge of [the company's] value." *Id.* The Sixth Circuit also found that the witness's "testimony rested on a sufficient foundation—his personal research into [the company's] financial reports." *Id.* Accordingly, the Sixth Circuit affirmed district court's determination that a witness with appropriate knowledge and experience could provide lay opinion testimony concerning the company's projected value, if the defendant had not breached a contract.

In the instant case, the Court finds that the proposed testimony by Messrs. Occhifinto and Jensen is lay opinion testimony. First, it is rationally based upon the witnesses' personal knowledge, derived from their review of Defendant's sales growth (or lack thereof) and Defendant's diminished value due to the dissemination of the Legal Notice. *See* Fed. R. Evid. 701(a). Second, their proposed testimony is helpful to the determination of a fact at issue, the damages allegedly sustained by Defendant as a result of Plaintiff's dissemination of the allegedly misleading Legal Notice. *See* Fed. R. Evid. 701(b). Third, the Court finds that Messrs. Occhifinto and Jensen's testimony is "not based upon scientific, technical, or other specialized knowledge within the scope of Rule 702," but is instead based upon their own "particularized knowledge," that is, their familiarity with the growth trajectory of Defendant's sales based upon their day-to-day management of the company.

Accordingly, the Court finds that the proposed testimony of these witnesses on the issue of lost profits is admissible under Rule 701.

Because Messrs. Occhifinto and Jensen's testimony is properly admissible as fact or as lay opinion under Rule 701, Defendant was not required to disclose a summary of their testimony under Rule 26(a)(2)(A), and the Court need not determine whether their proposed testimony would also qualify as expert opinion under Rule 702.

In sum, Plaintiff's motion in limine to exclude Defendant's "late and undisclosed damages positions" (Dkt. 398 Ex. 1) is **GRANTED IN PART** and **DENIED IN PART**.  Defendant may not seek disgorgement of Plaintiff's profits as part of its Lanham Act counterclaim, as Defendant has abandoned this damage theory.  However, Defendant is not prohibited from seeking an award of its own lost profits.

## CONCLUSION

To summarize, the Court's rulings are as follows:

A. The Parties' Objections to Magistrate Judge Whalen's Order Concerning Plaintiff's "Supplemental" Expert Reports (Dkts. 304, 324) are both **OVERRULED**;

B. Plaintiff's Motion in Limine to Exclude Evidence of USPTO Proceedings (Dkt. 307) is **GRANTED**;

C. Plaintiff's Motion in Limine to Preclude Defendant from Asserting an Unclean Hands Defense (Dkt. 308) is **DENIED**;

D. Plaintiff's Motion in Limine to Exclude Evidence or Argument Contrary to the Sixth Circuit's Mandate (Dkt. 309) is **DENIED**;

E. Defendant's Motion to Exclude the Original Report and Testimony of Dr. Dan Sarel (Dkt. 313) is **GRANTED**;

F. Defendant's Motion to Exclude Plaintiff's Expert Witness Howard Marylander (Dkt. 315) is **DENIED**;

G. Defendant's Motion to Exclude Plaintiff's Expert Witness Dr. Gregory Carpenter (Dkt. 316) is **GRANTED IN PART** and **DENIED IN PART**;

H. Defendant's Motion to Exclude Plaintiff's Expert Witness Tom Pirko (Dkt. 317) is **GRANTED IN PART** and **DENIED IN PART**;

I. Defendant's Motion to Preclude Plaintiff from Introducing Certain Instances of Alleged "Actual Confusion" (Dkt. 319) is **GRANTED IN PART** and **DENIED, WITHOUT PREJUDICE, IN PART**;

J. Defendant's Motion in Limine to Exclude Plaintiff's Invoice Summary (Dkt. 320) is **DENIED**;

K. Defendant's Motion in Limine to Preclude Plaintiff from Presenting Evidence Regarding the Ephedra Lawsuits (Dkt. 321) is **GRANTED**;

L. Defendant's Motion in Limine to Exclude the Testimony of Jesus "Joe" Palmeroni (Dkt. 322) is **DENIED**;

M. Defendant's Motion in Limine to Preclude Plaintiff from Arguing that the Legal Notice is "Literally True" (Dkt. 323) is **DENIED**;

N.  Defendant's Motion to Preclude Plaintiff from Introducing Evidence Concerning the Prior Criminal Convictions of Robert Occhifinto (Dkt. 354) is **GRANTED**;

O. Plaintiff's Motion to Exclude Certain Damages Theories of Defendant (Dkt. 398 Ex. 1) is **GRANTED IN PART** and **DENIED IN PART**.

The parties previously provided a proposed joint final pretrial order to the Court on or about October 14, 2014.  The proposed joint final pretrial order should be revised to reflect the rulings above.  Thus, the parties are directed to prepare and submit a revised proposed joint final pretrial order on or before **MONDAY, MARCH 9, 2015**.  The parties are also directed submit a *single set* of joint proposed

jury instructions and proposed voir dire on or before **MONDAY, MARCH 9, 2015**.

Finally, the parties are directed to mark and exchange proposed trial exhibits, in

accordance with the Court's practice guidelines.[9]  A full set of proposed trial exhibits

from Plaintiff and Defendant must be provided to the Court on or before **MONDAY,**

**MARCH 9, 2015**.

     **SO ORDERED.**

Dated:  February 27, 2015

               s/Terrence G. Berg
               TERRENCE G. BERG
               UNITED STATES DISTRICT JUDGE

## **Certificate of Service**

     I hereby certify that this Order was electronically submitted on February 27,

2015, using the CM/ECF system, which will send notification to each party.

               s/A. Chubb
               Case Manager

---

[9] Available at – https://www.mied.uscourts.gov/index.cfm?pageFunction=chambers&judgeid=37