UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INNOVATION VENTURES, LLC d/b/a
LIVING ESSENTIALS,

    Plaintiff/Counter-Defendant,

                Case No. 08-11867
v.                Hon. Terrence G. Berg

NVE, INC.,

    Defendant/Counter-Plaintiff.
_____/

## ORDER RESOLVING MOTIONS IN LIMINE (DKTS. 408, 411, 418 & 442)

   This is a trademark infringement and false advertising case.  This matter is set for a jury trial on February 1, 2016.  As happened the last time this case approached its trial date, when numerous motions in limine had been submitted and were decided by the Court (Dkt. 404), the parties have again brought five motions in limine.  Three of these motions are dressed in the guise of "trial briefs," although they are really additional motions in limine.  These trial brief motions are: (i) Defendant's motion to allow evidence of its unclean hands defense to be presented to the jury (Dkt. 408); (ii) Plaintiff's motion concerning Plaintiff's trademark ownership (standing) (Dkt. 411); and (iii) Plaintiff's motion to permit the jury to decide the amount of monetary recovery under 15 U.S.C. § 1117(a) (Dkt. 420).  Two additional motions in limine are Plaintiff's motion for reconsideration of the Court's prior ruling concerning Defendant's "newly disclosed damages theory" (Dkt. 418) and Plaintiff's motion to bifurcate the trial (Dkt. 442). This last motion,

seeking to split the infringement claims and the false advertising claim into separate trials, raises issues that overlap with Defendant's motion to present unclean hands evidence to the jury (Dkt. 408).

The Court heard oral argument on these motions on December 9, 2015. The Court's rulings are set forth below. Because the first and last motions listed above are interrelated, they will be discussed together first.

### A) Defendant's Motion to Allow the Jury to Hear Evidence of Plaintiff's Unclean Hands vs. Plaintiff's Motion to Bifurcate the Trial.

Defendant has moved to present its equitable defense of unclean hands to the jury; Plaintiff responds by requesting that this unclean hands evidence be considered only by the Court in a separate bench trial (Dkt. 408). Striking a related note, Plaintiff has moved to bifurcate the trial (Dkt. 442) into one trial on trademark infringement, and a second trial on Defendant's false advertising counterclaim.

The first issue raised by these two motions is whether the jury should be permitted to hear any evidence of Defendant's unclean hands defense. The parties agree that unclean hands is a defense sounding in equity that must be decided by the Court. Defendant seeks to present four kinds of unclean hands "evidence:" (1) Plaintiff's allegedly improper registration of Internet domain names using Defendant's 6 Hour POWER name, including www.sixhourpower.com and www.6hourpower.com; (2) Plaintiff's alleged efforts to keep Defendant's products off

the retail shelves; (3) Plaintiff's having allegedly opposed Defendant's efforts to register a trademark for "6 Hour POWER" with the USPTO; and (4) Plaintiff's publication and distribution of a "Legal Notice" which Defendant claims mislead retailers into removing Defendant's products from the shelves. Plaintiff would have this unclean hands presented only to the Court in a separate bench trial.

The second broad issue, raised in Plaintiff's motion to bifurcate the trial, concerns trial efficiency. Plaintiff argues that its trademark infringement claim should be tried to the jury first, without allowing the jury to hear any evidence concerning Defendant's false advertising counterclaim or unclean hands defense. Plaintiff posits that this procedure would be more efficient because, if Plaintiff prevails on its trademark infringement claim, then Defendant's false advertising counterclaim would be arguably be legally barred because Defendant would have had no legal right to sell an infringing 6 Hour POWER product in the first place. Plaintiff further hypothesizes that, should it lose its trademark infringement case, then any evidence relating to Defendant's unclean hands defense against trademark infringement becomes irrelevant, as there is no remaining legal claim left to defend against. In this scenario, if the trademark infringement claim fails, then a second trial could be held on Defendant's false advertising counterclaim. There may be some surface level appeal to this proposal, but there are also several concerns.

Defendant opposes Plaintiff's bifurcation proposal as unfair. It would allow Plaintiff to present its case in full – to put its best foot forward, so to speak – while at the same time completely barring Defendant from mounting its defenses. In this

3

vein, Defendant argues that a fair trial requires that the jury be presented with all the relevant evidence in proper context, especially considering that this case – at its core – relates to the behavior of two direct commercial competitors.  Further, Defendant objects that Plaintiff's proposal could subject out of town witnesses to several trips to Detroit for trial, and that it would actually be more efficient to try the whole case at once.

The parties' proposals raise three potential courses of action.  The first is to bifurcate the issues to be tried so that first a jury hears only evidence of Plaintiff's trademark claims and makes a finding on the issue of infringement.  Any evidence of an unclean hands defense would be heard separately the Court only.  Plaintiff argues that, if infringement is found, such a finding would obviate the need to consider Defendant's false advertising counterclaim.  If the first jury finds no infringement, then a second jury trial would be held to hear Defendant's false advertising counterclaim.  *See* Fed. R. Civ. P. 42(b) ("For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims.  When ordering a separate trial, the court must preserve any federal right to a jury trial").  This is, essentially, the option that Plaintiff proposes in its motion to bifurcate (Dkt. 442).

The second course would be to conduct parallel trials, divided between morning and afternoon sessions, with the legal issues (trademark infringement and false advertising) tried before a jury during the morning, and the equitable issues

4

(unclean hands) tried to the Court during the afternoon. The Court sees this as the least palatable option.

The third course of action is to try all the legal and equitable issues before the same jury, and direct the jurors to return advisory verdicts on the factual questions related to the equitable claims, with the final decision on the equitable issues being reserved to the Court. *See* Fed. R. Civ. P. 39(c) ("In an action not triable of right by a jury, the court, on motion or on its own: (1) may try any issue with an advisory jury; or (2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right, unless the action is against the United States and a federal statute provides for an nonjury trial").

As noted earlier, Plaintiff is opposed to having unclean hands evidence presented to the jury, even in an advisory capacity, because it believes such evidence will unduly prejudice the jury against Plaintiff and divert attention from Defendant's own, allegedly-infringing conduct. However, when there are factual questions common to both legal and equitable claims, those facts must be tried to the jury in order to preserve the constitutional right to a trial by jury. *See Cabinet Vision v. Cabnetware*, 129 F.3d 595, 600 (Fed. Cir. 1997) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 503, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) (in turn quoting *Scott v. Neely*, 140 U.S. 106, 109–10, 11 S.Ct. 712, 35 L.Ed. 358 (1891))).

5

To succeed on its affirmative defense of unclean hands, Defendant must demonstrate that "the doors of a court of equity" should be closed to Plaintiff because it is "tainted with inequitableness or bad faith relative to the matter in which [it] seeks relief, however improper may have been the behavior of [Defendant]." *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery*, 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) (bracketed alterations supplied). Much of the unclean hands evidence overlaps the evidence pertaining to Defendant's false advertising counterclaim. For example, the Legal Notice issued by Plaintiff is the central piece of evidence for Defendant's false advertising counterclaim, and Defendant's allegation that this notice is false is part of their unclean hands defense.

Furthermore, the Court finds that it would be helpful for the jury deciding this case to hear a full presentation of the real circumstances that surrounded how these parties acted in competition with one another. This means that the jury should hear evidence concerning, for example, Plaintiff's alleged efforts to get retailers to remove Defendant's products from store shelves. This evidence, when considered in conjunction with the Legal Notice, could indicate a concerted effort on behalf of Plaintiff to drive Defendant out of the market. In light of these overlapping factual issues, the Court concludes that Defendant's affirmative defenses should not be tried separately from Plaintiff's infringement claims. *See Haworth, Inc. v. Herman Miller, Inc.*, No. 1:92 CV 877, 1993 WL 761974, at *4

6

(W.D. Mich. July 20, 1993) (noting that "the issues of laches, estoppel, and willfulness are intertwined with common factual determinations").

The Court recognizes that Plaintiff is concerned about the possibility of suffering prejudice as a result of the jury hearing evidence of its own alleged misconduct. Some of this evidence – on the false advertising counterclaim – is rightfully before the jury and prejudice arising therefrom cannot be considered unfair prejudice. Any additional risk of prejudice from the less serious unclean hands evidence can be avoided by carefully instructing the jury, and must be weighed against the need to preserve Defendant's right to a jury trial and considerations of judicial efficiency. Moreover, due to the substantial overlap in the underlying facts, it will be extremely difficult to determine precisely what testimony should be presented to the jury, and what testimony should only be heard by the Court. Attempting to make that determination likely will require frequent objections, numerous sidebar conferences, and other discussions outside the hearing of the jury. Such continual interruptions of proceedings not only will unnecessarily prolong the trial, but it also will distract the jury's focus. Furthermore, many of the same witnesses likely will be called to present evidence on both the legal issues of trademark infringement and false advertising, and the equitable issue of unclean hands. In a bifurcated trial, those witnesses may be required to return to Court several days after testifying before the jury in order to separately present testimony to the Court on the equitable issues, resulting in inconvenience to the witnesses and unnecessary repetition of their testimony.

7

Other district courts have reached the same conclusion under similar circumstances. In *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A.*, No. 4:02–cv–40327, 2004 WL 5508752 (S.D. Iowa Sept. 9, 2004), the court held, over the plaintiff's objection of unfair prejudice, that the affirmative defense of inequitable conduct should be presented to the jury for an advisory verdict. *Id.* at *3–4. *Kemin* found that:

> [T]he evidence of inequitable conduct will be overlapping and intertwined with the evidence necessary on other issues in the case; and to the extent it is not, the court is confident that the jury, with direction from counsel and the court, will be able to discriminate as to questions to be decided by the jury and issues to be decided by the court. Under the unique circumstances of this case, the court finds that bifurcation of the trial on the issue of inequitable conduct is both unnecessary and an undue burden on the parties and the court.

*Id.* at *4. *See also Cornell University v. Hewlett–Packard Co.*, No. 01–CV–1974, 2006 WL 2739678, at *6–7 (N.D.N.Y. Sept. 25, 2006) (choosing to submit equitable defenses to an advisory jury rather than bifurcating the trial based on considerations of conservation of judicial resources and convenience of witnesses); *Medtronic Xomed, Inc. v. Gyrus ENT, LLC*, 440 F.Supp.2d 1333, 1336 (M.D. Fla. 2006) (finding, when there was substantial factual overlap between legal defense of patent invalidity and equitable defense of inequitable conduct, that holding a separate bench trial on the equitable issues after the jury had heard the remainder of the evidence "would not be the most efficient use of judicial resources, and could require re-calling witnesses who will or had testified at the jury trial").

For the foregoing reasons, therefore, Defendant's motion to present its equitable defenses of unclean hands and equitable estoppel to the jury (Dkt. 408) will be **GRANTED,** while Plaintiff's motion to bifurcate the trial (Dkt. 442) will be **DENIED**.  The same jury empaneled to decide Plaintiff's infringement claims (and Defendant's counterclaim) also will render an advisory decision on Defendant's equitable defense of unclean hands. The parties are directed to submit proposed interrogatories and verdict forms for the equitable issues.

### B) Plaintiff's Motion to Confirm its Standing To Bring This Lawsuit.

The next motion is brought by Plaintiff, and concerns Plaintiff's own standing to bring its trademark infringement claims (Dkt. 411).  It is unusual to see a *plaintiff* seeking an order establishing its own standing; normally, a defendant might bring a motion challenging the plaintiff's standing.  However, an odd procedural quirk brought the case to this point.  Namely, in previous pretrial litigation that predated the appeal and remand of this case, Defendant challenged Plaintiff's standing to bring a trademark infringement claim in a motion for summary judgment (Dkt. 137), on the grounds that Plaintiff did not "own" the underlying trademark.  Judge Zatkoff, who previously presided over this case, dismissed Plaintiff's trademark claims on other grounds (Dkt. 240) and never ruled on this argument.  The Sixth Circuit reversed this decision, in part, and remanded the case for trial on Plaintiff's trademark infringement claim and on Defendant's false advertising counterclaim. *See Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723 (6th Cir. 2012).  The question of Plaintiff's standing was never addressed.

Plaintiff has therefore filed a motion seeking clarification that it does indeed have standing to prosecute its trademark infringement claim.

Because this issue was initially raised in the context of a summary judgment motion, the Court will apply familiar summary judgment standards in considering the question. Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001). Based upon these standards, the Count concludes for the reasons explained below that there is no genuine issue of fact concerning Plaintiff's standing, and that Plaintiff does have standing to prosecute its trademark infringement claim. Therefore, this issue is foreclosed, and any evidence or argument by Defendant that Plaintiff somehow *lacks* standing to bring this case shall not be presented to the jury.

Defendant's argument that Plaintiff lacks standing to bring a trademark infringement claim can be summarized as follows. Plaintiff filed this case on May 1, 2008 (Dkt. 1). In the Complaint, Plaintiff alleged that it had standing as "the current owner of the 5 Hour ENERGY trademark" (Dkt. 1, ¶7). Defendant contends

10

that it learned during discovery that a separate company – Bio Clinical Development, Inc. ("Bio Clinical")[1] – may have been the owner of the trademark. Based on the available record, it does appear that at some point in time Bio Clinical was the owner of the mark at issue. This is based on two license agreements between Plaintiff and Bio Clinical dated September 15, 2004 and December 20, 2007 (Dkt. 430, Exs. 1, 4). Under these license agreements, Bio Clinical granted Plaintiff a non-exclusive license to use the 5-Hour ENERGY mark. Accordingly, Defendant submits that, contrary to the allegations of the Complaint, Plaintiff did not own the trademark when it filed suit and it could not, at the time the Complaint was filed, rely on ownership as the source of its legal right to sue to enforce the mark.

In response, Plaintiff advances two arguments. First, Plaintiff claims that its trademark claim is being brought under 11 U.S.C. § 1125(a), which confers standing upon users of trademarks who believe they are likely to be damaged by infringement. In other words, under this theory of standing, a plaintiff does not need to be an owner of a trademark to pursue a claim under 11 U.S.C. § 1125(a). Second, Plaintiff claims that a subsequent agreement between Plaintiff and Bio Clinical – dated February 1, 2008, three months before Plaintiff filed this lawsuit – "clarified" the understanding between Plaintiff and Bio Clinical, and provided that Plaintiff owned all rights in the 5-Hour ENERGY trademark during all relevant times (Dkt. 430, Ex. 6). Thus, Plaintiff argues that the original licensing

---

[1] Plaintiff and Bio Clinical are closely related companies. Plaintiff's CEO and majority owner – Manoj Bhargava – is the sole owner of Bio Clinical.

agreements did not accurately reflect its agreement with Bio Clinical. Rather, these companies always intended that Plaintiff own the trademark at issue in this litigation, and the February 1, 2008 agreement transferred the ownership of the mark to Plaintiff *nunc pro tunc.*

Having considered the parties arguments, the Court finds that Plaintiff has adequately alleged sufficient commercial interests in the 5 Hour ENERGY mark to meet the standing requirements for bringing claims for trademark infringement. This is so because, although § 32(1) of the Lanham Act speaks of the "registrant" who may bring an action for trademark infringement, *see* 15 U.S.C. § 1114(1), § 43(a)—the provision through which Plaintiff asserts its infringement claims in this case—is not so limited in scope. Specifically, § 43(a) permits "any person who believes that he or she is or is likely to be damaged" to bring a claim for infringement resulting from false association or false advertising. 15 U.S.C. § 1125(a)(1). Section 43(a) therefore affords relief to any plaintiff who shows the requisite injury from the defendant's infringing conduct, without regard to any ownership interest the plaintiff may have in the trademark. *See Murphy v. Provident Mut. Life Ins. Co. of Phila.*, 756 F.Supp. 83, 86 (D. Conn. 1990) ("[T]he question of ownership is immaterial to standing under § 43(a) ...."), aff'd 923 F.2d 923 (2d Cir.1990), cert. denied 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991). Indeed, courts frequently find non-owners—such as manufacturers, competitors, distributors, and others—to have standing under § 43(a) of the Lanham Act. *See, e.g., Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594 (4th Cir.

1992) (trade association has standing), cert. denied 506 U.S. 862, 113 S.Ct. 181, 121
L.Ed.2d 126 (1992); *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.*, 567 F.2d 154,
160 (1st Cir. 1977) (non-exclusive distributor has standing).

Despite the seemingly wide scope of § 43(a)'s standing-to-sue allowance, it is
not without limits. The United States Supreme Court recently resolved a split
among the circuit courts on the question of non-owner standing in *Lexmark
International, Inc. v. Static Control Components, Inc.*, ——U.S. ——, 134 S.Ct. 1377,
188 L.Ed.2d 392 (2014). There, the Supreme Court held that a non-owner
manufacturer of goods had standing to sue under § 43(a).  *Id*. at 1395.  In doing so,
the Supreme Court provided a framework for determining whether a non-owner
plaintiff has standing to raise a claim under § 43(a).

The Supreme Court began its analysis in *Lexmark* by reciting Article III's
well-known constitutional standing requirement: "The plaintiff must have suffered
or be imminently threatened with a concrete and particularized 'injury in fact' that
is fairly traceable to the challenged action of the defendant and likely to be
redressed by a favorable judicial decision." *Id*. at 1386 (quoting *Lujan v. Defenders
of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).
Constitutional standing not being disputed in *Lexmark*, the Supreme Court then
turned to formulate a second, two-pronged standing inquiry—which the Court
labeled "statutory standing"—to apply when analyzing any federal statute,
including the Lanham Act.  *Id*. at 1386–91.

13

Under "statutory standing," *Lexmark* held that a plaintiff must first fall within the "zone of interests" of the statute or statutory provision asserted. *Id*. at 1388. The determination of whether a plaintiff falls within a statute's zone of interests is generally "a straightforward question of statutory interpretation," requiring courts to look toward the statute's purpose where that purpose is unambiguous. *See id*. Upon reading the purpose of the Lanham Act, the Supreme Court identified § 43(a)'s zone of interests as protecting persons engaged in commerce. *Id*. at 1389–90. *Lexmark* specifically drew a distinction between those who have legitimate commercial interests at stake and others, such as consumers, who have merely been "hoodwinked" by an infringer's conduct. *Id*. at 1390. While the latter group may have suffered a true injury-in-fact sufficient to satisfy Article III, this class of plaintiffs falls outside of the Lanham Act's purpose in protecting commercial actors. *Id*. The Supreme Court therefore concluded that a plaintiff must demonstrate a cognizable "commercial interest in reputation or sales" to fall within § 43(a)'s zone of interests. *Id*. at 1389–90.

The second prong of statutory standing requires the plaintiff to demonstrate that its injuries were proximately caused by the defendant's wrongful conduct. *Id*. at 1390. Embodying the centuries-old common law rule, "the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Id*. In the context of claims brought under § 43(a), the Supreme Court held that "a competitor who is forced out of business by a defendant's false advertising" will generally show proximate cause, but that third

14

parties who suffer injury from the competitor's inability to meet financial obligations because of the defendant's false advertising would fail the proximate cause prong. *Id.* at 1391.

Based upon the analysis in *Lexmark*, Plaintiff clearly satisfies the constitutional requirements of Article III. Plaintiff alleges that it has used the 5 Hour ENERGY trademark in commerce, and suffered injuries in the form of lost revenue, lost business, and association with a competing product (Dkt. 1, ¶¶ 9, 11, 32) and that these injuries are fairly traceable to the conduct at issue—the introduction of the allegedly infringing 6 Hour POWER product into the marketplace  (*Id.* ¶ 32). A favorable jury verdict would compensate Plaintiff for these alleged injuries.

Plaintiff also satisfies statutory standing under § 43(a) of the Lanham Act. First, Plaintiff falls within the "zone of interests" protected by the Lanham Act. There is no question that, during the time-frame at issue, Plaintiff held (at a bare minimum) a license to utilize the "5 Hour ENERGY" mark in furtherance of commercial activities. Indeed, Plaintiff is exactly the type of commercial actor who § 43(a) of the Lanham Act envisions protecting.

Furthermore, the argument from Defendant that Plaintiff lacks standing fails for yet another reason – it has the ring of a *jus tertii* defense, that is, a defense premised on the argument that the rights of a third party (in this case, Bio Clinical) are superior to the rights of the plaintiff and therefore the third party is the proper

party to bring the trademark infringement suit. "*Jus tertii* in the trademark context arises when defendant alleges that plaintiff has no 'title' because plaintiff itself is an infringer of a third party with rights allegedly superior to plaintiff." *McCarthy on Trademarks*, § 31:157.

Defendant bases its contention that Plaintiff lacks standing, in part, upon portions of the licensing agreements between Plaintiff and Bio Clinical, which gave Plaintiff a non-exclusive license to use the 5-Hour ENERGY mark. The license agreements provided that Plaintiff must first obtain written permission from Bio Clinical before bringing suit to enforce the mark. Defendant contends that Plaintiff has never produced evidence of such written permission from Bio Clinical.

Defendant's argument is fundamentally flawed. A *jus tertii* defense of this nature is disfavored in trademark cases around the country.[2] The *McCarthy*

---

[2] *See, e.g., Marshak v. Sheppard*, 666 F. Supp. 590, 3 U.S.P.Q.2d 1829 (S.D. N.Y. 1987) (quoting *McCarthy* and rejecting defense that third party's rights were superior to plaintiff; whether plaintiff acquired valid title from his assignor is irrelevant where plaintiff has rights superior to defendant); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 7 U.S.P.Q.2d 1177 (E.D. N.Y. 1988) (quoting treatise and rejecting defense that third party's rights were superior); *General Cigar Co., Inc. v. G.D.M. Inc.*, 988 F. Supp. 647, 45 U.S.P.Q.2d 1481 (S.D. N.Y. 1997) (third party's possibly superior rights cannot be a defense, relying upon *McCarthy*); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 228 U.S.P.Q. 625 (D.N.J. 1985) (quoting treatise and rejecting defense that third party had priority over plaintiff and had to be joined as a party); *Specialty Measurements, Inc. v. Measurement Systems, Inc.*, 763 F. Supp. 91, 19 U.S.P.Q.2d 1444 (D.N.J. 1991) (*jus tertii* should not be allowed as a defense in any trademark case); *Texas Tech University v. Spiegelberg*, 461 F. Supp. 2d 510, 215 Ed. Law Rep. 320, 84 U.S.P.Q.2d 1162 (N.D. Tex. 2006) (plaintiff's asserted infringement of a third party's trademark is irrelevant: the *jus tertii* defense is rejected); *Dallas Cowboys Football Club, Ltd. v. America's Team Properties, Inc.*, 616 F. Supp. 2d 622 (N.D. Tex. 2009) (possible rights of third parties is no defense, quoting *McCarthy*); *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901, 74 U.S.P.Q.2d 1877 (W.D. Wis. 2003) (that a third party might have trademark rights superior to plaintiff "has no effect on this lawsuit"); *Committee for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 39 U.S.P.Q.2d 1705, 35 Fed. R. Serv. 3d 897 (9th Cir. 1996) ("[A] third party's prior use of a trademark is not a defense in an infringement action." Relying upon and quoting *McCarthy*); *1-800 Contacts, Inc. v. Memorial Eye, P.A.*, 100 U.S.P.Q.2d 1151, 2010 WL 5149269 (D. Utah 2010) (alleged conduct of plaintiff engaging in the same (allegedly infringing) conduct that it sues defendant for (buying trademarked terms of competitors as

treatise explains the policy rationale for the prohibition on *jus tertii* defenses in

trademark litigation:

> So long as a plaintiff proves rights superior to defendant, that is enough. Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world. The plaintiff's speculative dispute with a third party does not concern the defendant. To permit a *jus tertii* defense would be unwise judicial policy because it would expand many trademark disputes far beyond a mere two-party conflict. Before plaintiff could prevail, it would have to prove that it was not an infringer of one or more third parties that the defendant can conjure up.... A case could be expanded beyond reasonable bounds and effectively slowed to a crawl.

In sum, the Court finds that Plaintiff has standing to prosecute its trademark

infringement claim.  Since the Court finds that Plaintiff has standing to bring this

suit under § 43(a) of the Lanham Act, and does not need to "own" the trademark to

do so, Defendant's argument attacking the legitimacy of the February 1, 2008 *nunc*

*pro tunc* agreement is moot.

### C) Disgorgement of Defendant's Profits Will Go to the Jury

The Court next considers Plaintiff's motion regarding monetary recovery

under 15 U.S.C. § 1117(a) and the jury's involvement in this case (Dkt. 420).  This

motion essentially asks whether the jury will determine if disgorgement of

Defendant's profits should be awarded as damages, in the event that Plaintiff

prevails on its trademark infringement claim and, if so, whether the jury should

calculate the amount of those profits.

---

sponsored links in search engines) is conduct unrelated to plaintiff's infringement claim. That is, it was not trademark misuse for plaintiff to be allegedly infringing third party marks.)

Defendant responds (Dkt. 428) that disgorgement of profits is an equitable remedy that should be decided by the Court, and not the jury.  There is support for Defendant's position in trademark litigation.  *See  Ferrari S.P.A. v. Roberts,* 944 F.2d 1235, 1248 (6th Cir. 1991) (party not entitled to a jury trial in trademark case when only relief sought was an injunction and disgorgement of profits); *Lucky's Detroit, LLC v. Double L Inc.,* No. 09-14622, 2014 WL 4854982, at *3 (E.D. Mich. Sept. 30, 2014) (same).  However, Defendant also acknowledged during oral argument on this motion that the Court could, in its discretion, have the jury deliver an advisory verdict on the question of disgorgement of Defendant's profits.

Having considered the parties arguments, the Court will exercise its discretion and submit the question of disgorgement of Defendant's profits to the jury.  There are several reasons supporting this approach.  First, this case is distinguishable from *Ferrari* and *Lucky's Detroit* as Plaintiff is requesting both legal (Plaintiff's actual damages) and equitable (disgorgement of Defendant's profits) relief (Dkt. 1, Demand for Relief).  In *Ferrari* and *Lucky's Detroit* the plaintiffs were only requesting equitable relief.  Since there is no question in this case that the question of Plaintiff's actual damages will go to the jury, the Court finds that it would be more efficient to present both of Plaintiff's legal and equitable damage claims to the jury and let the jury decide what damages, if any, that Plaintiff should recover.  Any jury recommendation as to the amount of a disgorgement award would be considered by the Court, but the decision would be left to the Court's determination.  The same reasoning (discussed above) that supports the Court's

18

decision to send Defendant's unclean hands defense to the jury for an advisory verdict applies with equal force here.  *See* Fed. R. Civ. P. 39(c) ("In an action not triable of right by a jury, the court, on motion or on its own: (1) may try any issue with an advisory jury; or (2) may, with the parties' consent, try any issue by a jury whose verdict has the same effect as if a jury trial had been a matter of right, unless the action is against the United States and a federal statute provides for an nonjury trial").

Second, a Seventh Circuit model jury instruction explicitly contemplates having a jury decide disgorgement of profits in a trademark action.  *See* Federal Civil Jury Instructions for the Seventh Circuit, 13.6.4 Defendant's Profits (2015). Finally, in a similar 5 Hour ENERGY trademark infringement case tried in this district, the matter of disgorgement of profits was submitted to the jury and affirmed on appeal.  *See, e.g.*, *Innovation Ventures, LLC v. N2G Distributing, Inc.*, 2012 WL 1468470, *1 (E.D. Mich. 2012) ("[J]ury returned a verdict. . . that Defendants' infringement accounted for $1,750,000 of Defendants' profits") (citing jury verdict form).[3]

There is an additional aspect to Plaintiff's motion, however.  Plaintiff contends that the amount of Defendant's profits is actually no longer in dispute,

---

[3] In the *N2G* case, the parties stipulated to a jury instruction from the Ninth Circuit concerning the defendant's profits, and submitted this question to the jury on the verdict form.  *See Innovation Ventures, LLC v. N2G Distributing, Inc.*, Case No. 08-10983, Dkt. 290 at 22 (citing Ninth Circuit Model Jury Instructions § 2.8.6 (2008); Dkt. 310, verdict form.  This Ninth Circuit jury instruction is similar to the Seventh Circuit jury instruction cited above.  The Court acknowledges that here the parties do not agree to submit the question of Defendant's profits to the jury.  However, the fact that other judges in this district have permitted juries decide whether to award the defendant's profits as damages in trademark actions serves as persuasive authority to allow the jury to return an advisory finding on this question.

19

because Defendant's own expert stated that Defendant's "profits" during the relevant time-frame were $4,983,178 (Dkt. 421). Plaintiff indicates that it is content to use this amount as the proper calculation of Defendant's profits for disgorgement purposes, therefore there is no factual question as to what amount of profits should be awarded, if Plaintiff prevails on its trademark claim and if disgorgement is found to be a proper remedy. Plaintiff also states that Defendant's expert later "improperly changed its expert report to a lower number," $4,887,123. Since it appears that the parties do not stipulate to an amount for Defendant's profits, a genuine issue of fact remains, and so the jury will hear the evidence and make a recommended calculation as to the amount of Defendant's profits to be awarded Plaintiff should it find that trademark infringement occurred and that such damages are properly awarded.

### D) The Court Declines To Reconsider Its Prior Order.

Plaintiff finally seeks reconsideration of the Court's prior ruling (Dkt. 418) concerning the scope of the testimony that will be permitted from Defendant's President (Bob Occhifinto) and CFO (Erling Jensen). The specific testimony relates to the calculation of damages for Defendant's counterclaim. The Court previously ruled that Defendant's officers could offer lay opinion testimony under Rule 701, concerning Defendant's lost profits.

Subsequent developments in the case have led Plaintiff to question the soundness of the Court's ruling. Specifically, Plaintiff asked Defendant to provide

the "methodology" that Defendant anticipates that Mssrs. Occhifinto and Jensen

will utilize to calculate lost profits.  Defendant's counsel responded as follows:

> "Methodology for [Defendant's] Lost Profit Calculations:
>
> 1. Expected market share - actual market share for each period = [Defendant's] lost market share;
>
> 2. Multiply [Defendant's] lost market share by the total wholesale market for that period to determine [Defendant's] lost wholesale dollars for period;
>
> 3. Multiply lost wholesale dollars by [Defendant's] incremental profit margin for that period to determine [Defendant's] incremental profit dollars;
>
> 4. Calculate marketing/advertising expense at 33% of [Defendant's] lost wholesale dollars for that period;
>
> 5. Subtract marketing/advertising expense from the incremental profit dollars for that period to get [Defendant's] lost profits; and
>
> 6. Add lost profits for each period to calculate total lost profits."
>
> (Dkt. 418, Ex. C, March 2, 2015 Email from Taggart)

Plaintiff then asked for clarification as to how Defendant intended to calculate

"expected market share," "actual market share" and the "total wholesale market."

Defendant responded:

> ·      Expected market share is the market share that [Defendant's] would have had but for [Plaintiff's] Legal Notice, which at a minimum is the 9.2% energy shot market share [Defendant's] enjoyed just before the Legal Notice was published and disseminated by [Plaintiff].
>
> ·      [Defendant's] actual market share is the share calculated by Mr. Degen (and which will be provided to Mr. Jensen) based on [Defendant's] sales as reported by Mr. Crawford divided by total market as reported by Mr. Crawford.
>
> ·      Total wholesale market is calculated by Mr. Crawford's reported 5-Hour Energy shot sales divided by Mr. Crawford's total energy shot sales

which equals [Plaintiff's] market share, calculated by Mr. Degen (and which will be provided to Mr. Jensen). Mr. Jensen will divide [Plaintiff's] Gross Sales by [Plaintiff's] market share to establish the total wholesale market.

·        Incremental profit margin is the same [Defendant's] incremental profit margin reported by Mr. Degen in his reports.

(Dkt. 418, Ex. E, Taggart Email from 3-4-15)

Plaintiff argues that this "clarification" indicates that Defendant is intending to use its lay opinion witnesses as a way to "back-door" additional undisclosed expert testimony from Defendant's expert economist (Mr. Degen). Mr. Degen calculated damages for a limited time-period immediately following Plaintiff's dissemination of the legal notice – June 2008 to April 2009. Shortly after Mr. Degen's report was served on Plaintiff, Defendant's president (Bob Occhifinto) and CFO (Erling Jensen) testified in their depositions that Mr. Degen's expert was conservative, and that the allegedly misleading legal notice knocked Defendant's product "off its growth curve," resulting in "lost sales north of $10 million and still counting" (Dkt. 400, Ex. 4, Occhifinto Tr. 200:11-201:23). Essentially, Plaintiff is continuing to object to Defendant's officers offering testimony concerning Defendant's lost profits beyond the time-frame calculated by Mr. Degen, or in an amount greater than calculated by Mr. Degen, especially if these witnesses use Mr. Degen's report as a starting point for their calculations.

Plaintiff counters that the proposed testimony from Mssrs. Jensen and Occhifinto is properly admitted as lay opinion testimony under Rule 701, and that its damage calculation methodology (set forth in the emails above) is just a matter of "simple math."

The Court may grant a motion for reconsideration if the movant satisfactorily shows that:  (1) a palpable defect misled the parties and the Court; and (2) correcting the defect would result in a different disposition of the case.  *See* E.D. Mich. L.R. 7.1(h)(3).  A defect is palpable if it is "obvious, clear, unmistakable, manifest, or plain." *Olson v. Home Depot*, 321 F. Supp. 2d 872, 874 (E.D. Mich. 2004).  The Court will not grant a motion for reconsideration "that merely present[s] the same issues ruled upon by the court, either expressly or by reasonable implication." *Id.*

Having considered Plaintiff's argument, the Court will not reverse its prior ruling.  The cases cited in the Court's prior order (Dkt. 404 at 50) hold that an officer of a company may testify as to expected lost profits.  Furthermore, there is nothing improper about letting Mr. Jensen rely on data provided to him from outside sources to calculate Defendant's lost profits. *See, e.g., Station Enterprises, Inc. v. Ganz, Inc.*, 07-14294, 2009 WL 3059148, *3 (E.D. Mich. Sept. 24, 2009) (the fact that the business owner "may have relied on reports created by others does not alone disqualify him from otherwise testifying pursuant to Rule 701"); *Lighting Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (a lay witness "may incorporate documents that were prepared by others, while still possessing the requisite knowledge or foundation to render his lay opinion admissible under [Rule] 701"); *Mississippi Chem. Corp. v. Dresser-Rand Co.*, 287 F.3d 359, 374 (5th Cir. 2002) (fact witness allowed to testify about lost profits sustained by plaintiff where "production

23

figures (both actual and expected) at the core of [the witness'] damage computation were entered into evidence from other sources").

The case primarily relied on by Plaintiff in its motion for reconsideration is a Tenth Circuit case – *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207 (10th Cir. 2011). This case is inapposite.[4] In *James River*, the defendant sought to offer Fed. R. Evid. 702 expert testimony from its principal – Andrew Miller – concerning the value of a property that his company owned and that was destroyed by fire. On appeal, the Tenth Circuit determined that the district court had abused its discretion in allowing Mr. Miller to testify under Rule 701. Mr. Miller sought to "calculate a post-fire estimate of the pre-fire value of a dilapidated, condemned, 39-year old building." *Id.* at 1214. The Court found that "his testimony was based on technical or specialized knowledge, which is excluded from the category of lay opinion under Rule 701(c)." *Id.* at 1216. Among other things, his testimony relied on a 1,525-page technical report prepared by the Anderson Group, which used "specialized accounting calculations." *Id.* at 1215. The *James River* court also

---

[4] The other cases relied upon by Plaintiff are also distinguishable. *See JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519 (6th Cir. 2004) (lay witness opinion testimony concerning damages improperly admitted, however the witness was a CPA and a lawyer, not an "owner, officer, or director" of the plaintiff company, and the witness's calculations on the plaintiff's lost profits and lost business value were not based on his own familiarity but rather on calculations not independently verified); *Loadman Group, LLC v. Banco Popular N. Am.*, 4:10-cv1754, 2013 WL 115428 (N.D. Ohio Mar. 19, 2013) (testimony not permitted where witness was not an owner, officer, or director and he relied on third party information that he did not independently verify); *DIJO, Inc. v. Hilton Corp.*, 351 F.3d 679, 686 (5th Cir. 2003) (testimony not allowed where witness was a financial consultant, not an owner or officer, and lacked the "requisite first-hand, personal knowledge" of plaintiff's business); *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, No. 1:11-cv-190, 2014 WL 554565, *5-6 (N.D. Ind. Feb. 11, 2014) (finding that advisory committee's notes to Rule 701 whereby an officer or owner of a business may testify as a lay witness about the "value or projected profits of the business" was inapplicable because testimony "involved future damages arising from a breach of contract, not business valuation or lost profits" and was based on information outside of witness's personal knowledge).

pointed out that the "Federal Rules of Evidence generally consider landowner testimony about land value to be **expert opinion**. The Rule 702 advisory committee's note states that landowners testifying to land value are 'skilled witnesses' under Rule 702." *Id*. at 1215 (emphasis added) (citing Rule 702).

In contrast, and as this Court previously held, owners or officers like Messrs. Jensen and Occhifinto are typically allowed to testify to the value or projected profits of the business "without the necessity of qualifying the witness as an . . . expert" (Dkt. 404, at 50) (citing Fed. R. Evid. 701, Advisory Committee Notes for the 2000 Amendments); *see also Lativafter Liquidating Trust v. Clear Channel Communications, Inc*., 345 Fed. App'x. 46, 51 (6th Cir. 2009).

In summary, the Court has already carefully explained its reasons for concluding that Mssrs. Jensen and Occhifinto may offer law opinion testimony as to Defendant's lost profits. Because Plaintiff identifies no palpable defect in the Court's prior order, the motion for reconsideration (Dkt. 418) is not well taken and is **DENIED**.

## <u>CONCLUSION</u>

To summarize, the Court's rulings are as follows:

A. Defendant's motion to allow evidence of its unclean hands defense to be presented to the jury (Dkt. 408) is **GRANTED** and Plaintiff's motion to bifurcate the trial (Dkt. 442) is **DENIED**;

25

B. Plaintiff's motion concerning Plaintiff's trademark ownership (standing) (Dkt. 411) is **GRANTED**; the Court finds that Plaintiff has standing to bring its trademark infringement claim;

C. Plaintiff's motion to permit the jury to decide the amount of monetary recovery under 15 U.S.C. § 1117(a) (Dkt. 420) is **GRANTED**; and

D. Plaintiff's motion for reconsideration of the Court's prior ruling concerning Defendant's "newly disclosed damages theory" (Dkt. 418) is **DENIED**.

**SO ORDERED**.

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  January 21, 2016

**Certificate of Service**

I hereby certify that this Order was electronically submitted on January 21, 2016, using the CM/ECF system, which will send notification to each party.

By:  s/A. Chubb
Case Manager