**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| INNOVATION VENTURES, LLC, d/b/a LIVING ESSENTIALS,<br>*Plaintiff/Counterclaim-Defendant,*<br>v.<br>N.V.E., INC.,<br>*Defendant/Counterclaim-Plaintiff.* | Case No. 4:08-cv-11867-TGB-RSW<br><br>District Judge Terrence G. Berg<br>Magistrate Judge R. Steven Whalen |

**NVE'S MOTION UNDER FED. R. CIV. P. 59 FOR NEW TRIAL ON NVE'S FALSE ADVERTISING CLAIM**

Defendant/Counterclaim Plaintiff N.V.E., Inc. ("NVE") respectfully moves this Court under Federal Rule of Civil Procedure 59(a)(1)(A) for a new trial on NVE's false advertising counterclaim under the Lanham Act. The bases for this motion, as described more fully in the supporting brief, are that the jury verdict of no false advertising was against the clear weight of the evidence admitted at trial, and that opposing counsel made improper comments and arguments to the jury prejudicial to NVE's right to a fair trial on its false advertising claim.

The relief sought by this motion is a new trial on NVE's false advertising counterclaim.

Dated: March 25, 2016

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ
AND COHN LLP

*/s/ Leigh C. Taggart*
Leigh C. Taggart (P63765)
Emily J. Tait (P74708)
Mitra Jafary-Hariri (P74460)
39400 Woodward Avenue, Suite 101
Bloomfield Hills, MI 48304-5151
(248) 566-8496
ltaggart@honigman.com
etait@honigman.com
mjafary-hariri@honigman.com

*Attorneys for Defendant/Counterclaim Plaintiff N.V.E., Inc.*

NICOLL DAVIS & SPINELLA LLP
Anthony J. Davis
95 Route 17 South
Suite 316
Paramus, NJ 07652
(201) 712-1616
ADavis@ndslaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| INNOVATION VENTURES, LLC,<br>d/b/a LIVING ESSENTIALS,<br>*Plaintiff/Counterclaim-Defendant,*<br>v.<br>N.V.E., INC.,<br>*Defendant/Counterclaim-Plaintiff.* | Case No. 4:08-cv-11867-TGB-RSW<br><br>District Judge Terrence G. Berg<br>Magistrate Judge R. Steven Whalen |

**BRIEF IN SUPPORT OF NVE'S MOTION UNDER FED. R. CIV. P. 59 FOR NEW TRIAL ON NVE'S FALSE ADVERTISING CLAIM**

# ISSUES PRESENTED

1. Should NVE be granted a new trial on its false advertising claim under Rule 59 when the jury reached a seriously erroneous result as evidenced by the verdict being against the clear weight of the evidence that definitively established each and every element of NVE's false advertising claim?

**NVE's Answer: Yes.**

2. Should NVE be granted a new trial on its false advertising claim under Rule 59 when the jury reached a seriously erroneous result as evidenced by the trial being unfair to NVE in several respects?

**NVE's Answer: Yes.**

# MOST APPROPRIATE AUTHORITY

*J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474 (6th Cir. 1991)

*Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398 (6th Cir. 2006)

# TABLE OF CONTENTS


I. INTRODUCTION ........................................................................... 1

II. APPLICABLE LAW ........................................................................... 1

III. THE CLEAR WEIGHT OF THE EVIDENCE ESTABLISHES THAT LE'S "LEGAL NOTICE" CONSTITUTES FALSE ADVERTISING ........................................................................... 4

A. Element 1: Misleading Statement of Fact ........................................... 4

B. Element 2: Actually Deceived a Substantial Portion of the Intended Audience ........................................................................... 8

C. Element 3: Likely to Influence Purchasing Decisions ....................... 14

D. Element 4: Advertisement Entered Interstate Commerce ................... 17

E. Element 5: Some Causal Link Between Statement and Harm ............ 18

IV. LE's IMPROPER ARGUMENTS MISLED THE JURY ABOUT ITS TASK IN REVIEWING THE FALSE ADVERTISING EVIDENCE ......... 22

V. CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

**CASES** **PAGE(S)**

*Acuity Mut. Ins. Co. v. Frye.*,
471 Fed. Appx. 431 (6th Cir. 2012)....................3

*Dunn v. Savage (In re Saffady)*,
524 F.3d 799 (6th Cir. 2008)....................3

*Grant v. Metro. Gov't of Nashville & Davidson County*,
606 F.3d 855 (6th Cir. 2010)....................4

*Innovation Ventures, LLC v. Body Dynamics, Inc.*,
No. 08-12711, 2009 WL 877640 (E.D. Mich. Mar. 30, 2009)....................5, 7, 8

*Innovation Ventures, LLC v. N.V.E., Inc.*,
694 F.3d 723 (6th Cir. 2012)....................*passim*

*Innovation Ventures, LLC v. NVE, Inc.*,
90 F.Supp.3d 703 (E.D. Mich. 2015)....................5

*J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*,
936 F.2d 1474 (6th Cir. 1991)....................ii, 2, 3

*Mike's Train House, Inc. v. Lionel, L.L.C.*,
472 F.3d 398 (6th Cir. 2006)....................ii, 2, 3

*Silbergleit v. First Interstate Bank of Fargo, N.A.*,
37 F.3d 394 (8th Cir. 1994)....................23

*Strickland v. Owens Corning*,
142 F.3d 353 (6th Cir. 1998)....................3

*Waldo v. Consumers Energy Co.*,
726 F.3d 802 (6th Cir. 2013)....................3

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50....................2, 3

Fed. R. Civ. P. 59 .......... 1, 2, 3

Fed. R. Civ. P. 59(a) .......... 2

Fed. R. Civ. P. 59(a)(1) .......... 1

FEDERAL PRACTICE AND PROCEDURE, Charles A. Wright, Arthur R. Miller and Mary Kay Kane, .......... 1

## I. INTRODUCTION

Fed. R. Civ. P. 59 commits to the sound discretion of the district court the power and duty to order a new trial when the jury verdict is against the clear weight of the evidence. The district court also has the power and duty to order a new trial when it was conducted in an unfair manner that likely impacted the verdict. NVE respectfully moves for a new trial on its false advertising claim for both of these reasons.

## II. APPLICABLE LAW

Rule 59(a)(1) of the Federal Rules of Civil Procedure provides in part that:

> The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:
>
> > (A) After a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . .

"Rule 59 recognizes the common-law principle that it is the duty of a judge who is not satisfied with the verdict of a jury to set the verdict aside and grant a new trial." 11 Charles A. Wright, Arthur R. Miller and Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE §2801 (2012) ("Wright & Miller"). "It is the judge's right, and indeed duty, to order a new trial if it is deemed in the interest of justice to do so. . . Ultimately the motion invokes the sound discretion of the trial court, and appellate review of its ruling is quite limited." *Id.* §2803. The power to set aside a jury verdict is itself an important safeguard of the right to trial by jury. *Id.* §2806.

A new trial is warranted under Rule 59(a) when the jury has reached a "'seriously erroneous result'" as evidenced by (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party. *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 405 (6th Cir. 2006). Upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, "the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence." *J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir. 1991).

The standard for review and the scope of the review of a motion for new trial under Rule 59 are very different than the standard and scope of review on a motion for judgment as a matter of law under Rule 50. *Wyckoff* distinguishes the Court's broad review of the record on a motion for new trial under Rule 59 from the much narrower review applicable to a motion for judgment under Rule 50:

> One who challenges the weight of the evidence argues that the jury's verdict, although supported by some evidence, is still clearly against the weight of the evidence. **Unlike motions for directed verdicts and judgments notwithstanding the verdict**, in ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, **the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence**. It should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unreasonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable.

*Id.* at 1487 (emphasis added). *See also Acuity Mut. Ins. Co. v. Frye.*, 471 Fed. App'x. 431, 435-36 (6th Cir. 2012) (affirming grant of new trial on damages when jury award was not reasonably related to trial evidence); *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 814-18 (6th Cir. 2013) (affirming grant of new trial when first verdict was contrary to the weight of the evidence); *Strickland v. Owens Corning*, 142 F.3d 353, 357 (6th Cir. 1998) (reversing trial court and granting new trial limited to issue of apportionment of fault among defendants).

The different standard and scope of review applied by the trial court to the two different motions is also reflected in the different standards for appellate review of these decisions. The district court's grant of a motion for judgment under Rule 50 is reviewed *de novo*, while a grant of a motion for new trial under Rule 59 is reviewed on appeal only for an abuse of discretion. *Mike's Train House*, 472 F.3d at 405.[1] Unlike a decision on a Rule 50 motion, which creates finality giving rise to the right to appeal, the grant of a new trial under Rule 59 is

---

1 In determining whether a new trial should be granted, Rule 59 provides district court judges with "broad discretion." *Dunn v. Savage (In re Saffady)*, 524 F.3d 799, 808 (6th Cir. 2008) (Clay, C.J., dissenting in part and concurring in the judgment). Ultimately, "[t]he governing principle in the Court's acting on a motion for new trial is whether, *in the judgment of the trial judge*, such course is required in order to prevent an injustice; and where an injustice will otherwise result, the trial judge has the duty as well as the power to order a new trial." *Saffady*, 524 F.3d at 808 (quoting *Davis by Davis v. Jellico Cmty Hosp. Inc.*, 912 F.2d 129, 133 (6th Cir. 1990) (emphasis added in *Saffady*).

interlocutory, and is not reviewable on appeal until the new trial is complete and a final judgment has been entered on the claim in the district court. *Grant v. Metro. Gov't of Nashville & Davidson County*, 606 F.3d 855, 859 (6th Cir. 2010).

## III. THE CLEAR WEIGHT OF THE EVIDENCE ESTABLISHES THAT LE'S "LEGAL NOTICE" CONSTITUTES FALSE ADVERTISING

The trial evidence admitted overwhelmingly supports a verdict for NVE and against LE on false advertising. As the jury was instructed, to establish false advertising, NVE must prove by a preponderance of the evidence that:

1. Living Essentials made a misleading statement of fact in a commercial advertisement about NVE's product.
2. The statement actually deceived a substantial portion of the intended audience.
3. The statement was likely to influence the purchasing decisions of the intended audience.
4. Living Essentials caused the commercial advertisement containing the statement to enter interstate commerce.
5. There is some causal link between the challenged statement and harm to N.V.E.

**(Dkt. 501, Vol. 12, Tr. 52:22-53:6.)**

NVE presented compelling and largely unrefuted evidence on each element. The key evidence is discussed on an element-by-element basis below; however, the evidence typically overlaps and is applicable to satisfy more than one element.

### A. Element 1: Misleading Statement of Fact

The Legal Notice is misleading, as two judges in this District have so found. *Innovation Ventures, LLC v. Body Dynamics, Inc.*, No. 08-12711, 2009 WL

877640, *1 (E.D. Mich. Mar. 30, 2009).[2] It is misleading because it *omits* the most basic identifying information about the enjoined product, including photograph, UPC, and manufacturer name, and never even "refer[s] to the product…in one complete phrase." *Innovation Ventures, LLC v. N.V.E., Inc.*, 694 F.3d 723, 736 (6th Cir. 2012). It is misleading because its language (e.g., vaguely referring to a "6 Hour" product and using differing prefatory words throughout) is so ambiguous that the Sixth Circuit said it "teeters on the cusp between ambiguity and *literal falsity*[.]" *Id*. Even its label, "Legal Notice," is misleading because it suggests that it was somehow authorized by law. As Mr. Bengoa testified, it was not a legitimate *Legal* Notice (nor did LE make any effort to defend it as such), but rather was a "ploy" to "kill 6 Hour products, period." **(Dkt. 492, Vol. 9A, Tr. 94:9-10.)**

The trial evidence only further confirmed this obvious and undeniable point. LE's <u>only</u> attempt to suggest that it was not misleading came from Mr. Bhargava, who testified that certain statements in the Legal Notice were "true." **(Dkt. 484, Vol. 3, Tr. 47-48); Ex. 1, Bharghava Trial Slides.** But literal truth is no defense to false advertising. *Innovation Ventures, LLC v. NVE, Inc.*, 90 F.Supp.3d 703, 729 (E.D. Mich. 2015). Moreover, several of the things that Mr. Bhargava claimed

---

[2] In this opinion, Chief Judge Rosen fully concurred with and adopted Magistrate Judge Pepe's Report and Recommendation granting BDI's preliminary injunction based on the Legal Notice.

were "true" in his trial testimony (and highlighted as "True" in his slides) were the very things that the Sixth Circuit said were not true—for example, the statement in the Legal Notice that LE "won a decision against a '6 Hour' energy shot" is "***not literally true***[.]" *Innovation Ventures*, 694 F.3d at 736. But Mr. Bhargava specifically called this sentence out as being "True." **(Dkt. 484, Vol. 3, Tr. 47:12-17.)**

On cross-examination, Mr. Bhargava finally admitted that the Legal Notice could have been more clear in a number of ways. Calling it a "Notice" instead of a "Legal Notice" would have been more clear. (**Dkt. 484, Vol. 3, Tr. 118:24-119:01.)** Pictures of the recalled 6 Hour Energy product would have made it more clear. **(*Id.*, 119:02-13.)** In fact, Mr. Bhargava admitted on cross that the trial slides that LE's counsel used on direct to support his claim that statements in the Legal Notice were all "true" also incorporated pictures of the knock-off 6 Hour ENERGY product to ensure that the jury would "understand the language that [he] called out from the legal notice." **(*Id.*, 120:4-22.)** The jury needed help to comprehend the confusing Legal Notice and pictures provided that clarity: "It helps them, absolutely." (***Id.*, 121:18-22**).

Although Mr. Bhargava resisted the suggestion that inclusion of the Uniform Product Code ("UPC") for the recalled 6 Hour ENERGY shot would have made it more clear, **(Dkt. 484**, **Vol. 3, Tr. 114:17-115:19, 119:14-17**), he admitted that is

exactly what important convenience store chain customers, such as 7-Eleven, requested from LE. **(*Id.*, 124:4-10; Ex. 2, DX 1020, e-mail from Sandra Colvin, dated 6-11-08**). His testimony is further undermined by substantial trial evidence showing that UPCs are consistently used in the convenience store industry for the purpose of product identification. **(Ex. 2, DX 1020.)**

While Mr. Bhargava also resisted the suggestion that identifying the manufacturer of the enjoined knock-off 6 Hour Energy shot would have made the Legal Notice more clear, (**Dkt. 484**, **Vol. 3, Tr. 118:10-23**), this too is not credible. As Judges Rosen and Pepe recognized, LE "could easily have avoided any possibility of confusion by identifying *the actual manufacturer* and product enjoined…." *BDI*, 2009 WL 877640, at *2 (emphasis added). In fact, one trade magazine explicitly asked LE to identify the manufacturer of the enjoined 6 Hour Energy product because NVE also had a "6 Hour" product so a "distinction should be made." **(Dkt. 484, Vol. 3, Tr. 182:3-15.)** Thus LE had advance notice that the Legal Notice was unclear and yet refused to make a change that would have made it more clear. ***Id.***

LE "could easily have avoided any possibility of confusion…." *BDI*, 2009 WL 877640, at *2. So easy would it have been to draft a clear notice that NVE took it upon itself to do so—and used its alternative, corrected Notice (which included pictures, UPC, and manufacturer name) as a trial demonstrative. **(Ex. 3,**

**DX 1398.)** Ultimately Mr. Bhargava admitted that this alternative, corrected Notice "is written fairly well" **(Dkt. 484**, **Vol. 3, Tr. 118:24-119:1)**, that "I kind of like [it]" **(*Id.*, 119:5)** and "Look, it's clear. There's no doubt." **(*Id.*, 119:12-13.)** LE's confusing Legal Notice took effort—and there is simply no excuse for it.

### B. Element 2: Actually Deceived a Substantial Portion of the Intended Audience

The mass disruption, confusion, and deception in the marketplace as a result of the "Legal Notice" definitively establishes Element 2 and further supports Element 1. So significant was the confusion among convenience stores that it was covered in the industry press in a June 17, 2008 BevNET.com article called, "***Energy shot dispute confuses retailers***." **(*See* Ex. 4, DX 1016.)** This article was cited as evidence of confusion in the BDI case. *BDI*, 2009 WL 877640, at *8.

J.R. Merlau, Vice President of distributor Novelty, Inc., based in Indiana, testified that the Legal Notice "was confusing to the marketplace. It caused a lot of issues within our customers. We had to send out notices to our customers to advise them that none of the products we were selling was subject to this recall." **(Dkt. 480-4, Merlau Test. 11:1-6.)** Specifically, the corrective notice was to inform retailers that the recall "does not apply to the 6 Hour Power products." **(Dkt. 480-4, Merlau Test. 16:13-16:15.)**

Sandra Colvin, energy shot category buyer for 7-Eleven convenience stores, contacted LE to complain about the way that the recall was being handled, to note

that there was no UPC identified, and to question whether it was even appropriate for LE to recall a competitor's product. **(Ex. 2 DX 1020; Ex. 19, DX 1021.)**

Karen McClellan is the Category Buyer responsible for energy shots at CoreMark, which distributes to more than 29,000 convenience stores nationwide, and testified by video deposition at trial. **(Dkt. 480-2, Mclellan Test., 8:11-9:15, 10:14-11:12.)** On June 16, 2008, she sent a notice to all U.S. division buyers to warn against spreading e-mails containing the recall and creating "panic." **(Ex. 5 DX 1042; Ex. 6, 1054; Dkt. 480-2, Mclellan Test., 77:1-12, 83:11-86:16.)** Asked about the last sentence of her notice, "I hope this clears up the confusion that this letter has created," Ms. McClellan testified: "I was confused by the letter. . . . I had to read it thoroughly a few times and then I had to talk to Rise [Meguiar, LE's Sales Vice President] and several other people to ask them exactly what it is about so I knew specifically." **(Dkt. 480-2, Mclellan Test., 95:5-96:23, 98:9-15.)** Still experiencing problems over a month later, on July 22, 2008, Ms. McClellan emailed LE for "help" to clear up continuing questions about returning 6 Hour POWER. **(*Id.*, 104:6-107:16.)** Customers were calling with "questions" about sending back "perfectly good Stacker 2 6 Hour Power" because "the customer thinks it is this other stuff." **(*Id.*, 108:3-110:5; 176:7-177:10; 113:20-114:16.)**

Carlos Bengoa of CB Distributors is a "master distributor" who testified at trial that his Wisconsin-based company distributes products to approximately 60,000

of the 150,000 convenience stores in the country. **(Dkt. 492, Vol. 9A, Tr. 74:7-18.)** When the Legal Notice was sent to 110,000 convenience stores in 2008, CB Distributors was the largest distributor of both 5-hour ENERGY and 6 Hour POWER products. **(*Id.*, 89:11-19.)** After the "Legal Notice," people started calling to ask if they should return NVE's products. **(*Id.* 94:23-25.)** Although CB Distributors sent out its own corrective notice to its customers, **(Ex., 7, DX 1163; Dkt. 492, Vol. 9A, Tr. 101:25-103:24, 104:21-105:6)**, the Legal Notice was an "***earthquake***" that caused a dramatic reduction in CB's 6 Hour POWER sales **(Ex., 8, DX 1246-1; Dkt. 492, Vol. 9A, Tr. 98:20-99:15.)** A case of 6 Hour POWER contains 120 energy shots. **(Dkt. 492, Vol. 9A Tr. 87:25-89:7.)** Up through July 2008, CB Distributors sold over 21,000 cases of 6 Hour POWER shots, but from August to December 2008 after the impact of the Legal Notice, sales dropped to about 8,100 cases. **(Ex. 8, DX 1246-1, p. 4; Dkt. 492, Vol. 9A, Tr. 99:3-13.)** Mr. Bengoa's immediate reaction that the Legal Notice was a "ploy" to "kill 6 Hour products" **(Dkt. 492, Vol. 9A, Tr. 94:9-10)** was confirmed by Mr. Bhargava himself, who in June 2008 bragged that it "accomplished what I wanted"—which Mr. Bengoa understood from the context of their discussion was to kill 6 Hour POWER sales. **(Dkt. 492, Vol. 9A, Tr. 109:23-111:7.)**

In addition to CB Distributing's huge drop in sales, NVE's sales also declined dramatically beginning in August 2008. This was true even though NVE

launched a new Watermelon energy shot in September 2008, and LE damages expert Rodney Crawford testified that, before the Legal Notice, NVE's new energy shot launches always correlated with a significant increase in NVE's sales. **(Dkt. 497, Vol. 11B, Tr. 44:20-45:8, 46:13-47:4.)** By November 20, 2008, NVE's sales had declined so dramatically that LE's Carl Sperber reported in an internal e-mail that 6 Hour POWER sales "continue to nosedive." **(Ex. 9, DX 1049.)**

The trial testimony by NVE Sales Manager Glenn Lee confirms that NVE was deluged with "hundreds" of phone calls from confused customers and its sales staff spent weeks trying to correct the false impression that NVE's 6 Hour POWER product had been recalled. **(Dkt. 491, Vol. 8B,Tr. 20:8-21:1.)** Mr. Lee testified that he was contacted by J.R. Merlau of Novelty, Inc. who "was getting many calls from my retail customers telling me that your 6 Hour Power energy shots have been recalled." **(Ex. 10, DX 1169; Dkt. 491, Vol. 8B, Tr. 15:4-7, 17:2-21.)** As discussed above, Mr. Lee's testimony was further corroborated by Mr. Merlau himself. That day and afterwards, Mr. Lee heard from a great number of customers, both distributors and some retailers (i.e., convenience stores) that the Legal Notice was confusing and that, as a result, they believed that 6 Hour POWER was in recall. **(Dkt. 491, Vol. 8B, Tr. 18:21-19:8.)** One of the convenience stores that contacted NVE was Lisa Nichols, the manager of a Shop & Hop store in Missouri who sent a handwritten letter to NVE asking if the Legal

Notice was a “hoax” and stating, “At this point, I’m not sure if I can sell this [6 Hour POWER] product in my store or not.” **(Ex. 11, PX 400.)**

On June 10, 2008, Mr. Lee received an e-mail from a master distributor in the Northeast United States, Jim Green at Liberty USA. Mr. Green wrote that “because they did not show a picture of the product, many of our customers” think it is NVE’s product that is being recalled. **(Ex. 12, DX 1170**; **Dkt. 491, Vol. 8B, Tr. 26:3-24.)** On June 17, 2008, NVE received an e-mail from Will Maloney, the President of Willco Distributing in Eugene, Oregon, a large master distributor in the Northwest United States that services thousands of convenience stores. **(Ex. 13, DX 1155**; **Dkt. 491, Vol. 8B, Tr. 28:5-11.)** Mr. Maloney wrote that the Legal Notice was causing serious problems with his efforts to continue to sell 6 Hour POWER:

> The retailers have not even seen the “offending” product but because of our past extensive sales efforts on your 6 Hour Power products, the retailers are VERY familiar with THEM. This is costing us a lot of time=money. Secondly, we have lost placements, reorders and most likely new business. The reputation of your product has suffered at both retail and consumer levels. This is a product which is very definitely brand-tied by the repeat customer. Our long-term efforts are being undermined and diminished.

**(Ex. 13, DX 1155)** (emphasis in original)**.** A broker of 6 Hour POWER products also reported that its customers Tripifoods and United Refining, a large chain of convenience stores, had received the Legal Notice. **(Ex. 14, PX 346.)**

Mr. Lee's former assistant, Michele Canzone, who testified by video at trial, said the Legal Notice created a "nightmare" for her and she also reported massive confusion as a result of it. Ms. Canzone was on the front lines: "phone calls just started pouring in from all of the little mom and pop shops all over the United States, you know, asking if they should pull our product." **(Dkt. 480-3, Canzone Test. 27:12-22.)** She received multiple calls at a time and "was being inundated" with phone calls. **(*Id.*, 32:11-33:17.)** Callers told her that "they got a recall letter to pull 6 Hour POWER from the shelves." **(*Id.*, 55:25-56:6.)**

The admitted trial evidence discussed above was *unrebutted by any LE witness*, and none of the evidence was seriously challenged on cross-examination. In fact, LE's own witnesses corroborate this evidence. For example, Scott Henderson, LE's former President, testified that LE "jumped the chain of command" by sending the Legal Notice to convenience stores directly. **(*See* Dkt. 485, Vol. 4, Tr. 126:17-19.)** LE received backlash as a result. *Id.* Mr. Henderson further admitted that "there was a lot of confusion out there." **(Dkt. 485, Vol. 4, Tr. 122:11-17.)** LE's Dempsey Garrett noted in an email dated June 17, 2008 to LE's Rise Meguiar that "I have been flooded with calls of 'displeasure'" regarding the Legal Notice. **(*See* Ex. 15, DX 1032.)** LE's Carl Sperber reported that NVE's 6 Hour POWER sales "continue to nosedive" in the time immediately following the Legal Notice. **(Ex. 9, DX 1049.)**

Taken together, the evidence strongly supports the conclusion that a substantial portion of convenience stores serviced by distributors in all parts of the United States, were deceived by the Legal Notice, which is why they reacted strongly and immediately by contacting distributors and NVE attempting to return products or with questions about how to respond to the Legal Notice. There is simply no reason for NVE, let alone major convenience store distributors such as Novelty, Inc., CoreMark, and CB Distributors, to send out a corrective notice to their customers unless the convenience stores were confused. The corrective notices are compelling circumstantial evidence of convenience stores' confusion; the notices would not have been sent without a perception of serious confusion and thus a serious danger that the Legal Notice would negatively affect their businesses.

### C. Element 3: Likely to Influence Purchasing Decisions

This element does not require NVE to show that the Legal Notice actually influenced purchasing decisions of the intended audience, only that it was *likely* to. It is difficult to imagine a type of false advertising more *likely* to influence purchasing decisions than the Legal Notice. The print ad version stated in bold, capitalized text **LEGAL NOTICE** and the letter version that was sent directly to over 110,000 convenience stores was sent in an envelope stating in bold capitalized text **LEGAL NOTICE ENCLOSED**. **(Ex. 3, DX 1398; Ex. 16, DX 1028.)** The words "**LEGAL NOTICE**" strongly imply that it is authorized by a Court or other

legal authority, while the words "**RECALL OF '6 HOUR' SHOT ORDERED**" suggest that there could be serious health or safety problems with the "6 Hour" product.[3]

The instant reaction of anyone to a recall is that the product itself must be unsafe. This is particularly true at a time when, as NVE CEO Bob Occhifinto testified, there had recently been some very large recalls of various food products, such as spinach and beef. **(Dkt. 488, Vol. 7A, Tr. 167:18-168:4.)** Moreover, as J.R. Merlau testified, the people at convenience stores receiving the Legal Notice are not particularly sophisticated and would "look for anything that says 6 Hour and yank it." **(Dkt. 480-4, Merlau Test., 37:21-39:2, 33:7-35:17.)** Carlos Bengoa, a master distributor with 25 years of experience in the convenience store industry, testified that "anything that might be troublesome they're not going to carry it. They're going to force it out. They don't want any problems." **(Vol. 9A, Tr. 98:6-13.)**

What made the Legal Notice particularly effective at disrupting NVE's 6 Hour POWER sales is that it was published and mailed after the recall of the N2G 6 Hour ENERGY knock-off product was already complete. As the Sixth Circuit explained, "After the recall had been completed, LE took it upon itself to send an

[3] As the U.S. government webpage describes it, "A recall is an action taken by a manufacturer, or the government, to protect the public from products…that may cause health or safety problems." *See* https://www.usa.gov/recalls; *see also, e.g.*, *www.recalls.gov*; *www.cpsc.gov/en/Recalls/*.

additional recall notice…" *Innovation Ventures*, 694 F.3d at 734. Given that the recall was complete and the N2G product was a blatant knockoff, very few convenience stores in the country had ever seen or heard of that energy shot. For example, Carlos Bengoa, who constantly travels the country selling products to convenience store chains, never saw the knock-off 6 hour ENERGY shot in a convenience store. **(Dkt. 492, Vol. 9A, Tr. 93:4-23.)** Mr. Bengoa only saw the knock-off 6 Hour ENERGY shot once – at a trade show in March 2008 which he promptly reported to LE so they could stop the knock-off. *Id.* Will Maloney, of the large Oregon-based distributor Willco, also said that his convenience store customers had never seen the knock-off product, so the only "6 Hour" shot they were familiar with was 6 Hour POWER: "The retailers have not even seen the offending product but because of our past extensive sales efforts on your 6 Hour Power products, the retailers are very familiar with them." **(Ex. 13, DX 1155.)**

J.R. Merlau testified at deposition on November 30, 2009, a year and a half after the Legal Notice was published. He recounted a meeting that he had had a few weeks before his deposition:

**Q:** Do you know in talking with your salespeople or anyone else whether sales were affected as a result of the legal notice?

**A:** Yes.

**Q:** How do you know that?

**A:** I've since talked to some customers or companies, I'm sorry, they are not customers, other convenience store companies that have mentioned this recall notice and that they don't sell 6 Hour Power.

**Q:** Can you tell me about that?

**A:** A few weeks ago I was in a chain. We were talking about the energy shots. He was telling me that they don't sell 6 Hour Power because of some recall from a while ago. That was the one instance that I can think of here.

**Q:** Do you know what store they were referring to or what chain they were referring to?

**A:** I don't. It was an east coast chain.

(**Dkt. 480-4, Merlau Test., 33:17-34:10.)**

As this example illustrates, not only did the Legal Notice actually affect the purchasing decisions of convenience store chains, those decisions continued to block purchases of NVE's 6 Hour POWER shots by convenience store chains over a year later. If a convenience store chain told Mr. Merlau that it was not purchasing 6 Hour POWER shots due to the Legal Notice, it is clear that the Legal Notice was likely to influence purchasing decisions. Likewise, all of the other evidence discussed in this brief and presented at trial showing, among other things, the dramatic drop in NVE's and CB Distributing's sales of 6 Hour POWER shots (including Mr. Bengoa's testimony that his customers stopped placing orders for the product) and the widespread mistaken belief in the marketplace that 6 Hour POWER was recalled, further show that Element 3 is established by the clear weight of the evidence.

### D. Element 4: Advertisement Entered Interstate Commerce

The fourth element was uncontested. **(Dkt. 501, Vol. 12, Tr. 52:7-9.)**

### E. Element 5: Some Causal Link Between Statement and Harm

There was strong direct and circumstantial evidence admitted at trial that establishes a causal link between the Legal Notice and the harm to NVE. The testimony from J.R. Merlau at Novelty, Inc. that an east coast convenience store chain had in fact stopped carrying 6 Hour POWER due to the Legal Notice is direct evidence that it caused a loss of sales to convenience stores:

> **Q:** The store you were at, were they currently carrying the 6 Hour Power product?
>
> **A:** They had no 6 Hour. Only 5 Hour.
>
> **Q:** Right. Did they indicate to you why they currently were not carrying 6 Hour Power?
>
> **A:** When I asked him about other shots -- When I asked him about other shots he mentioned they <u>stopped carrying 6 Hour</u> because of a recall from some time ago.
>
> **Q:** Do you understand that to be the recall letter that we have now been discussing this morning as NOV4 [Legal Notice sent to stores]?
>
> **A:** That is what he was talking about, yes.

**(Dkt. 480-4, Merlau Test., 35:5-17.)** (emphasis added) Mr. Merlau's testimony was neutral, disinterested third party testimony that was credible and unrebutted.

Carlos Bengoa's testimony regarding the steep decline in CB Distributing's 6 Hour POWER sales in the second half of 2008 also provides direct evidence of the causal link between the Legal Notice and NVE's lost sales. Mr. Bengoa sells to *over one-third of the convenience stores in the United States* – when they stopped reordering, he lost sales. He testified that his 6 Hour POWER sales

decline was due to the "earthquake" caused by the Legal Notice **(Dkt. 492, Vol. 9A, Tr. 99:3-23.)** Mr. Bengoa's testimony is also consistent with, NVE's reported lost sales, LE's internal email reporting that NVE's sales "continue to nosedive" six months after the Legal Notice **(Ex. 9, DX 1049)**, and Mr. Maloney from Willco in Oregon reporting that: "we have lost placements, reorders and most likely new business." **(Ex. 13, DX 1155)** (emphasis added).

NVE's damages expert Carl Degen analyzed each of the other factors in the marketplace in late 2008 and early 2009 to determine what impact, if any, those factors might have had in the decline of 6 Hour POWER sales. He analyzed the impact of significant new market entrants such as energy shots from Coke, Pepsi and Monster, **(Dkt. 494, Vol. 10A, Tr. 31:11-32:5),** and determined that the impact was greater on sales of 5-hour ENERGY than on 6 Hour POWER or other smaller energy shots. **(Dkt. 494, Vol. 10A, Tr. 39:10-17; Ex. 18, DX 1363; Dkt. 494, Vol. 10A, Tr. 48:5-24, 50:15-23.)** He also considered what impact, if any, NVE's non-6 Hour POWER shot sales might have on NVE's sales of 6 Hour POWER. **(Dkt. 494, Vol. 10A, Tr. 32:6-14; 51:7-24.)** Mr. Degen accounted for changes in the overall growth rate of the market during the damages period that he we assessing. **(*Id.*, 37:8-17.)** Finally, Mr. Degen considered NVE's historic approach to seasonal advertising and determined that the advertising spending patterns were similar in the year after the Legal Notice to the relevant period

before the Legal Notice. **(*Id.*, 118:9-16; 121:19-122:19.)** After adjusting for other factors, what remained were sales losses caused by the Legal Notice. Mr. Degen concluded that NVE had lost sales of 6.6 million bottles of 6 Hour POWER and lost profits of at least $3.4 million as a result of the Legal Notice during the period June 2008 through April 2009. **(*Id.*, 40:22-41:10; 42:7-12; Ex. 17, DX 1440.)**

NVE's Chief Financial Officer Mr. Jensen testified that, before the Legal Notice, NVE's 6 Hour POWER sales were growing faster than the overall energy shot market, but that beginning about August 2008, product orders slowed and sales began to go down. (**Dkt. 495. Vol. 10B, Tr. 29:11-30:9; 32:23-33:25.)** Mr. Jensen also testified that NVE tried to overcome the negative effects of the Legal Notice, including running millions of dollars of new advertising, adding new salespeople, adding new energy shot flavors, and offering discounted retail pricing on 6 Hour POWER shots in the form of BOGO (buy one get one) two packs. **(*Id.*, 38:1-40:25.)** Despite the fact that the overall energy shot market continued to grow rapidly, and although NVE was taking the same or more actions that it was taking to support 6 Hour POWER sales in the pre-Legal Notice period, NVE went from growing much faster than the market to growing much slower than the market in 2009. After 2009, NVE's 6 Hour POWER sales began a steady downward slide even though the energy market as a whole continued to enjoy robust growth. **(Dkt. 495, Vol. 10B, Tr. 41:23-44:19.)** By 2010, the energy shots from the

significant new entrants declined and then disappeared as a factor that might limit NVE's sales. **(Dkt. 495, Vol. 10B, Tr. 36:16-37:25; Dkt. 496, Vol. 11A, Tr. 50:21-51:9.)** Even LE's Carl Sperber confirmed that these large players disappeared quickly from the market. **(Dkt. 482, Vol. 2A, Tr. 54:17-59:16.)**

All of this evidence substantiates not just some causal link, but a very strong causal link between the Legal Notice and the "nosedive" that NVE's 6 hour POWER sales took following the Legal Notice. The challenges to NVE's causation evidence—principally the introduction and brief success of other energy shots from significant players—were shown not to have any lasting impact.

Nor does the contrary evidence offered through LE damages expert Rodney Crawford change this conclusion. For example, Mr. Crawford asserted that the fact that NVE sales went up shortly after the Legal Notice before beginning to nosedive disproved causation. **(Dkt. 496, Vol. 11A, Tr. 80:17-22; 82:7-25.)** That period was simply reflective of the supply chain and continued order placement by distributors before the full impact of the Legal Notice was known. Mr. Crawford asserted that Nielsen ACV data showed that 6 Hour POWER was in more convenience stores after the Legal Notice than before. **(Dkt. 496, Vol. 11A, Tr. 86:9-21.)** On cross-examination, however, Mr. Crawford admitted that, in the weighted data he used, higher sales volume stores count for more than small sales volume stores. Mr. Crawford thus did not have data to support his opinion that 6

Hour POWER was sold in more stores after the Legal Notice than before. **(Dkt. 497, Vol. 11B, Tr. 38:15-39:15.)** Mr. Crawford's point that NVE added over 100 new wholesale accounts in the months after the Legal Notice was discredited by his admission that he had not subtracted accounts that NVE lost. **(*Id.*, 40:2-18.)**

## IV. LE's IMPROPER ARGUMENTS MISLED THE JURY ABOUT ITS TASK IN REVIEWING THE FALSE ADVERTISING EVIDENCE

The jury was almost certainly swayed to reach its verdict of no false advertising against the weight of the evidence by several false arguments and contentions that LE repeatedly made during the course of the trial:

(1) LE improperly argued that, in order to prove that a substantial number of the intended audience was deceived by the Legal Notice, NVE was required to bring convenience store owners to trial to testify. LE argued in closing "There's a total failure of proof here." **(Dkt. 501, Vol. 12, Tr. 88:15-89:4.)** LE made the same false argument when addressing whether the Legal Notice was likely to influence the purchasing decisions of the intended audience, stating "Again, 110,000 and they couldn't find one person?" **(*Id.*, 89:5-11.)** This argument defies the settled law of the case—without any specific testimony from convenience store owners, the Sixth Circuit held that NVE had sufficient evidence on which a reasonable jury could find false advertising. *Innovation Ventures*, 694 F.3d at 737-38 (reviewing evidence from NVE's Michelle Canzone, J.R. Merlau of Novelty, Inc., Jim Green of Liberty USA, Karen McClellan of CoreMark, NVE's damages

evidence and various corrective notices, which was also admitted at trial). In addition, it was also improper and prejudicial to tell the jury that NVE must provide direct evidence from conveniences stores when that is not required, and when direct and circumstantial evidence of causation from other sources is both probative and sufficient.

(2) LE improperly argued that the jury could and should infer that NVE had run a false advertising survey and didn't like the results: "I think a fair inference is that they knew the survey would show no confusion, or they did a survey and the found no confusion." **(Dkt. 501, Vol. 12, Tr. 87:20-22.)** There was no evidence admitted at trial that would support this argument. The only testimony on this issue was from Dr. Jacoby, who specifically testified that NVE did not ask him to run a false advertising survey, and that he offered NVE no predictions on how a survey might come out. **(Dkt. 500, Vol. 6B, Tr. 23:9-22.)** It was clearly improper to suggest that the jury could draw negative inferences against NVE's false advertising proofs when those inferences would be directly contradictory to the only admitted evidence on those issues at trial. *Cf. Silbergleit v. First Interstate Bank of Fargo, N.A.*, 37 F.3d 394, 398 (8th Cir. 1994) (finding new trial warranted due to question by counsel that placed prejudicial information before the jury). Moreover, the court should focus "not only on counsel's conscious

impropriety, but on the nature of the information that counsel attempted to bring before the jury." *Id.*

(3) LE elicited testimony from its owner and CEO Manoj Bhargava that several statements in the Legal Notice are literally true. His testimony runs counter to the Sixth Circuit's analysis of the Legal Notice. For example, the Sixth Circuit said that the statement that LE "won a decision against a '6 Hour' energy shot" is "***not literally true***[.]" *Innovation Ventures*, 694 F.3d at 736 (emphasis added). Yet this very sentence was highlighted by LE in its Bhargava demonstrative with a prominent checkmark indicating that it is "True." **(*See* Ex. 1, Bhargava Trial Slides, p. 8.)** Mr. Bhargava also said that his various references to the product subject to the recall as "a '6 Hour' shot" and "the '6 Hour shot" were "true." **(Dkt. 484, Vol. 3, Tr. 3 46:24-48:13.)** Yet the Sixth Circuit explained that the "notice could be viewed as either *ambiguous or false* with respect to how the product is named." *Innovation Ventures*, 694 F.3d at 736 (emphasis added). The Court also noted that the differing prefatory words ("a," "any," "the") made it unclear if one or more than one product was at issue. *Id.*

Moreover, as this Court previously ruled, citing certain parts of the Legal Notice as literally true is no defense if the Legal Notice was misleading as a whole. *Innovation Ventures, LLC v. NVE, Inc.*, 90 F.Supp.2d 703, 729 (E.D. Mich. 2015).

Nevertheless, LE persisted and misled the jury with this irrelevant line of testimony, which was highly likely to, and apparently did, confuse the jury.

## V. CONCLUSION

When the Court compares the opposing proofs, the clear weight of the trial evidence shows that NVE proved false advertising by a preponderance of the evidence. Given the incorrect jury verdict, it is likely that the jury was unfairly swayed by false arguments. NVE respectfully asks the Court to set aside the verdict, and order a new trial on false advertising.

Dated: March 25, 2016

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ
AND COHN LLP

*/s/ Leigh C. Taggart*
Leigh C. Taggart (P63765)
Emily J. Tait (P74708)
Mitra Jafary-Hariri (P74460)
39400 Woodward Avenue, Suite 101
Bloomfield Hills, MI 48304-5151
(248) 566-8496
ltaggart@honigman.com
etait@honigman.com
mjafary-hariri@honigman.com

*Attorneys for Defendant/Counterclaim Plaintiff N.V.E., Inc.*

NICOLL DAVIS & SPINELLA LLP
Anthony J. Davis
95 Route 17 South
Suite 316
Paramus, NJ 07652
(201) 712-1616
ADavis@ndslaw.com

**CERTIFICATE OF SERVICE**

This is to certify that on March 25, 2016, a copy of the foregoing was electronically filed with the Clerk of the Court using the ECF system which will send notification of such filing to the attorneys of record.

By: /s/ Mitra Jafary-Hariri
Mitra Jafary-Hariri (P74460)
Honigman Miller Schwartz and Cohn LLP
39400 Woodward Avenue, Suite 101
Bloomfield Hills, MI 48304-5151
(248) 566-8496